TM:EMN/SEF
F.#2008R01634

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                        11 CR 005 (SLT)

BARTOLOMEO VERNACE,
    also known as "Pepe," "Bobby,"
    "Bobby Glasses" and "Robert,"
VITO CORTESIANO,
    also known as "Vito Love,"
MICHAEL DOLPHIN,
ANTHONY VAGLICA,
    also known as "Bosch," and
ROBERT WEHNERT,
    also known as "Bobby Werner,"

        Defendants.

- - - - - - - - - - - - - - - - - -X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S POSITION REGARDING PRETRIAL DETENTION

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Evan M. Norris
Stephen E. Frank
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its position regarding pretrial detention in the above-captioned matter.  Defendant Bartolomeo Vernace – a captain in the Gambino organized crime family of La Cosa Nostra ("Gambino crime family") and member of the family's ruling panel – is charged with participating in a 30-year racketeering conspiracy involving multiple crimes of violence, including a brutal double homicide for which he was one of the shooters. Because Vernace is also charged with violating 18 U.S.C. § 924(c), he is presumed to pose a danger to the community and a risk of flight.  18 U.S.C. § 3142(e)(3)(B).  As set forth below, Vernace will be unable to meet his burden of defeating the presumption.  Accordingly, Vernace should be detained.

The other four defendants – Vito Cortesiano, Michael Dolphin, Anthony Vaglica and Robert Wehnert – are all Gambino crime family associates in Vernace's crew.  The government respectfully submits that each poses a danger to the community and risk of flight that can only be adequately mitigated, if at all, through substantial bail packages and restrictive conditions of release.

<u>BACKGROUND</u>

On January 6, 2011, a grand jury in the Eastern District of New York returned a sealed indictment charging a 30-

year racketeering conspiracy against Vernace and four of his closest associates, in violation of 18 U.S.C. § 1962(d).  Vernace is charged with predicate acts of murder, murder conspiracy, extortionate extension of credit, extortionate extension of credit conspiracy, extortionate collection of credit and illegal gambling.  In addition, Vernace is charged in Count Two with possession of a weapon in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).

The other four defendants, Cortesiano, Dolphin, Vaglica and Wehnert, are also charged in Count One's racketeering conspiracy.  They are named variously in predicate acts involving extortionate extension of credit, extortionate extension of credit conspiracy, extortionate collection of credit, extortionate collection of credit conspiracy and illegal gambling.

In light of the seriousness of the charges and the other reasons set forth below, all five defendants pose a danger to the community and a risk of flight.

<u>LEGAL STANDARD</u>

A.  <u>Bail Reform Act</u>

Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et seq.</u>, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  <u>See</u> 18 U.S.C.

§ 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.  However, in cases where the defendant is charged with "an offense under section 924(c)," a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

The Bail Reform Act makes clear that evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210

F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery."  United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

B.   Organized Crime Defendants

Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese crime family acting bosses Dominick Cirillo and Lawrence Dentico, as well as captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino crime family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390,

395 (S.D.N.Y. 1998) (Luchese crime family acting boss Joseph DeFede detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino crime family member Carmine Agnello detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese crime family acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

1.   Organized Crime Leaders Are Dangers to the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y.

1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Salerno, in ordering the detention of two leaders of the Genovese crime family, the district court observed that:

> The activities of a criminal organization such as the Genovese Family do not cease with the arrest of its principals and their release on even the most stringent of bail conditions.  The illegal businesses, in place for many years, require constant attention and protection, or they will fail.  Under these circumstances, this court recognizes a strong incentive on the part of its leadership to continue business as usual. When business as usual involves threats, beatings, and murder, the present danger such people pose in the community is self evident.

631 F. Supp. at 1375.

Similarly, in Defede, Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese crime family, thus rendering him a danger to public safety: "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence.  Defede's continued liberty therefore presents a substantial danger to the public."  Defede, 7 F. Supp. 2d at 395.

In <u>Cirillo</u>, the Honorable Robert M. Levy, United States Magistrate Judge, denied bail to the acting boss of the Genovese crime family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," <u>id.</u> at 11.  The Second Circuit affirmed Judge Levy's decision by summary order.  <u>See</u> 149 Fed. Appx. 40 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.").

