JDB:EMN/SEF
F.#2008R01634

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -                                        11 CR 005 (SLT)

BARTOLOMEO VERNACE,

          Defendant.

- - - - - - - - - - - - - - - - - -X


SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTION FOR A PERMANENT ORDER OF DETENTION


LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Evan M. Norris
Stephen E. Frank
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this supplemental memorandum of law in support of its appeal of the decision of the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, granting the defendant Bartolomeo Vernace's application for pre-trial release in the above-captioned case.  A magistrate court's decision regarding bail is reviewed by the district court de novo.

Pursuant to 18 U.S.C. § 3145(a)(1), the government moves for revocation of the release order and entry of a permanent order of detention.  The defendant poses a danger to the community and a risk of flight, as supported by the following facts:

- The defendant, who is charged with multiple crimes of violence including a 30-year racketeering conspiracy, is part of the three-member ruling panel that governs the affairs of the Gambino organized crime family of La Cosa Nostra ("Gambino crime family"), a violent criminal enterprise.  As such, he has approximately 200 made members at his disposal who are sworn to follow his orders and commit violence upon his command.

- The defendant, then an associate in the Gambino crime family in the crew of Joseph Corozzo, was one of the shooters in a brutal 1981 double homicide in Woodhaven, Queens stemming from a dispute in a bar over a spilled drink.  The victims, the owners of the bar, were killed by gunshots to the face and chest.

- The defendant, who was formally inducted into the Gambino crime family as a soldier in the 1990s, was engaged in criminal activity – including crimes of violence – the entire time he was on $1 million bail in Queens County from 1999 to 2002 awaiting trial for the double homicide.

- The defendant has operated a social club in a cafe he has controlled in Glendale, Queens since the 1990s – a place where mafia figures come to meet him and where he receives proceeds from racketeering, loansharking and gambling activities.  On January 17, 2011, three days before he was arrested, the cafe was raided and the defendant was found in the back room with eight other made members of the Gambino crime family: Louis Mastrangelo (captain), Alphonse Trucchio (captain), John Ambrosio (soldier), Raffaele DeSantis (soldier), Vincent Frogiero (soldier), Salvatore Gambino (soldier), Salvatore Pugliese (soldier), and John Setaro (soldier).  All eight men are convicted felons and three (Mastrangelo, Trucchio and Frogiero) were arrested with the defendant three days after the raid for racketeering and other crimes arising out of a separate indictment in the Southern District of New York.  The only non-inducted member of the Gambino crime family with the defendant that night was his brother, Michael Vernace, who was holding $6500 in cash and the keys to two gambling machines that were seized by the FBI.

- Since the defendant was elevated to a leadership position in the Gambino crime family in the 2000s, he has been surveilled at numerous wakes and weddings with other high-ranking members.  On January 19, 2011, the night before he was arrested, the defendant was surveilled attending the wake of a Gambino crime family soldier at the same time as fellow ruling-panel member John Gambino.  The third member of the ruling panel, Daniel Marino, has been incarcerated since April 2010.

- The defendant, 61, is now facing life imprisonment.

For these reasons, as well as the additional reasons set forth below, the defendant is a danger to the community and a risk of flight and should be detained pending trial.

<u>BACKGROUND</u>

On January 20, 2011, the defendant – a captain in the Gambino crime family and member of the family's ruling panel – was arrested pursuant to an indictment charging him with

participating in a 30-year racketeering conspiracy involving multiple crimes of violence, including a brutal double homicide for which he was one of the shooters.  The defendant was also charged with violating 18 U.S.C. § 924(c), and, as such, is presumed to pose a danger to the community and a risk of flight. 18 U.S.C. § 3142(e)(3)(B).

The defendant was arraigned on the date of his arrest and ordered detained pursuant to a temporary order of detention. On January 27, 2011, a detention hearing was held before Judge Reyes.  Judge Reyes found that the defendant was not a risk of flight.  With respect to dangerousness, Judge Reyes found that, while the government had established by clear and convincing evidence the defendant's dangerousness as of the past few years, there was insufficient evidence that the defendant poses a present danger to the community. (Transcript of Proceedings dated January 27, 2011 (hereinafter "Tr.") 52-53).[1]  Accordingly, the