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  <u>Ciccone</u>, 312 F.3d at 542-43; <u>see also</u> <u>Ferranti</u>, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing <u>Colombo</u>, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because

inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release." Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. As the court held in Defede:

> [I]t is well established that persons who hold Defede's status routinely engage in conduct that is a menace to public safety. The argument thus is based not on the status, but on the inference that a person in Defede's position is quite likely to engage in dangerous conduct – just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate.

7 F. Supp. 2d at 392.

Moreover, in enacting the Bail Reform Act, Congress itself recognized that high-ranking members of an organized crime family fall within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the

community."  S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, <u>as</u>
<u>reprinted in</u> 1984 U.S. Code Cong. & Admin. News 3182 ("Senate
Report"), 3188-89.

Nor is the above caselaw narrowly limited to organized
crime "bosses" or "acting bosses."  In <u>Salerno</u>, 631 F. Supp. at
1374-75, the court held that a defendant would be a danger to the
community if released on bail based on evidence that he was a
captain in an organized crime family who managed the enforcement
operations of the enterprise.  In <u>Colombo</u>, 777 F.2d at 99, a
captain of a crew in the Colombo crime family was ordered
detained because the operation of that organization posed a "risk
to the public" and a "danger to the community" by its "consistent
pattern of orchestrating a series of violent criminal
operations."

2.   Organized Crime Defendants Are Likely to Commit
     <u>Crimes if Released on Bail</u>

Organized crime defendants pose a particular threat to
the community due to the continuing nature of the charged
enterprise and its violent criminal activities.  At bottom,
because organized crime defendants are career criminals who
belong to an illegal enterprise, they pose a distinct threat to
commit additional crimes if released on bail.  <u>See</u> <u>Salerno</u>, 631
F. Supp. at 1375 (finding that the illegal businesses of
organized crime require constant attention and protection, and

recognizing a strong incentive on the part of its leadership to continue business as usual).

Congress noted that defendants pose a danger to the community not only when they commit acts of violence, but when it is likely that they will commit even non-violent crimes that are detrimental to the community. See Senate Report at 3195 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence"). In Salerno, the court held:

> In light of Congress' direction that "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate" . . . .

631 F. Supp. at 1371 (quoting Senate Report at 3189). See also Colombo, 777 F.2d at 99.

3. Elaborate Bail Packages Are Insufficient to Protect the Community Against Violent Organized Crime Defendants

Finally, the Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including leaders of organized crime families shown to be involved in violent criminal activities. See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package secured by real property);

United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993)

(rejecting $3 million bail package secured with real property,

home detention, restricted visitation and telephone calls, and

electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting

$500,000 bail package secured by real property).

The Second Circuit has viewed home detention and

electronic monitoring as insufficient to protect the community

against dangerous individuals.  In United States v. Millan, the

Second Circuit held that:

> Home detention and electronic monitoring at
> best elaborately replicate a detention
> facility without the confidence of security
> such a facility instills.  If the government
> does not provide staff to monitor compliance
> extensively, protection of the community
> would be left largely to the word of [the
> defendants] that [they] will obey the
> conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal

quotations omitted).  See also Orena, 986 F.2d at 632

("electronic surveillance systems can be circumvented by the

wonders of science and of sophisticated electronic technology")

(internal quotation marks and citations omitted).

Similarly, courts in this district have denied

dangerous defendants bail in recognition of the Second Circuit's

dim view of the effectiveness of home detention and electronic

monitoring.  See, e.g., United States v. Cantarella, 2002 WL

31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting

"principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

<u>ARGUMENT</u>

Detailed below is a proffer of the relevant facts in support of the government's position with respect to the five defendants. LaFontaine, 210 F.3d at 130-31 (government entitled to proceed by proffer in detention hearings).

A. Bartolomeo Vernace

Vernace is a captain in the Gambino crime family who serves on a three-member ruling panel that has been overseeing the affairs of this violent criminal enterprise since the incarceration of the entire administration in 2008. Vernace is

charged in Count One with racketeering conspiracy, including predicate acts of murder, murder conspiracy, extortionate extension of credit, extortionate extension of credit conspiracy, extortionate collection of credit and illegal gambling.  Vernace is also charged with possession of a weapon in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  If convicted, Vernace faces up to life imprisonment for the racketeering conspiracy and a mandatory 10-year consecutive term of imprisonment for the § 924(c) count.