---

[1]  Given the narrow grounds articulated for the ruling, the government advised Judge Reyes that the defendant had also been indicted the previous week in the Southern District of New York in a separate case charging racketeering, including a predicate act of loansharking, up to 2010.  The court concluded that it could not modify its decision without more specific evidence about the charges (which the government did not then have), but suggested that if the government "provide[d] [this Court] with specifics on these charges, bringing it up to 2010," it might well impact the Court's decision on this appeal.  (Tr. 63-64).

magistrate court accepted the defendant's bail package, staying its decision pending the government's appeal to this Court.[2]

ARGUMENT

For the reasons set forth below, the government respectfully submits that it has established that the defendant is a danger to the community and risk of flight such that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  As noted, a magistrate court's decision regarding bail is reviewed by the district court de novo.  See United States v. Minnici, 128 Fed. Appx. 827, 828 (2d Cir. 2005); United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985).

A.  Legal Standard

1.  Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C.

---

[2]  The defendant did not present his sureties to Judge Reyes at the time of the hearing, electing instead to await the outcome of the government's appeal.  After the government notified the Court orally later the same day that it intended to appeal the decision, the Court directed the parties to perfect the proposed bond before the duty magistrate before scheduling further proceedings before the Court.  Ten sureties, some of whom are discussed below, have since been added to the proposed bond.

5

§ 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.  In cases where the defendant is charged with "an offense under section 924(c)," a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(B).[3]

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the

---

[3]  The defendant raised objections he might later make to the § 924(c) charge at the hearing below.  While none has merit, for purposes of bail the issue is of no moment as the government respectfully submits that it has met its burden with or without the benefit of the presumption.  See United States v. Marino, 2010 WL 3239141, at *4 (Aug. 7, 2010 S.D.N.Y.) (noting, in ordering Daniel Marino, one of the Gambino crime family bosses, held without bail, that it "would reach this conclusion independent of any presumption under the Bail Reform Act").

6

defendant's release and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g).

The Bail Reform Act makes clear that evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).  As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination.  Most proceed on proffers.  See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000).  This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131).  Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence.  Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

2.   Organized Crime Defendants

Courts in this circuit have routinely faced the issue of pretrial detention of organized crime defendants charged with racketeering-related offenses.  See, e.g., United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese crime family acting bosses Dominick Cirillo and Lawrence Dentico,

as well as captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino crime family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Defede, 7 F. Supp. 2d 390, 395 (S.D.N.Y. 1998) (Luchese crime family acting boss Joseph DeFede detained as danger to the community); United States v. Marino, 2010 WL 3239141 (Aug. 7, 2010 S.D.N.Y.) (Gambino crime family administration member Daniel Marino detained as danger to the community); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino crime family member Carmine Agnello detained as danger to the community); United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese crime family acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention

8

and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

> a.   Organized Crime Leaders Are Dangers to
>      the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, in Salerno, in ordering the detention of two leaders of the Genovese crime family, the district court observed that:

> The activities of a criminal organization
> such as the Genovese Family do not cease with
> the arrest of its principals and their
> release on even the most stringent of bail
> conditions.  The illegal businesses, in place
> for many years, require constant attention
> and protection, or they will fail.  Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

Similarly, in <u>Defede</u>, Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Luchese crime family, thus rendering him a danger to public safety: "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence.  Defede's continued liberty therefore presents a substantial danger to the public."  <u>Defede</u>, 7 F. Supp. 2d at 395.

In <u>Cirillo</u>, the Honorable Robert M. Levy, United States Magistrate Judge, denied bail to the acting boss of the Genovese crime family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," <u>id.</u> at 11.  The Second Circuit affirmed Judge Levy's decision by summary order.  <u>See</u> 149 Fed. Appx. 40 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.").

In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court has pointed out, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."  Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

To be sure, courts' decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.  As the court held in Defede:

> [I]t is well established that persons who
> hold Defede's status routinely engage in
> conduct that is a menace to public safety.
> The argument thus is based not on the status,
> but on the inference that a person in
> Defede's position is quite likely to engage
> in dangerous conduct – just as one reasonably
> could infer that one holding the position of

> major league baseball pitcher is entirely
> likely to hurl a small white object in the
> direction of home plate.

7 F. Supp. 2d at 392.

Moreover, in enacting the Bail Reform Act, Congress itself recognized that high-ranking members of an organized crime family fall within the "small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community."  S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89.

Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses."  In Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise.  In Colombo, 777 F.2d at 99, a captain of a crew in the Colombo crime family was ordered detained because the operation of that organization posed a "risk to the public" and a "danger to the community" by its "consistent pattern of orchestrating a series of violent criminal operations."

12

b.   Organized Crime Defendants Are Likely to
     Commit Crimes if Released on Bail

Organized crime defendants pose a particular threat to
the community due to the continuing nature of the charged
enterprise and its violent criminal activities.  At bottom,
because organized crime defendants are career criminals who
belong to an illegal enterprise, they pose a distinct threat to
commit additional crimes if released on bail.  See Salerno, 631
F. Supp. at 1375 (finding that the illegal businesses of
organized crime require constant attention and protection, and
recognizing a strong incentive on the part of its leadership to
continue business as usual).

Congress noted that defendants pose a danger to the
community not only when they commit acts of violence, but when it
is likely that they will commit even non-violent crimes that are
detrimental to the community.  See Senate Report at 3195
("language referring to safety of the community refers to the
danger that the defendant might engage in criminal activity to
the detriment of the community . . . .  The Committee intends
that the concern about safety be given a broader construction
than merely danger of harm involving physical violence").  In
Salerno, the court held:

        In light of Congress' direction that "[w]here
        there is a strong probability that a person
        will commit additional crimes if released,
        the need to protect the community becomes

> sufficiently compelling that detention is, on
> balance, appropriate" . . . .

631 F. Supp. at 1371 (quoting Senate Report at 3189). <u>See also</u>
<u>Colombo</u>, 777 F.2d at 99.

> c.    Elaborate Bail Packages Are Insufficient to
>       Protect the Community Against Violent
>       <u>Organized Crime Defendants</u>

Finally, the Second Circuit repeatedly has rejected
"elaborate" bail packages for dangerous defendants, including
leaders of organized crime families shown to be involved in
violent criminal activities.  <u>See</u> <u>Ferranti</u>, 66 F.3d at 543-44
(rejecting $1 million bail package secured by real property);
<u>United States v. Orena</u>, 986 F.2d 628, 630-33 (2d Cir. 1993)
(rejecting $3 million bail package secured with real property,
home detention, restricted visitation and telephone calls, and
electronic monitoring); <u>Colombo</u>, 777 F.2d at 97, 100 (rejecting
$500,000 bail package secured by real property).

The Second Circuit has viewed home detention and
electronic monitoring as insufficient to protect the community
against dangerous individuals.  In <u>United States v. Millan</u>, the
Second Circuit held that:

> Home detention and electronic monitoring at
> best elaborately replicate a detention
> facility without the confidence of security
> such a facility instills.  If the government
> does not provide staff to monitor compliance
> extensively, protection of the community
> would be left largely to the word of [the
> defendants] that [they] will obey the
> conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

B.   Analysis

    1.   The Defendant is a Danger to the Community

        a.   Nature and Circumstances of the Crimes Charged

Counts One and Two are both crimes of violence, and four of the six predicate acts in which the defendant is named in the racketeering conspiracy count are crimes of violence.  This factor thus favors detention.

The defendant is charged in Count One with racketeering conspiracy involving four predicate acts that are crimes of violence: two predicate acts of murder/murder conspiracy, and two predicate acts involving extortionate extension of credit conspiracy, extortionate extension of credit and extortionate collection of credit.  As such, Count One is a crime of violence. See 18 U.S.C. § 3156(a)(4)(A) (defining "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another"); United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002) (racketeering conspiracy is a crime of violence if any of the predicate acts are, like extortion, violent in nature).

Racketeering Acts One and Two allege the defendant's involvement in the fatal shootings of John D'Agnese and Richard Godkin in the Shamrock Bar on Jamaica Avenue in Queens on April 11, 1981.  The victims were shot to death after a dispute arose between a Gambino crime family associate close to the defendant

and others in the bar over a spilled drink.  The associate left the bar and went to pick up the defendant and a third accomplice. A short time later, the three men returned and gunned down D'Agnese and Godkin, the owners of the bar.  D'Agnese died from a single gunshot to the face and Godkin died from a point-blank gunshot wound to his chest.  An eyewitness is expected to identify the defendant as one of the shooters, and two cooperating witnesses are expected to testify to learning, immediately afterwards, about the defendant's involvement in the murders.