The government seeks entry of a permanent order of detention against Vernace on the ground that he is both a danger to the community and a risk of flight, both of which are presumed by operation of the Bail Reform Act.  See 18 U.S.C. § 3142(e)(3)(B).

1.  Proffered Facts

a.  Vernace Is Part of the Gambino Crime Family Administration

Vernace is a longstanding member and captain in the Gambino crime family, and he serves as part of the ruling panel that runs the family.  The government will establish Vernace's position in the Gambino crime family through the testimony of cooperating witnesses, consensual recordings and surveillance evidence.  Each category of evidence is briefly discussed below.

Multiple cooperating witnesses are expected to testify that Vernace is a longstanding member of the Gambino crime family

who holds the rank of captain and has been closely aligned with Joseph Corozzo, the consigliere, since the 1970s.  In addition, one cooperating witness has advised that Vernace is on the ruling panel, along with Gambino crime family captains John Gambino and Daniel Marino, formed in approximately 2008.[1]

Surveillance evidence also establishes Vernace's long-lived association with and position in the Gambino crime family. As far back as 1989, Vernace was observed at the Ravenite, former Gambino crime family boss John J. Gotti's social club in Little Italy.  Since 1992, when he was observed attending the wake of Gotti's father, Vernace has been observed with other members and associates of the Gambino crime family at 20 weddings and wakes, including the wake of Gotti himself in 2002 and, most recently, the 2010 wedding of the daughter of a Gambino crime family captain.  Also notable – as a measure of Vernace's stature in the family – is the fact that the 2006 wake for Vernace's sister was well attended not just by many loyal members of Vernace's crew, but by the upper reaches of the enterprise, including acting

---

[1]  The ruling panel appears to have been formed following the arrest of the entire administration of the Gambino crime family – acting boss John D'Amico, acting underboss Domenico Cefalu and consigliere Joseph Corozzo – on February 7, 2008 pursuant to an indictment filed in this district.  See United States v. Agate, et al., Criminal Docket No. 08-76 (JBW).  On April 20, 2010, one of the members of the panel, Marino, was arrested pursuant to an indictment filed in the Southern District of New York and detained pending trial.  See United States v. Marino, et al., Criminal Docket No. 09-1243 (LAK).

underboss Domenico Cefalu, consigliere Joseph Corozzo and more
than a dozen other captains and soldiers.  Cooperating witnesses
and law enforcement witnesses are expected to testify that these
events are attended by members and associates of organized crime,
many of whom are convicted felons who committed those crimes as
part of an organized crime family, and that Gambino crime family
business is routinely conducted at such events.

In addition to wakes and weddings, Vernace has been
observed repeatedly over the past decade meeting with members and
associates of the Gambino crime family at the Queens cafes he
controls.  Overwhelming evidence from cooperating witnesses and
consensual recordings makes clear that Vernace uses these cafes
as a base from which to engage in and direct the criminal
activities of his crew and, more recently, the entire enterprise.
Notably, just three nights ago, when one of Vernace's cafes was
raided pursuant to a search warrant and two illegal gambling
machines were seized, Vernace was found with multiple captains
and soldiers, as well as his brother, Gambino crime family
associate Michael Vernace, who held the keys to the machines.

b.   Vernace Is Charged with Crimes of Violence

As noted above, Vernace is charged with two murders and
other crimes of violence as part of a 30-year racketeering
conspiracy.  Vernace is also charged with one count of violating
18 U.S.C. § 924(c) in connection with Count One, which is itself

a crime of violence.  See United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir. 2009).  A brief proffer of the facts pertaining to the crimes of violence with which Vernace is charged follows.