Racketeering Acts Four and Six allege that the defendant was involved in loansharking activities from the 1990s into the 2000s.  Both acts – one involving the extension of extortionate loans to gamblers in a seasonal baccarat game run by the Gambino and Bonanno crime families, the other involving a $70,000 loanshark loan made by the defendant, co-defendant Michael Dolphin and others to a debtor, John Doe, who became a cooperating witness – are crimes of violence.  In addition, both loansharking acts occurred in part during the time the defendant was on $1 million bail pending trial in Queens County for the D'Agnese and Godkin murders.

The government cited a number of consensual recordings in its detention memorandum detailing the roles the defendant, Dolphin and Terrance Comiskey, another associate of the

defendant's, played in the nearly two-year effort to collect on this debt that is the subject of Racketeering Act Six.[4]  In one recording, from May 4, 1999, a discussion of the murder charges that had been pending against the defendant since November 1998 gives rise to a chilling discussion of the circumstances under which a debtor might be killed.  Comiskey told John Doe: "Does it happen?  Yeah.  It happens every day. . . .  Different circumstances allow that to happen.  This is not one of those circumstances.  [UI]  If they found you were setting them up, more than likely, yeah. . . .   You're not doing that."  The clear implication is that if the defendant and his associates knew that John Doe was cooperating with the government, they

---

[4]  In the recordings, Dolphin and Comiskey make clear that the defendant is a member of organized crime and that they answered to him.  In one conversation, Dolphin told John Doe that he would forgive some of the interest payments he owed, but when John Doe asked if he could simply repay the principal, Dolphin said "let the other half make that decision."  In another conversation, John Doe said he wanted to make a proposal with regard to repayment.  Dolphin said he would consider any proposal but "there's other people involved in this. . . .  I can't make a decision . . . ."  In a conversation with Comiskey, John Doe said, "So Terry, you're telling me I have reason to be scared?"  Comiskey replied: "I would."  In the same conversation, Comiskey complained that by not repaying his debt, John Doe was putting him "in a bad light" and that, although Comiskey did not intend to harm John Doe, someone could put him "in the fuckin' hospital."  Comiskey also warned John Doe that if he ultimately did not repay the loan, Dolphin and his conspirators had "two choices: walk away from you and lose the money . . . or fuckin' kill you.  That's the bottom line."

would have killed him.  (A CD copy of this recording is attached, along with a transcript of two excerpts, labeled Exhibit A.[5])

In addition to racketeering conspiracy, the defendant is charged in Count Two with violating 18 U.S.C. § 924(c) based on his participation in the underlying crime of violence charged in Count One.  See United States v. Ivezaj, 568 F.3d 88, 96 (2d Cir. 2009) (holding that racketeering involving two or more crimes of violence may serve as the predicate crime underlying a charge of using, carrying and possessing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)).

The nature and circumstances of the crimes charged weigh thus strongly in favor of detention.

      b.   History and Characteristics of the Defendant

The Bail Reform Act lists a number of factors to consider in weighing a defendant's history and characteristics, including employment, community ties, past conduct, criminal history and "whether, at the time of the current offense . . . the person was . . . on release pending trial . . . for an offense under Federal, State, or local law."  These factors weigh strongly in favor of detention.

---

    [5]  These and other exhibits attached hereto are not being filed on ECF.

First, the defendant has no history of employment, reports having no assets and appears to have no credit history – all of which starkly suggest that the defendant, who drives a nice car and lives in a comfortable home in Rockland County, does not participate meaningfully in legitimate society.  While the defendant has only two gambling-related convictions from 1971 and 1980, those convictions, especially in the context of his lack of legitimate employment history and his continued involvement in the same illegal activity through the present day, attest to the continuity of the defendant's illegal pursuits, and lack of legitimate pursuits, over decades.

The defendant points to illnesses he has had over the past 20-plus years, implying that he has somehow been unable to earn money.  The evidence, however, is that the defendant has been an active earner.  Based on information from multiple cooperating witnesses who have known the defendant at various times from the 1970s through the 2000s, physical and video surveillance at wakes, weddings and social clubs from 1989 to 2011, consensual recordings of co-conspirators made while the defendant was on bail for murder from 1999 to 2001, and evidence seized during a raid on January 17, 2011, three days before the defendant's arrest, it is clear that the defendant has been very active over the years, making money not from legitimate pursuits

but from core racketeering activities like loansharking and
illegal gambling.