> i.   Murder/Murder Conspiracy of John D'Agnese
>      Murder/Murder Conspiracy of Richard Godkin
>      (Racketeering Acts One and Two)

Vernace is charged in the fatal shootings of John D'Agnese and Richard Godkin in the Shamrock Bar on Jamaica Avenue in Queens on April 11, 1981.  D'Agnese and Godkin were shot to death after a dispute arose between a Gambino crime family associate close to Vernace and others in the bar over a spilled drink.  The associate left the bar and went to pick up Vernace and a third accomplice.  A short time later, the three men returned and gunned down D'Agnese and Godkin, the owners of the bar.  D'Agnese died from a single gunshot to the face and Godkin died from a point-blank gunshot wound to his chest.  The evidence of Vernace's involvement in the murders is strong.  It consists of the testimony of multiple cooperating and lay witnesses, consensual recordings, crime scene evidence, ballistics and other evidence.[2]

---

[2]      Vernace was previously tried and acquitted in 2002 on state charges in connection with these murders.  The evidence in the instant case is significantly stronger than in the state's case, during which not a single witness identified Vernace as having participated in the murders.  As set forth below, the government expects to present both eyewitness testimony and the testimony of multiple cooperating witnesses establishing Vernace's involvement in the murders.

Multiple cooperating witnesses are expected to testify about Vernace's involvement in the murders.  Two cooperating witnesses are expected to testify about admissions one of Vernace's co-conspirators, Gambino crime family associate Frank Riccardi, made shortly after leaving the bar implicating himself, Gambino crime family associate Ronald Barlin and Vernace in the murders.  At least two other cooperating witnesses are expected to testify about later learning that Vernace had been involved in the murders.

In addition to cooperating witnesses, multiple lay witnesses are expected to testify about the events inside the Shamrock Bar on the night of April 11, 1981.  Witnesses will testify to the dispute that arose over the spilled drink and the events a short time later when one of the individuals involved in the dispute returned with two accomplices and D'Agnese and Godkin were killed.  At least one eyewitness will identify Vernace as one of the shooters.

The government will also seek to introduce consensual recordings, crime scene evidence, ballistics and other evidence that corroborates the testimony described above.

       ii.  Extortionate Extension of Credit Conspiracy
           (Racketeering Act Four)

Vernace, along with Cortesiano, Vaglica and Wehnert, is charged in Racketeering Act Three with participating in the operation of a long-running illegal gambling business from

approximately October 1990 to January 2003.  At least four cooperating witnesses are expected to testify that the Gambino and Bonanno crime families jointly ran a seasonal high-stakes baccarat game (an Italian card game similar to blackjack) at various cafes in Queens, and that Vernace acted as the Gambino crime family "representative" at the game for years.

In Racketeering Act Four, Vernace is charged with extortionate extension of credit conspiracy, a crime of violence, in connection with the baccarat game.  In addition to acting as an overseer of the Gambino crime family's interests at this profitable game, Vernace also served as one of the family's loansharks who ensured that gamblers always had a ready source of money to wager.  The cooperating witnesses will testify that the loans that were extended at the games by both families were extended at usurious rates of interest and with an implied threat of violence to ensure repayment.

The evidence of Vernace's involvement in this predicate act is strong.  In addition to the testimony of multiple cooperating witnesses, some of whom participated in running the baccarat games at the time Vernace was involved, the government will offer evidence seized during the execution of search warrants at various cafes where the games were hosted from 1991 to 2002.  The evidence includes photographs of the individuals present during the raids, including Vernace, Cortesiano, Wehnert

and other members of Vernace's crew.  Finally, law enforcement
agents are also expected to testify as to surveillance they
conducted during the games, which corroborates the evidence
described above.

iii. Extortionate Extension and Collection of
     Credit (Racketeering Act Seven)

Vernace is also charged with predicate acts of
extortionate extension and collection of credit in connection
with a loanshark debt owed by an individual identified in the
indictment as John Doe.  Between approximately April 1999 and
March 2001, Vernace, Dolphin and other conspirators sought to re-
negotiate the terms of a pre-existing $70,000 loan and collect
payment from John Doe, a cooperating witness who has since died.[3]

The government will establish Vernace's involvement in
this racketeering act through approximately 50 consensual
recordings John Doe made at the direction of the FBI, which will
be corroborated by the expected testimony of multiple cooperating
witnesses regarding Vernace's loansharking partnership with
Dolphin.  In the recordings, Dolphin and another conspirator made
clear that Vernace was a member of organized crime and that they