Second, the defendant's asserted "ties to the
community" (Tr. 36) cannot withstand scrutiny.  The defendant
surrounds himself with friends and family who are involved in
illegal activities, including his own.  For example, among the
people in the spectator's gallery during the hearing before the
magistrate court was a woman who, according to multiple
cooperating witnesses, the defendant has employed in the Glendale
cafe he has controlled since the 1990s and who, among other
things, helped operate the illegal gambling machine business that
were housed there until they were seized last month.[6]  While she
was not included as a surety on the defendant's proposed bond
last week, the defendant <u>has</u> included on the bond his brother,
Michael Vernace, who has been one of the defendant's trusted
associates since at least the 1980s.  Most recently, Michael
Vernace was among the nine men found with the defendant during
the raid of the defendant's social club last month.  As discussed
further below, Michael Vernace was the only non-inducted member

---

[6]  The cafe is owned and operated by two of the defendant's
long-time criminal associates and co-defendants, Michael Dolphin
and Vito Cortesiano.  Dolphin bought the building in which the
cafe is located in 1998 and still owns it.  From 2000 to 2009,
Cortesiano, who is also known as "Vito Love," was the chairman of
a Delaware corporation called "Cafe Love, Inc." registered to the
same address as the cafe.  Cortesiano continued to run the cafe
up to the time of his arrest.

of the Gambino crime family in the back room; he held the most money (over $6500 in cash); and he held the keys to the gambling machines that were seized.  See infra note 9.  Until the government objected, the defendant actually sought to put his brother on his visitor list if he were to be released.

Another of the "decent people, law-abiding people" (Tr. at 37) the defendant has added as a surety to his proposed bond is Eliahu Nahmias.  Nahmias is a Gambino crime family associate with a serious criminal history.  Nahmias was arrested in August 1996 and charged in Queens County with possession of a loaded weapon.  He was arrested again the following month and subsequently indicted on multiple weapons and narcotics charges, and the two cases were ultimately consolidated.  On March 1, 1999, Nahmias pled guilty to a conspiracy charge and was sentenced to 30 to 90 months in prison.  Nahmias is an associate both of the defendant and Domenico Cefalu, who was the Gambino crime family acting underboss at the time of his arrest in this district in February 2008 and who, according to multiple cooperating witnesses, has long been close to the defendant.[7]

Finally, the defendant has shown himself to have no regard for the authority of the court.  The Bail Reform Act

---

[7]  Bureau of Prisons records reveal that in 2009, an individual with the last name Nahmias and the zip code provided by Nahmias on the defendant's proposed bond twice deposited money into Cefalu's commissary account at FCI Elkton.

specifically addresses "whether, at the time of the current offense . . . the person was . . . on release pending trial . . . for an offense under Federal, State, or local law."  18 U.S.C. § 3142(g)(3)(B).  Count One charges the defendant with racketeering conspiracy from 1981 to 2010.  Given the strong evidence of the defendant's commission of multiple crimes of violence, as well as other offenses, during the entire period he was on bail from 1999 to 2002, this factor weighs in favor of detention.

In 2008, Magistrate Judge Levy relied heavily on this same factor in denying bail to Gambino crime family soldier Vincent Gotti – despite a proposed $10 million bail package - because of the importance of a defendant's respect for the court's authority:

> [T]he key factors are what the Government has proffered happened during the time that Mr. Gotti was either on parole or in prison or under indictment in the past[,] and that gives me serious concern because it has to do with whether or not an order of the Court can be evaded.

United States v. Gotti, Cr. No. 08-76, Hearing Transcript, Docket Entry No. 440 at 34 (E.D.N.Y. Mar. 13, 2008), aff'd, Docket Entry No. 582 (Weinstein, J.).  The rationale employed in Gotti clearly counsels in favor of detention here.  Unlike the defendant, Gotti did not hold a leadership position, and the charges against him were less serious.  The continued involvement of the defendant

Bartolomeo Vernace in loansharking while he was on bail from 1999 to 2002 evidences his lack of respect for the court's authority.

Accordingly, consideration of the defendant's history and characteristics weighs in favor of detention.

### c. Seriousness of the Danger Posed by the Defendant's Release

The defendant poses a clear, serious and present danger to the community if released.  Given the magistrate court's finding that the government clearly established that the defendant constituted a danger as of 2003, the government focuses below on the evidence from the past eight years.  During this time, the defendant has grown more dangerous – not less – as he has risen to lead the violent criminal enterprise to which he swore a blood oath of allegiance and gained the power to order others to commit violence on command.  See United States v. Bellomo, 944 F. Supp. 1160, 1167 (S.D.N.Y. 1996) (finding that the acting boss of the Genovese crime family posed "a danger at least as much for what he might direct or assist others in doing as for what he might do himself").