---

[3]     Dolphin and one of the other conspirators, Terrance
Comiskey, were arrested on March 13, 2001, pursuant to a
complaint filed in this district charging them with extortionate
extension of credit conspiracy, in violation of 18 U.S.C.
§ 892(a).  Both defendants ultimately pled guilty and were
sentenced to terms of imprisonment.  See United States v.
Dolphin, et al., Criminal Docket No. 01-413 (JG).  Vernace was
never charged in the case.

answered to him.  In one conversation in April 1999, in response to complaints from John Doe, who was then under indictment, Dolphin referred to the fact that "my friend is also in trouble," in reference to Vernace, who had just been released in January 1999 after having been charged by state authorities with the Godkin and D'Agnese murders (discussed further below).  In another conversation, Dolphin told John Doe that he would forgive some of the interest payments he owed, but when John Doe asked if he could simply repay the principal, Dolphin said "let the other half make that decision."  In another conversation, John Doe said he wanted to make a proposal with regard to repayment.  Dolphin said he would consider any proposal but "there's other people involved in this. . . .  I can't make a decision . . . ."

Dolphin conveyed many of his threats to the debtor through a third individual named Terrance Comiskey who assisted Vernace and Dolphin with debt collections and who had originally referred John Doe to Dolphin when he needed to borrow money.  On multiple occasions, Comiskey referred to Dolphin as a "barking dog."  In one conversation, John Doe said, "So Terry, you're telling me I have reason to be scared?"  Comiskey replied: "I would."  In the same conversation, Comiskey complained that by not repaying his debt, John Doe was putting him "in a bad light" and that, although Comiskey did not intend to harm John Doe, someone could put him "in the fuckin' hospital."  Comiskey also

warned John Doe that if he ultimately did not repay the loan, Dolphin and his conspirators had "two choices: walk away from you and lose the money . . . or fuckin' kill you.  That's the bottom line."

In another exchange, from May 1999, Comiskey and John Doe discussed at length the fact that Vernace had been arrested for the murders of D'Agnese and Godkin.  After discussing newspaper coverage of the case, they had the following exchange:

John Doe:    Understandably – you understand that I'm nervous?

Comiskey:    Yes, I understand that.

John Doe:    I'm, uh, I, you know, I'm afraid I'm gonna get hurt.

Comiskey:    No, you're not.

John Doe:    You know.

Comiskey:    I wouldn't be involved in anything like that –

John Doe:    When I read -

Comiskey:    – at this stage in my life.

John Doe:    When I read the paper article I really got nervous.

Comiskey:    Well, you know it's for real, don't you?

John Doe:    Yeah.

Comiskey:    Ok.

John Doe:    You know when I read that newspaper article. . .

Comiskey:    <u>There, there are "wannabes" and the real</u>
             <u>thing.</u>

John Doe:    <u>Yeah.</u>

Comiskey:    <u>You just happened to have friends that . . .</u>

John Doe:    <u>And, uh, you know, when I read that and I</u>
             <u>saw what, what he was accused of - two</u>
             <u>homicides - I, uh -</u>

Comiskey:    <u>Your friends happen to be the real thing.</u>
             <u>That's all I can tell you.</u>

John Doe:    – I, uh, got really nervous.

Comiskey:    And?

John Doe:    You know?

Comiskey:    And what did you think before that?  They
             were angels?

John Doe:    No!  But <u>when I read the article and saw</u>
             <u>that he got charged [UI] . . . that he got</u>
             <u>charged with, uh, two homicides, I don't</u>
             <u>want to be the third.</u>

Comiskey:    You've been watching too much fuckin'
             movies — too many movies. . . .

John Doe:    Oh, Terry, you and I both know that . . .
             you know?

Comiskey:    <u>Does it happen?  Yeah.  It happens every</u>
             <u>day.</u>

John Doe:    <u>Ok.</u>

Comiskey:    <u>Different circumstances allow that to</u>
             <u>happen.  This is not one of those</u>
             <u>circumstances.  [UI]  If they found you</u>
             <u>were setting them up, more than likely,</u>
             <u>yeah.</u>

John Doe:    <u>Yeah [UI].</u>

Comiskey:   You're not doing that.

John Doe:   No.

The clear implication is that if Vernace and Dolphin knew that John Doe was cooperating with the government, they would kill him.