### i. The Defendant's Position

Multiple cooperating witnesses are prepared to testify that the defendant has been a made member of the Gambino crime family since the 1990s.  In addition, two cooperating witnesses have detailed, well-corroborated information regarding the defendant's recent ascension into the leadership of the family.

As the government proffered in detail below, in approximately 2005, one cooperating witness, a Gambino crime family associate who had known the defendant well since the 1990s, learned that the defendant had been elevated to the rank of captain and that Domenico Cefalu, with whom the defendant was close, had been elevated to the rank of underboss.  In approximately 2007, a second cooperating witness, another associate, was introduced to the defendant at a Gambino crime family social gathering and learned there that he was a captain.  At the time of the encounter, the defendant was seated at a table with John D'Amico and Cefalu, then the acting boss and acting underboss, respectively, as well as Alphonse Trucchio and Anthony Moscatiello, then both soldiers.

In February 2008, the entire Gambino crime family administration – D'Amico, Cefalu and Joseph Corozzo, the consigliere, with whom the defendant has been close since the 1970s – was arrested in this district in Criminal Docket No. 08-076 (JBW) and charged with racketeering conspiracy, among other crimes.  In approximately 2008 or 2009, the first cooperating witness learned that the defendant, Daniel Marino and John Gambino had been appointed to a three-member ruling panel to run the affairs of the family.  The cooperating witness learned this information from, among others, Trucchio (now a captain) and Moscatiello.  At the time the cooperating witness last had

contact with members and associates of the Gambino crime family -
in early 2010 - the witness understood that the defendant
remained on the ruling panel.

Significant evidence corroborates the information
provided by these cooperating witnesses.  The progression of
wakes, weddings and other large social gatherings the defendant
has attended from 1992 to 2011 – important events that
cooperating witnesses will testify are the site of Gambino crime
family business – makes clear the defendant's increased position
over time.  Whereas in the 1990s, the defendant was observed at
only a small handful of such events, in the 2000s, the defendant
began attending these events with much greater frequency.  Since
2002, the defendant has attended at least 24 such gatherings.
(Photographs of several of these gatherings were presented to the
court below and marked as Court Exhibit 1, and are attached
hereto as Exhibit B.[8])  Indeed, in the last wake the defendant
attended – of Gambino crime family soldier Louis Scida, on
January 19, 2011, the night before the defendant was arrested –

---

[8]  The photographs further corroborate the cooperating
witnesses' information concerning the defendant's close
relationship with Cefalu and some of the members of the Gambino
crime family present during the raid at the defendant's social
club last month (discussed below).  For example, the defendant is
pictured in four of the photographs (April 2002, June 2002,
November 2003, June 2006) with Cefalu and in three with captain
Louis Mastrangelo (July 2006, September 2006, January 2009).

the defendant was surveilled attending the wake at the same time as fellow ruling panel member John Gambino.

ii.   The January 17, 2011 Raid

The raid on the defendant's cafe – his social club – three nights before his arrest provides additional evidence corroborating the cooperating witnesses with respect to the defendant's position.  The rank of the individuals congregating in the back room of the cafe – as well as the fact that the defendant and his brother had more than half of the $22,000 recovered – speaks volumes about the defendant's position in the Gambino crime family hierarchy:

- Louis Mastrangelo - Captain, 2-Time Convicted Felon, Currently Under Indictment

- Alphonse Trucchio - Captain, Convicted Felon, Currently Under Indictment

- John Ambrosio - Soldier, 3-Time Convicted Felon

- Raffaele DeSantis - Soldier, Convicted Felon

- Vincent Frogiero - Soldier, Convicted Felon, Currently Under Indictment

- Salvatore Gambino - Soldier, 2-Time Convicted Felon

- Salvatore Pugliese - Soldier, Convicted Felon

- John Setaro - Soldier, 3-Time Convicted Felon

- Michael Vernace - Associate, Proposed Surety

(Several photographs from the raid were presented to the court below and marked as Court Exhibit 2, and are attached hereto as

Exhibit C.[9])  The presence of these nine men with the defendant
in his social club – much as the defendant and others, including
Joseph Corozzo and John Setaro, were caught on video going to
boss John J. Gotti's social club in Little Italy in 1989 – is
considerable evidence of the defendant's position.  See Defede, 7
F. Supp. 2d at 393 ("[T]here is considerable evidence that law
enforcement officers observed [acting boss] DeFede meeting with
various members and associates of the Luchese family in a manner
common for leadership figures in organized crime.").