In sum, the evidence of Vernace's involvement in this racketeering act is strong.

2.   Vernace Constitutes a Danger to the Community and Should Be Detained

Vernace poses a danger to the community.  He is one of three men who direct the affairs of a violent organized crime family and has himself engaged in numerous crimes of violence, including murders and loansharking.  Courts in this circuit repeatedly have held that high-ranking members of organized crime constitute a danger to the community.  The Second Circuit's decision in United States v. Ciccone, 312 F.3d 535 (2d Cir. 2002), is particularly instructive.  There, Gambino crime family acting boss Peter Gotti was indicted on racketeering charges that included predicate acts of extortion against others.  Peter Gotti, himself, was not alleged to have participated in any predicate acts of extortion – only money laundering and money laundering conspiracy.

At the detention hearing, the government contended that Gotti, as the leader of the Gambino crime family, was able to direct the activities of his co-defendants and therefore was

responsible for the extortions and the other crimes committed by
them.  The Honorable Cheryl L. Pollak, United States Magistrate
Judge, ordered Gotti detained, finding that Gotti had been
"charged with a crime of violence" and therefore could be
detained on grounds of dangerousness.  _Id._ at 538.  Judge Pollak
held that the government had clearly shown that Gotti was the
acting boss of the Gambino crime family, and as such, was
responsible for controlling the activities of the enterprise.
_Id._  Thus, while Gotti was not named in the specific racketeering
acts charging extortion, he could nonetheless be held responsible
for the acts of the members of his organization given his status
as the acting boss of the family.  Because extortions are crimes
of violence, Judge Pollack ordered Gotti detained as a danger to
the community.  _Id._ at 538-39.

On appeal, the Second Circuit upheld the court's
findings that Gotti constituted a danger to the community.  The
court held that it was proper for a court to consider the RICO
enterprise as a whole when considering the dangerousness of one
of its leaders.  _Id._ at 542.  The court found that once the
government demonstrated Gotti's leadership role in the
enterprise, and the enterprise was charged with crimes of
violence, there was clear and convincing evidence for the court
to have found that Gotti was a danger to the community and
therefore should be detained.  _Id._ at 542-43.

As discussed below, Vernace is on the ruling panel of the Gambino crime family and is himself charged with murder and other crimes of violence.  Accordingly, the evidence supporting the government's argument for detention here is even stronger than that in Ciccone.  See also United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese crime family acting bosses Dominick Cirillo and Lawrence Dentico, as well as captain Anthony Antico, were charged with extortion and extortion conspiracy and detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005).  As set forth below, each of the relevant considerations under the Bail Reform Act favors detention here.

a.   Nature and Circumstances of the Crimes Charged

As set forth above, Vernace is charged with racketeering conspiracy involving two predicate acts of murder/murder conspiracy – a crime of violence – committed as part of a decades-long racketeering conspiracy.  The racketeering conspiracy also alleges Vernace's participation in extortionate extension of credit conspiracy, extortionate extension of credit and extortionate collection of credit – additional crimes of violence.  See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another").  Moreover, Vernace leads a

violent criminal enterprise and has at his disposal approximately 200 inducted members of that family who are sworn to follow his orders and commit violence upon his request.  Vernace, who is 61 years old, faces life imprisonment.  Thus, the nature and circumstances of the crimes charged favors detention.

> b.   History and Characteristics of the Defendant

Vernace is a long-standing member of the Gambino crime family who now serves on its ruling panel.  He is a life-long criminal who has sworn an oath to a violent criminal enterprise. Indeed, his criminal record substantially understates his criminality.  Although Vernace's record reflects only two convictions for gambling-related offenses, his criminal activities continued unabated during the time he was on bail in the late 1990s and early 2000s, while he was awaiting trial in Queens for the D'Agnese and Godkin murders.