        Below, defense counsel argued that "these clubs are not
exclusively dens of criminal activity" and that the raid simply
showed that "people unrelated to Mr. Vernace had . . . too much
money in their pockets."  (Tr. 34).  These arguments are
unpersuasive.  The government respectfully submits that it has
established the following facts:

   •   The defendant's social club is and has in fact been a
       den of criminal activity, including loansharking and
       illegal gambling, for over fifteen years.  It is a
       place where mafia figures come to meet the defendant
       and a place where the defendant operates an illegal
       gambling business and receives proceeds from crime.

---

[9]  Exhibit C includes photographs of the individuals who
were in the back room of the defendant's social club during the
raid.  The two photographs following the picture of Michael
Vernace show a table filled with the $6,583 in cash the
defendant's brother was carrying and the keys to the gambling
machines he had in his pocket (the two small keys on the right).
The subsequent photographs show the gambling machines, which were
seized, as well as gambling records found in and around the
machines.

- Of the eight people with the defendant on the night of the raid (excluding his brother, who is in fact related), (a) all belong to the same secret criminal organization the defendant helps run and all are convicted felons, (b) five (Mastrangelo, Trucchio, DeSantis, Gambino and Pugliese) attended the defendant's sister's wake in 2006, (c) three (Mastrangelo, Trucchio and Frogiero) have been indicted with the defendant in the Southern District of New York for the same loansharking conspiracy, and (d) one (Setaro), according to information provided by cooperating witnesses, was actually inducted into the Gambino crime family with the defendant on the same day and, like the defendant, was involved in a double homicide.  These people are not "unrelated" to the defendant.  They are eight of the close criminal associates he commands.

- While many people had significant sums of money in their pockets on the night of the raid, the two with the most money – over $11,000 together, more than half of the total seized – were the defendant and his brother.

This evidence, along with the other evidence proffered, establishes the defendant's leadership in the racketeering conspiracy in which he has been charged – a 30-year a crime of violence – up to the eve of his arrest.

### iii. The Decision Below

The magistrate court below found that the government had not established that the defendant posed a current danger to the community because there was insufficient recent evidence of dangerousness.  While the standard of review on this appeal is de novo and no finding of error is required, the government respectfully submits that the magistrate court's finding was erroneous.

After the magistrate court issued its findings, the
government brought to the court's attention the fact that the
defendant had been indicted the previous week in the Southern
District of New York on charges of racketeering and loansharking
that were alleged to have continued through 2010.  See United
States v. Joseph Corozzo, et al., 11 CR 012 (RMB) (S.D.N.Y.).
The government provided a copy of the indictment to the court
(attached hereto as Exhibit D) and pointed out that, notably,
three of the defendant's co-defendants in the loansharking
charges – Trucchio, Mastrangelo and Frogiero – were found with
him at the raid.  The court indicated that, without more specific
information regarding the recency of the defendant's involvement
in the crime, it could not change its finding, but invited the
government to present additional facts in that regard to this
Court.  (Tr. 63-64).

        The government has now acquired additional information
about these loansharking charges.  The evidence against the
defendant includes the expected testimony of a cooperating
witness regarding multiple, specific instances of the defendant's
involvement in actual or contemplated loanshark loans, including
as late as approximately 2008 or 2009.  In addition, the
government notes that the loansharking conspiracy itself is
charged up to 2010.  The government respectfully submits that the
magistrate court erred in its decision below and that the

government met its burden without reference to the additional
crimes of charged in the Southern District of New York.  That
said, the additional crimes of violence the defendant has been
charged with in that district provide further evidence that the
defendant continues to engage in crimes of violence up to the
present day.

In sum, the proffered evidence against the defendant of
his participation in the crimes of violence charged as predicate
acts in the instant indictment variously from 1981 to 2003 is
strong.  In addition, the proffered evidence against the
defendant of his current leadership position and his
participation in the racketeering conspiracy – also a crime of
violence – charged in the instant indictment through December
2010 is also strong.  The fact the defendant stands charged in
another district with racketeering, including a predicate act
that is a crime of violence, up to 2010, provides yet further
evidence in support of the government's position.  Taken
together, it is clear the defendant poses a danger to the
community if he is released on bail.