Vernace was arrested by the New York City Police Department on November 22, 1998 and was detained until January 21, 1999, when he was released on bail.  Vernace remained on bail until November 2002, when he was tried in state court and acquitted of the murders.  Vernace engaged in criminal activities the entire time he was on bail.  The consensual recordings made by John Doe concerning the loansharking discussed above span April 1999 through March 2001 — all during the time Vernace was on bail.  The recordings make clear that Vernace was consulted

frequently by his associates, and, indeed, that his associates used the murder charges to bolster the threat of violence they used repeatedly in an effort to force John Doe to pay. In addition, Vernace continued to represent the Gambino crime family's interests in the seasonal baccarat game – including by overseeing the extension of loanshark loans during the games – throughout the entire period as well. These facts make abundantly clear that Vernace has no regard for the authority of the court and will not cease his criminal activity if released on bail. Bail should be denied on this ground alone.

Recently, Magistrate Judge Levy rejected the offer of a substantial bail package made by another member of the Gambino crime family on precisely this ground. In March 2008, Vincent Gotti, a Gambino crime family soldier charged with RICO conspiracy, including predicate acts of attempted murder, narcotics dealing and loansharking, proposed a $10 million bail package. Though the package Gotti proposed was secured by over $5 million in real property and included conditions such as home detention and electronic monitoring, Judge Levy found it insufficient in light of the evidence the government proffered that Gotti had been under some form of court supervision at the same time he was engaging in narcotics dealing and loansharking:

> [T]he key factors are what the Government has
> proffered happened during the time that Mr.
> Gotti was either on parole or in prison or
> under indictment in the past[,] and that

> gives me serious concern because it has to do
> with whether or not an order of the Court can
> be evaded.

United States v. Gotti, Cr. No. 08-76, Hearing Transcript, Docket Entry No. 440 at 34 (E.D.N.Y. Mar. 13, 2008).  Gotti appealed Magistrate Judge Levy's decision, offering to improve the bail package by agreeing to "a Consensual Wire Tap on all phones in the home [and] any other reasonable condition imposed."  Id., Docket Entry No. 443 at 1.  After hearing oral argument, the Honorable Jack B. Weinstein, United States District Judge, affirmed Magistrate Judge Levy's decision.  See id., Docket Entry No. 582.

The rationale employed by Magistrate Judge Levy in deciding to deny Vincent Gotti bail clearly counsels in favor of detention here.  First, Vernace, unlike Gotti, is a high-ranking leader of the Gambino crime family and thus has scores of made members and associates at his disposal to commit acts of violence on his command.  Second, Vernace, unlike Gotti, is charged with two murders rather than one attempted murder; also unlike Gotti, Vernace was the one who actually pulled the trigger.  Third, Vernace, like Gotti, committed crimes while under court supervision.

The fact that Vernace has shown himself to have no regard for court-ordered restrictions, combined with his criminal history and the fact that he is a powerful leader of a violent

criminal enterprise who is charged with murder, among other crimes of violence, strongly favors detention.  See 18 U.S.C. § 3142(g)(1)(B).

        c.    Seriousness of the Danger Posed by the
              Defendant's Release

Vernace poses a clear danger if released.  As noted above, the government will establish Vernace's association with, and position of authority in, the Gambino crime family through a variety of sources, including the testimony of cooperating witnesses, consensual recordings and surveillance evidence.

Courts in this circuit routinely detain high-ranking members of organized crime based on their leadership roles in criminal enterprises that engage in acts of violence.  See, e.g., Defede, 7 F. Supp. 2d at 393 (detaining defendant on dangerousness based on the proffered testimony of cooperating witness and surveillance evidence that he was the acting boss of the Luchese crime family, an enterprise involved in extortionate conduct, among other crimes); Gotti, 312 F.3d at 542 ("Indeed, we made it quite clear in United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985), that the [Bail Reform Act] 'does not require that the defendant himself commit acts of physical violence as a condition precedent to a detention order.'").

Vernace is one of the leaders of the Gambino crime family and he has been involved in acts of violence, including murder.  He thus falls within the "small but identifiable group

of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  Senate Report at 3188-89.  Vernace's position in the Gambino crime family gives him the authority and resources to continue his criminal activities and to order and accomplish acts of violence against potential witnesses or any person he perceives as a threat – of which there will be many during the course of this prosecution.

Finally, Vernace likely will continue his criminal conduct if released; he is a convicted criminal who heads a continuing criminal enterprise.  As noted, courts in this circuit have recognized that when organized crime defendants are charged with their participation in a criminal enterprise, the risk of continued criminal conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1375.

      d.   Evidence of the Defendant's Guilt

The government's evidence of Vernace's guilt as to the charged crimes is strong.  To prevail on the racketeering conspiracy count, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino

crime family, exists; (c) that the enterprise engaged in, or its activities affected, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.