A case posing similar issues was considered last year
in Marino and resulted in the defendant's remand.  In April 2010,
Daniel Marino, one of the defendant's fellow members on the
Gambino crime family ruling panel, was arrested in the Southern
District of New York and charged with racketeering conspiracy,

including predicate acts (alleged against others) of narcotics
distribution and sex trafficking.  <u>Marino</u>, 2010 WL 3239141 at *1.
Appealing a detention order, Marino, too, argued that "the
government has not established that he <u>now</u> would be a danger to
the community if released on bail" based on "the supposed lack of
evidence of any criminal behavior in recent years and Marino's
age and physical infirmity."  <u>Id.</u> at *3 (emphasis in original).
The court rejected both arguments.  With respect to the first, it
found that the defendant had posed a danger to the community in
the past – as Judge Reyes did below – and that, "[w]hile the
government has not proffered evidence of specific criminal acts
by Marino since 2006, it has proffered that Marino remains a boss
of the Gambino family and that surveillance has placed Marino in
the company of other mobsters at various mob gatherings through
2009."  <u>Id.</u>

        The court quoted <u>Defede</u> at length in rejecting Marino's
appeal:

            "it is important to recognize that the threat
            inherent in [Marino]'s continued liberty need
            not stem directly from the threat of violent
            acts by him.  Nor need it arise from the
            charged offenses.  Given [Marino]'s position
            of leadership in a notorious and violent
            criminal organization, 'his ability to plan,
            order, and supervise criminal activity' is of
            paramount importance.  Marino 'is a danger at
            least as much for what he might direct or
            assist others in doing as for what he might
            do himself.'  In consequence, for the reasons
            set forth in <u>Bellomo</u>, both <u>Gotti</u> cases, and
            in the Court of Appeals decisions in <u>Colombo</u>

and <u>Orena</u>, this Court finds, by clear and convincing evidence, that no condition or combination of conditions adequately would secure the safety of the community."

<u>Id.</u>  The same reasoning applies here – and, the government submits, in light of the nature of the charges against this defendant, with even more force.

* * *

Accordingly, the seriousness of the danger posed by the defendant's release also favors detention.

d.  <u>Evidence of the Defendant's Guilt</u>

The government's evidence of the defendant's guilt is strong.  As noted in the government's detention memorandum, to prevail on the racketeering conspiracy count, the government must prove the following four elements: (a) that the defendant knowingly agreed to conduct or participate, directly or indirectly, in the conduct of the affairs of the charged enterprise through a pattern of racketeering activity; (b) that the enterprise, here the Gambino crime family, exists; (c) that the enterprise engaged in, or its activities affected, interstate or foreign commerce; and (d) that the defendant was employed by, or associated with, the enterprise.  The government's evidence of these elements, as well as the defendant's commission of the six racketeering acts in which he is named, is summarized in detail in the detention memorandum.  In summary, it includes the expected testimony of over seven cooperating witnesses – some of

33

whom committed crimes with the defendant as far back as the 1970s – as well as law enforcement witnesses and eyewitnesses, consensual recordings, photographic and video surveillance, crime scene evidence, search warrant evidence and documentary evidence. The same evidence will establish the defendant's guilt with respect to Count Two as well.  Accordingly, this factor clearly favors detention as well.

> 2.    The Defendant Is a Risk of Flight

In addition to the facts set forth above, given that the defendant faces a Guidelines sentence of life imprisonment, he constitutes a risk of flight and should be detained.   See United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (finding the possibility of a "severe sentence" heightens the risk of flight).  This risk of flight is heightened as a result of the strong evidence against the defendant, who has scores of made members and associates of the Gambino crime family with the means to provide refuge.  The fact that the defendant did not flee when he was on bail a decade ago is of little moment in light of the strength of the government's evidence in this case, the defendant's age and the fact that the defendant, if convicted, faces life imprisonment.

34

CONCLUSION

For the foregoing reasons, the government respectfully submits that the defendant Bartolomeo Vernace is a danger to the community and a risk of flight and should be detained pending trial.

Dated: Brooklyn, New York
       February 6, 2011

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

Evan M. Norris
Stephen E. Frank
Assistant U.S. Attorneys
     (Of Counsel)