First, the government will prove the existence of the Gambino crime family and Vernace's membership and position in that enterprise through, among other evidence, the testimony of cooperating witnesses, consensual recordings and surveillance photographs.

Second, the government will prove, through the testimony of multiple cooperating witnesses, that the Gambino crime family has engaged in a variety of crimes – including without limitation narcotics trafficking, robbery and extortion of businesses – that affect interstate commerce.

Third, to prove that Vernace engaged in the charged pattern of racketeering activity, the government will offer law enforcement witnesses, cooperating witnesses and consensual recordings. For example, as discussed above, the government has multiple recordings documenting Vernace's involvement in one of the acts of loansharking for which he is indicted in this case. With respect to the two murders alleged against him, cooperating witnesses, whose testimony will be corroborated by other witnesses and evidence, including ballistics and other crime scene evidence, are expected to testify to Vernace's role in the

double homicide.  The above facts establish Vernace's guilt with respect to Count Two as well.  Accordingly, the government's evidence against Vernace is overwhelming and clearly favors detention.

       3.   The Defendant Also Constitutes a Risk of Flight

       In addition to the facts set forth above, given that Vernace faces a Guidelines sentence of life imprisonment, he constitutes a risk of flight and should be detained.  See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  This risk of flight is heightened as a result of the strong evidence against Vernace, who has a large crew of Gambino members and associates with the means to provide refuge. The fact that Vernace did not flee when he was on bail a decade ago is not decisive in light of his age, the strength of the government's evidence in this case and the fact that, at this point, any substantial sentence – up to and including a sentence of life – will effectively constitute life imprisonment. Accordingly, as Vernace will be unable to meet his burden of defeating the presumption that he is a flight risk, he should also be detained on this ground as well.

B.   Vito Cortesiano, Michael Dolphin, Anthony Vaglica and
     Robert Wehnert

       Cortesiano, Dolphin, Vaglica and Wehnert are all Gambino crime family associates who have reported to Vernace

since the 1990s.  The evidence of racketeering activity against each defendant is strong.

Dolphin, Vaglica and Wehnert are all charged with racketeering conspiracy involving loansharking, which is a crime of violence.  Vaglica and Wehnert, both of whom have prior convictions for illegal gambling, are named alongside Vernace in a predicate act alleging conspiracy to make extortionate loans to players at the Gambino/Bonanno seasonal baccarat game.  The evidence against them, much of it detailed above, includes the expected testimony of multiple cooperating witnesses, evidence seized during the execution of search warrants, physical surveillance and consensual recordings.

The racketeering conspiracy also alleges Dolphin's participation in the loansharking acts relating to John Doe that are discussed above, as well as a conspiracy to make and collect extortionate extensions of credit.  The evidence against Dolphin includes the expected testimony of multiple cooperating witnesses and approximately 50 consensual recordings.  If convicted as charged, Dolphin will be sentenced as a Career Offender under the Guidelines and faces 210 to 240 months in prison.

Cortesiano is especially close to Vernace: among other things, Cortesiano runs one of the Queens cafes that Vernace controls and uses as a base, and oversaw the operation of the illegal gambling machines that Vernace and Dolphin housed in the

back room of the cafe prior to their seizure earlier this week. Moreover, although Cortesiano is not presently charged with any crimes of violence, the government has evidence that Cortesiano has participated in violent assaults.

For the foregoing reasons, and given their long-standing, close association with Vernace, each of these defendants poses a danger to the community and a risk of flight. Accordingly, pretrial release is only appropriate in the event the defendants present substantial bail packages and are subject to restrictive release conditions, such as home detention and electronic monitoring.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendant Bartolomeo Vernace should be detained pending trial, and the other defendants should not be released unless they present substantial bail packages and are subject to restrictive conditions of release.

Dated: Brooklyn, New York
      January 20, 2011

                         Respectfully submitted,

                         LORETTA E. LYNCH
                         United States Attorney
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201

Evan M. Norris
Stephen E. Frank
Assistant U.S. Attorneys
    (Of Counsel)