UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          : 11-CR-00005(SLT)
                                   :
                                   :
                                   :
      -against-                    : United States Courthouse
                                   : Brooklyn, New York
                                   :
                                   :
                                   : Monday, March 18, 2013
BARTOLOMEO VERNACE,                : 9:30 a.m.
                                   :
          Defendant.               :
                                   :

- - - - - - - - - - - - - X


        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
         BEFORE THE HONORABLE SANDRA L. TOWNES
             UNITED STATES DISTRICT JUDGE


              A P P E A R A N C E S:


For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                  BY:  AMIR TOOSSI, ESQ.
                      M. KRISTIN MACE, ESQ.
                      EVAN M. NORRIS, ESQ.
                      Assistant United States Attorney


For the Defendant:   CHARLES F. CARNESI
                     1225 Franklin Avenue
                     Suite 325
                     Garden City, New York 11530
                  BY: CHARLES F. CARNESI, ESQ.


              VB     OCR     CRR

A P P E A R A N C E S:  (Continued)


For the Defendant:    JOSEPH DIBENEDETTO
                      233 Broadway
                      Suite 2707
                      New York, New York 10279
                      BY:JOSEPH DIBENEDETTO, ESQ.



        ALSO PRESENT:        Special Agent Paul Tambrino

                             Special Agent Jeffrey Tarklin

                             Paralegal Shernita Moore




Court Reporter:      VICTORIA A. TORRES BUTLER, CRR
                     225 Cadman Plaza East
                     Brooklyn, New York 11201
                     **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1          (In open court.)

2          (The following occurs outside the presence of the

3     jury.)

4          (Judge SANDRA L. TOWNES enters the courtroom.)

5          THE COURTROOM DEPUTY:  All rise.

6          THE COURT:  Be seated, please.

7          (Defendant enters the courtroom.)

8          THE COURTROOM DEPUTY:  Criminal cause for trial,

9     Docket Number 11-CR-05, the United States of America versus

10    Bartolommeo Vernace.

11         Counsel, please state your appearances for the

12    record.

13         MR. NORRIS:  For the Government, Evan Norris, Amir

14    Toossi, Kristin Mace, with us Shernita Moore and Special Agent

15    Paul Tambrino.

16         THE COURT:  Good morning.

17         MR. CARNESI:  Good morning, Your Honor.

18         Charles Carnesi and Joseph DiBenedetto appearing for

19    Mr. Vernace.

20         THE COURT:  Good morning.

21         MR. DiBENEDETTO:  Good morning.

22         THE COURT:  And Mr. Vernace is present.

23         Are we ready to bring the jury in?

24         MR. TOOSSI:  Your Honor, we had filed a motion

25    relative to a witness's testimony that's going to be

1  testifying first today.

2         THE COURT:  I have been away all weekend.

3         MR. TOOSSI:  Okay.

4         Your Honor, may I step up?

5         THE COURT:  Yes.

6         MR. TOOSSI:  Your Honor, the Government is moving to

7  admit.

8         THE COURT:  I don't have that.  Veronica, would you

9  please get a copy of this for me.

10        THE COURTROOM DEPUTY:  Yes, Judge.

11        MR. TOOSSI:  I have a copy.

12        THE COURTROOM DEPUTY:  Thank you.

13        (Handing.)

14        THE COURT:  Do you have any objection to this?

15        MR. DiBENEDETTO:  Yes, Judge, we filed a response in

16  opposition yesterday.

17        THE COURT:  This is a report prepared by this

18  witness?

19        MR. TOOSSI:  Yes, Your Honor.  He would be prepared

20  to testify that he recalls vaguely the arrest of John Canova

21  and that he processed the arrest, he prepared an arrest

22  report, and that it is his report.

23        But he does not recall, unsurprisingly, doesn't

24  recall specifically any of the information that's contained in

25  the report, but that he had personal knowledge of the contents

1  of the report and that at the time that he made the report,

2  that they accurately reflect his personal knowledge at the

3  time, and that his recollection cannot be refreshed by looking

4  at the report.

5          So, under that foundation, the Government believes

6  that he should be allowed to read in the contents of his

7  report under the exception to the hearsay rule past

8  recollection recorded.

9          THE COURT:  Do you have a copy of the response in

10 opposition?

11         MR. DiBENEDETTO:  Yes.

12         THE COURT:  If that's an extra copy that you have.

13         MR. DiBENEDETTO:  It's the only copy, Judge, but

14 that's fine if Your Honor needs to look at it.

15         (Pause in the proceedings.)

16         THE COURT:  Is it an alias that he was convicted

17 under?

18         MR. TOOSSI:  And this is an important point

19 Your Honor, there is a difference between Government aliases,

20 given name aliases and street name aliases.

21         The Government alias, the official alias that he was

22 arrested under was John Canova.  Other than the arrest report,

23 we're unaware of any documentation, including the criminal

24 complaint, that identified him as Bobby or Pepe.  It's just in

25 the arrest report.

1          Defense Counsel makes the point in his response that

2     that the defendant wouldn't have given this information or

3     something like that because it would have led back to him, but

4     that's conflating a Government --

5               THE COURT:  Let me interrupt you.

6               MR. TOOSSI:  Sure.

7               THE COURT:  You are not trying to get that in with

8     this witness.

9          The only thing you are trying to get in, as I read

10    this, is that a person named John Canova was arrested on

11    August 8th.

12              MR. TOOSSI:  1979.  And it's September 4th, I

13    believe.

14              THE COURT:  Yes, September 4th.

15         Is that what you are trying to get in?

16              MR. TOOSSI:  And that the alias that he provided

17    that is included in the arrest report is Bobby and Pepe, and

18    several other items.

19              MR. DiBENEDETTO:  Judge.

20              THE COURT:  Well, wait, wait, wait.

21              MR. TOOSSI:  Sure.

22              THE COURT:  So, what you are opposing is the Bobby

23    and Pepe.

24              MR. DiBENEDETTO:  Correct, Judge.

25              THE COURT:  All right.

1          So, can your witness lay a foundation that the

2    person John Canova told him that he was also known as Bobby

3    and Pepe?

4          MR. TOOSSI:  As under a past recollection recorded,

5    we believe so, Your, Honor because he would be able to testify

6    that he recalls arresting John Canova, that John Canova was

7    processed, that his pedigree information was taken, that that

8    report is his report, and that at the time that he created the

9    report he had personal knowledge of the information that's

10   contained in the report, and that it accurately reflects his

11   knowledge at the time that the report was created.

12         THE COURT:  Okay.

13         And what foundation or evidence do you lay that

14   Bobby and Pepe he knew from his own knowledge?

15         MR. TOOSSI:  Well, that's just it, Your Honor; that

16   in creating that arrest report, he would have gone through all

17   the boxes on the arrest report and he would have filled it out

18   based on an interview with the defendant.

19         THE COURT:  So, he is going to testify --

20         MR. TOOSSI:  He can't.

21         THE COURT:  Wait, listen to me.

22         MR. TOOSSI:  Sure.

23         THE COURT:  He is going to testify that he took

24   information from the defendant and the defendant told him I am

25   also known as Bobby and Pepe.

1      MR. TOOSSI:  That's just it, Your Honor; he's going

2 to testify that in taking the information, he would have taken

3 it at the time of the interview, but he doesn't have a

4 specific recollection of that and that's why we're asking for

5 it to be admitted under past recollection recorded.

6      THE COURT:  I'm not going allow it because I have to

7 know where the information came from.

8      MR. TOOSSI:  And he would testify that the

9 information in the arrest report came from the defendant.

10      MR. DiBENEDETTO:  Well, Judge, if I may be heard.

11      And I think Your Honor is keying in on the crucial

12 issue.  If he is saying that the aliases came in -- were told

13 to him by our client, then let him testify to that on the

14 stand.  There's no reason for him to read in from the arrest

15 report.  The whole purpose for past recollection recorded is

16 when a witness has zero recollection of what occurred.  And

17 for that purpose, would like to read from the arrest record.

18      But as Your Honor has pointed out, the issue is

19 whether or not our client or he learned from a different

20 source that our client's alias at that point was Pepe or

21 Bobby.  And to the extent that he learned from an outside

22 source, that's a hearsay statement, Judge, and under those

23 circumstances it should not be allowed.

24      MR. TOOSSI:  But, Your Honor, our point is this, is

25 that that arrest report that he would lay a foundation for the

1   fact that when he arrested the defendant, that all the

2   information contained in that arrest report is from the

3   defendant, is from the person he knew as John Canova.  And

4   that's why it's a past recollection recorded.  He doesn't have

5   to be able to, under the rule, he doesn't have to be able to

6   testify I remember him specifically saying Bobby or Pepe.

7   That's the specific reason for the rule; is that he doesn't

8   have, it's not something that he would remember from 33 years

9   back, but he can testify that he recorded it at that time and

10  during the taking of the pedigree information.

11          And in terms of knowing that this information was

12  coming from the defendant, if Your Honor is concerned that

13  this information may have come from an outside source, there's

14  a lot of information in the arrest report that could have only

15  come from the defendant.  For example, the name of his wife,

16  his address at the time, the name of his daughter, the age of

17  his daughter, there's plenty of other information in the

18  arrest report that makes it very clear that this report was

19  clearly made after an interview with the defendant.

20          And the specific reason for the rule is to say no,

21  he cannot remember, he cannot remember the moment when the

22  defendant says my name is Bobby, I go by Bobby or Pepe, but he

23  recorded it at the time and that's a past recollection

24  recorded.

25          MR. DiBENEDETTO:  Judge, may I be heard again?

1           THE COURT:  Yes.

2           MR. DiBENEDETTO:  What the Government is leaving out

3    are some essential facts that I highlighted in my response.

4           This arrest, the arrest in question, was the result

5    of a one-month investigation and that investigation was

6    spearheaded by a Sergeant who acted as an undercover and, as a

7    result of that investigation, our client was arrested.  So,

8    Judge there's a distinct possibility that this undercover had

9    direct contact with those involved in the gambling ring and

10   learned certain aliases.  So, it's more likely that this

11   information, the alias, came from on outside source as opposed

12   to Mr. Lucadamo himself.

13          Also, Judge, I would ask the Court to take a common

14   sense approach with regard to this and Your Honor has

15   articulated it.  An alias, Judge, is not something in the

16   normal course of business that a detective elicits from

17   somebody he's just arrested.  The way an alias is derived is

18   either from an outside source or, once somebody is

19   fingerprinted, an arrest record will pop up and if the

20   gentleman was arrested under any other name, it would also pop

21   up at that point.

22          So, there's two things, Judge.  The fact that the

23   allegation is that our client did, in fact, give this

24   information, it doesn't, it doesn't follow.  It doesn't make

25   sense.

1      THE COURT:  Well, he can testify about that.  I want

2  to hear him testify as to where this information came from and

3  then, I'll see.  You certainly have the opportunity to

4  cross-examine him, but I want to see where he says he got the

5  information from.

6      MR. DiBENEDETTO:  Well, that's the issue, Judge.  He

7  has no recollection where the information came from.  He

8  can't say that the information came specifically from our

9  client and that's the issue that we're having.

10      THE COURT:  And if he can't say that, I'm not going

11  to allow him to testify about it.

12      MR. DiBENEDETTO:  We're okay with that, Judge.

13      MR. CARNESI:  That's fine.

14      THE COURT:  We'll bring the jury in.

15      (Pause in the proceedings.)

16

17      (In open court.)

18      THE COURTROOM DEPUTY:  All rise.

19      (Jury enters at 10:17 a.m.)

20      THE COURT:  Please, be seated.

21      Good morning.

22      THE JURY:  Good morning.

23      THE COURT:  The record will reflect that the jurors

24  are all present, the defendant, and Counsel.

25      Mr. Toossi.

1          MR. TOOSSI:  Yes, Your Honor.

2          The Government calls Nicholas Lucadamo.

3          (Witness enters and takes stand.)

4          THE COURTROOM DEPUTY:  Good morning.

5          THE WITNESS:  Good morning.

6          THE COURTROOM DEPUTY:  Please, raise your right

7   hand.

8

9          (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Please, raise your right

2     hand.

3     **N I C K   L U C A D A M O**,

4               called by the Government, having been

5               first duly sworn, was examined and testified

6               as follows:

7

8          THE COURTROOM DEPUTY:  Thank you, please take a

9     seat.

10          Please, state your name and spell it for the record.

11          THE WITNESS:  Nick Lucadamo -- L-U-C-A-D-A-M-O.

12          THE COURT:  Spell your first name, please.

13          THE WITNESS:  Excuse me, Your Honor?

14          THE COURT:  Spell your first name.

15          THE WITNESS:  N-I-C-K.

16          THE COURT:  Thank you.

17          MR. TOOSSI:  Your Honor, may I enquire?

18          THE COURT:  Yes.

19          MR. TOOSSI:  Thank you.

20     DIRECT EXAMINATION

21     BY MR. TOOSSI:

22     Q    Good morning, Mr. Lucadamo.

23     A    Good morning.

24     Q    Are you currently employed?

25     A    No.

1  Q    Are you retired?

2  A    Retired.

3  Q    Before you retired, where did you work?

4  A    Nassau County Police Department.

5  Q    And from what year to what year did you work for the

6  Nassau County Police Department?

7  A    1970 to '89, I believe.

8  Q    And what rank did you achieve in the Nassau County Police

9  Department?

10  A    Top-grade detective.

11  Q    Okay.  And what divisions were you in, in the Nassau

12  County Police Department?

13  A    What divisions was I in?

14  Q    Yes.

15  A    8th precinct, Vice Squad, Racket Squad, District

16  Attorney's office.

17  Q    You mentioned the Vice Squad.  What does the Vice Squad

18  do?

19  A    Investigates illegal gambling and sex crimes.

20  Q    I want to direct your attention to September of 1979.

21       Were you employed at that time by the Nassau County

22  Police Department?

23  A    Yes I was.

24  Q    And were you working as a detective?

25  A    Yes, I was.

1   Q    Was that in the Vice Squad?

2   A    Yes.

3   Q    Did there come a time when you had an occasion to arrest

4   an individual known to you as John Canova?

5   A    Yes, sir.

6   Q    Can you explain for the jury what John Canova was

7   arrested for?

8   A    Illegal gambling.

9   Q    Can you explain what was, what led to his arrest?

10  A    Several wire-taps.

11  Q    Was there an investigation into illegal gambling?

12  A    Yes, there was.

13  Q    What type of illegal gambling, if you recall?

14  A    Book-making.

15  Q    Is that sports gambling?

16  A    Yes, sir.

17  Q    After you arrested the individual known to you as

18  John Canova, what did you do?

19  A    After I arrested him?

20  Q    Yes.

21  A    He was transported back to the District Attorney's

22  Office, Vice Squad.

23  Q    For what purpose?

24  A    Processing.

25  Q    And when you say processing, what does that mean?

1  A    It means filling out all the Court paperwork and his

2  arrest record.

3  Q    Does that include fingerprinting him?

4  A    No, that's done at headquarters.

5  Q    Okay.  Was John Canova fingerprinted, to your knowledge?

6  A    Well, yeah, that's procedure, but it's not done in my

7  presence, that was done at headquarters.

8  Q    Did you process the defendant?

9  A    I don't recall.

10  Q    Okay.  Would anything refresh your recollection?

11  A    Possibly.

12         MR. TOOSSI:  Your Honor, may I approach the witness?

13         THE COURT:  Yes.

14         MR. TOOSSI:  Detective, I am showing you what's been

15  marked for identification as 3500-NL-2.  Would you please look

16  at that document?

17         (Handing.)

18         THE WITNESS:  Okay.

19  Q    Detective Lucadamo, does that document refresh your

20  recollection as to whether you processed the defendant?

21  A    Yes, I believe it does.

22  Q    And the information -- and what is that document?

23  A    That's an arrest record, it's called a Form 81.

24  Q    And did you prepare that report?

25  A    Very possible, I don't recall, though, this is 34 years

1  ago.

2  Q    Is your name on that report?

3  A    Yes, it is.  As arresting officer.

4  Q    Okay.  And do you believe that that is a report you

5  created?

6  A    I believe it is.

7  Q    And the information contained in that report, contained

8  in that report, where would it have come from?

9  A    From the defendant.

10  Q    And as you sit here today, do you recall any of the

11  information; the defendant providing you with any specific

12  piece of information that's in that report?

13  A    Yes, sir.

14  Q    What do you recall him providing you?

15  A    Name, address, date of birth, place of birth, marital

16  status, Social Security number.

17  Q    Okay.  And did you prepare that report at or about the

18  time of the arrest of John Canova?

19  A    Yes, that same evening.

20  Q    And did you have personal knowledge of the information

21  that's contained in that report?

22  A    Yes.

23  Q    And at the time that you created that report, did it

24  accurately reflect your knowledge of the information in the

25  report?

1   A    Yes, sir, it did.

2   Q    Now, specifically, as you sit here today, do you recall

3   what John Canova told what you his alias was without referring

4   to the report?

5   A    I'd have to say no.

6        MR. TOOSSI:  Your Honor, at this time, the

7   Government would ask that the witness be allowed to read in a

8   portion of his report under the alias.

9        THE COURT:  Well, not until you ask the question

10  that I need to know before I allow him to do that.

11       MR. TOOSSI:  Okay.

12  Q    Does the arrest report contain a section for aliases?

13  A    Yes, sir, it does.

14  Q    Okay.  And in your common practice at the time that this

15  arrest was made, would you obtain the alias from an arrestee?

16  A    Yes.

17  Q    And what would be the purpose of obtaining the an alias

18  from an arrestee?

19  A    For further investigations and to know what their street

20  name is or alias.

21  Q    And would that information come from the arrestee in the

22  arrest report?

23  A    Yes.

24       MR. CARNESI:  Objection, Judge.

25       THE COURT:  Overruled.

1          I'll allow it.

2          MR. CARNESI:  Judge, may we approach?

3          THE COURT:  Yes.

4          (Side-bar conference held on the record out of the

5     hearing of the jury.)

6

7          (Side-bar.)

8          MR. CARNESI:  Judge, my understanding of the

9     instructions that you had laid is you were looking for

10    testimony from the officer that he recalled that that

11    information came from the defendant.  We haven't gotten that.

12         THE COURT:  He just testified.

13         MR. CARNESI:  I'm sorry, Judge, let me finish.

14         But what I heard him say is generally, that's what

15    happens.

16         THE COURT:  So?

17         MR. CARNESI:  He has no recollection.

18         MR. TOOSSI:  But that's the point of the rule.

19         MR. CARNESI:  No, it's not.  The point of the rule

20    is I had a conversation.

21         THE COURT:  Right.

22         MR. CARNESI:  I recorded it accurately.  That's not

23    what he's say egging.

24         MR. TOOSSI:  That's what he just said.

25         MR. CARNESI:  No, he didn't.  He said generally,

1   that's what happens.

2            MR. TOOSSI:  Your Honor, if I may?  Excuse me.

3            If I may, he just testified that he processed

4   John Canova, that he filled out the arrest report in

5   connection with that, that the arrest report is based on an

6   interview with the defendant generally, and that that

7   information in the arrest report came from the defendant.

8            MR. DiBENEDETTO:  Judge, just to highlight.

9            THE COURT:  He did say that.

10           MR. DiBENEDETTO:  Just to highlight his specific

11  testimony, the one then that he could not say that he recalls

12  getting from this defendant was his actual alias.  He said he

13  gave other pedigree information regarding his marital status,

14  where he lived.

15           THE COURT:  I'm sorry?

16           MR. DiBENEDETTO:  He did say that he got marital

17  status, where he lived, specifically from the defendant.  But

18  he could not say is his alias, where he obtained that from.

19           THE COURT:  He just said he got it from the

20  defendant.

21           MR. CARNESI:  Judge, again, I don't think he did say

22  that.  I think the questions were asked how does it work,

23  what's the procedure and he indicated the procedure.  As he

24  sits here now, he has no specific recollection.

25           And my concern is although he was the arresting

1   officer, this was an investigation that went on for over two

2   months.  If you read the complaint, most, much of the

3   complaint is based on information that was provided to him by

4   other people, including the two wire-taps, two different

5   wire-taps and I don't know if that's where he got the

6   information from or not.

7           So my point is, unless he has a specific

8   recollection of, in this instance, getting the information --

9           THE COURT:  Do you want to question him?

10          MR. CARNESI:  Yes.

11          THE COURT:  All right.  We'll do that.

12          (Side-bar end.)

13

14          (In open court.)

15          THE COURT:  Mr. Carnesi, you have questions?

16          MR. CARNESI:  Yes.

17  VOIR DIRE

18  BY MR. CARNESI:

19  Q    Good morning, Mr. Lucadamo.

20  A    Good morning.

21  Q    My name is Charles Carnesi, I just want to clarify if you

22  can, for me.

23          As you sit here now, do you have a specific

24  recollection of having a conversation with Mr. Canova?  Do you

25  remember that or are you just relying on this report?

1   A      Probably 80 percent on the report.

2   Q      Okay.  And my question to you then, sir, is do you

3   recall -- you recall -- having a conversation with that

4   individual about his aliases?

5          Not procedure, but do you specifically recall as you

6   sit here now, having that conversation?

7   A      On that particular night?

8   Q      Yes?

9   A      No, sir.

10         MR. CARNESI:  Thank you.

11         MR. TOOSSI:  Your Honor, at this time we would ask

12  that the witness be allowed to read from the report and if we

13  need to have a side-bar, I would like to.

14         THE COURT:  We need to have a side-bar because I'm

15  not certain of where he got this information.

16         (Side-bar conference held on the record out of the

17  hearing of the jury.)

18

19         (Side-bar.)

20         MR. TOOSSI:  Your Honor, I just want to go over the

21  rule, which I know you have in front of you.

22         THE COURT:  Yes, I have the rule.

23         MR. TOOSSI:  Okay.

24         THE COURT:  I know what the rule is.

25         MR. TOOSSI:  Right.

1        THE COURT:  The last part accurately reflects the

2   witness's knowledge.  That's the problem I'm having.

3        MR. TOOSSI:  But he's testifying that in -- he's

4   already testified that it accurately reflects his knowledge of

5   that.

6        THE COURT:  No, he didn't.

7        MR. TOOSSI:  Hold on, Your Honor.

8        THE COURT:  Don't say hold on to me.

9        MR. TOOSSI:  I'm sorry, I wasn't trying to be rude.

10        THE COURT:  Don't say hold on to me.  Ever.

11        MR. TOOSSI:  Okay.  I apologize, Your Honor, I

12   didn't mean to be rude.  I assure you that was not my

13   intention at all.

14        Your Honor, we cited to a Second Circuit case where

15   the Second Circuit specifically said that it is not necessary

16   for the person to specifically remember creating the report

17   and that's in the...

18        MR. DiBENEDETTO:  Judge, we have also cited case

19   law.

20        MR. TOOSSI:  Excuse me, I wasn't finished.

21        The Garcia case.  In the Garcia case, in that second

22   paragraph in our motion, Second Circuit specifically states

23   under past recollection recorded he does not have to remember

24   making that report.  That's the whole point of the rule.  He

25   said that that report accurately reflects his information

1    because he remembers that being his report.

2         Now can he sit here and specifically say I remember

3    him saying that to me?  If he could, we wouldn't need the past

4    recollection recorded.  The whole point of the rule is that he

5    created the report at the time, he believes that it was

6    accurately reflective of his personal knowledge, he's

7    testified that it accurately reflected his personal knowledge

8    at the time, but he can't remember it.

9         That's specifically the reason for the rule and we

10   would submit that that's why he should be allowed to read that

11   portion.

12        MR. CARNESI:  We're asking him if he remembers in

13   order because what he's about to say is that it came from this

14   defendant.  All he's saying is that is my report, I recognize

15   my signature.

16        THE COURT:  I have not seen the report, so.

17        MR. CARNESI:  Yeah, we'll concede, Judge, that he

18   drafted the report.

19        But my point is if the undercover officer who knew

20   this individual as John Canova told him this is John Canova,

21   he's Pepe on the wire-tap, it didn't come from my defendant.

22        MR. TOOSSI:  Your Honor, if I might shed some light

23   on that issue about the undercover.

24        The Nassau County Police Department had a flood a

25   number of years ago and all the records associated with this

1    case were destroyed.  What we do have is the complaint that

2    was filed and we also have an FBI report that was generated

3    based on an interview with Detective Lucadamo at the time.

4    And when he was interviewed relevant to that point, relevant

5    to the investigation, he talked -- this undercover that

6    they're referring to is a Sergeant Repedi -- R-E-P-E-D-I.

7          And it says here that Repedi began betting with

8    Joseph Capone, and that's important for the following reason.

9    Based on what we can gather from what we know about the

10   investigation, the undercover was placing bets with somebody

11   who was a runner for the defendant and so, what happened was

12   Repedi was placing bets with Capone, and Capone was phoning

13   them in to the location where Lucadamo arrested the defendant.

14         There's no indication that the undercover ever met

15   the defendant and there's no indication that the undercover

16   had anything to do with writing this report.

17         If Counsel wants to cross-examine him on the point

18   about whether the undercover provided any of that information,

19   there's no other place that it could come from other than the

20   defendant.  And even if it was gleaned from the wire-tap, it

21   would be his personal knowledge because he would have heard

22   it.

23         So, one way or the other, it appears that he's

24   testifying --

25         THE COURT:  Just a minute, it would be his personal

1  knowledge because what?

2          MR. TOOSSI:  I take that back.

3          Our contention is that this came from the interview

4  with the defendant and there's no indication that the

5  undercover even met the defendant in the course of the

6  investigation.  He met a person named Joseph Capone.

7          And the complaint that Mr. Carnesi is looking at

8  right now, indicates that John Canova accepted wages on horse

9  and sporting events from Joseph Capone.  So, that's how these

10 gambling operations normally work.  They worked in the '70s

11 that way, they work that way now.  You have a central buyer

12 room, you have runners in the field; runners who go around

13 taking bets from people and then they phone it in.

14         Joseph Capone was clearly a runner, and the

15 undercover was placing bets with the runner, and it was coming

16 back to the defendant.  So, when Mr. Lucadamo's testifying

17 that I arrested the defendant and I obtained his alias, there

18 is an indicia of reliability.

19         Furthermore, there's information in the report, in

20 the report that shows that the defendant was providing

21 information.  Information that could not be gleaned from an

22 undercover.

23         THE COURT:  Let me see the report.

24         (Handing.)

25         THE COURT:  You said there is indication in the

1  report.

2          MR. TOOSSI:  Of personal information, correct,

3  Your Honor.  And I'll point it out here.

4          He indicated his wife's name is Jacqueline Settele.

5  In Government's Exhibit 608, a certified record of birth.

6  That's the defendant's daughter.  Jacqueline Settele is his

7  wife and the daughter is listed there as well, Vita, at

8  two-and-a-half years old, which is consistent with this

9  information.

10         It also contains the defendant's address.  And it

11  also contains his military duty.

12         MR. NORRIS:  The defendant's address is at the

13  bottom of the birth certificate.

14         MR. TOOSSI:  Correct.

15         So there's an indicia of reliability that this

16  information was coming from the defendant at that time.

17         And the surrounding circumstances show that the

18  undercover couldn't have provided it and had nothing to do

19  with preparing the report.

20         THE COURT:  And the undercover was simply calling in

21  bets and not having contact with this John Canova?

22         MR. TOOSSI:  That's the information this we have

23  here, that Repedi, Sergeant Repedi began betting with Joseph

24  Capone and then Joseph Capone was -- that John Canova was

25  accepting bets from Joseph Capone.

1      And based on our background information on how these

2  gambling operations usually work, that's how they work.

3  There's a runner in the field, collects bets, calls them in to

4  a wire room, and the defendant was arrested in a wire room.

5      And actually, Your Honor, just to further this

6  point, I mean his interview, this is his interview with the

7  FBI, Lucadamo stated at the time John Canova was arrested at

8  the club.  Just by background, this is Jo-Jo Corozzo's club,

9  which acted as a wire room.  Dominick Corozzo, Jo-Jo's father,

10  was manning the telephones at the time.  So clearly, what's

11  happening here is that's a wire room and the undercover may

12  not have any sort of contact with the defendant.

13      So, this argument that clearly this information is

14  coming from an outside source is simply incorrect, given that

15  what we have in the arrest report is a lot of personal

16  information that is accurate.

17      And just as another point here, Your Honor, the

18  defendant lied about his true name, he lied about his

19  Social Security number and he lied about his date of birth.

20  And we have this from the Government's Exhibit 641 and, if you

21  compare the birth date that he gave to the birth date that he

22  gave here, that's off by a digit.  If you compare his

23  Social Security number to the arrest report, it's different.

24      And so, what's clear from this report is what the

25  defendant was doing was he was -- there are three ways that we

1  identify ourselves in all the databases.  Our name, our date

2  of birth and our Social Security number.  He lied about those

3  three things and then gave the truth about everything else.

4  And that information is clearly coming from the defendant.

5          MR. CARNESI:  Or was not recorded accurately because

6  he gives his address as to where to find me.  I'm going to

7  hide and give false information, but I'm giving you my

8  address, my wife's name and my child's name.

9          MR. TOOSSI:  And one other point, Your Honor.

10          We also have testimony in this case from one witness

11  who knew the defendant as Bobby at the time and another

12  witness who knew Pepe at the time.  So, if we're talking about

13  indicia of reliability, this is --

14          THE COURT:  But that is not the issue.  The issue is

15  where this witness received his information.  If he received

16  it from the defendant, it goes in.  If he did not, then it's

17  hearsay.

18          MR. CARNESI:  Judge --

19          MR. TOOSSI:  Your Honor, my point is that based on

20  his testimony in conjunction with what else we know, it's

21  clear that this information is coming from the defendant.

22          MR. CARNESI:  Judge, once again, he clearly said he

23  doesn't recall.  If I can just refer to the memorandum that

24  Counsel was citing a little white ago.

25          First of all, it refers to an officer by the name of

1   Repedi, as he said, who was undercover.

2          It goes on to say that Repedi was placing bets with

3   an individual by the name of Joe Capone.  Capone is a

4   low-level bookie in partnership with Richard Giordanello.

5   Capone introduced the undercover over to Giordanello, who

6   collects money from numbers, sports betting, booking and

7   loansharking every evening at a particular location.

8   Giordanello is very open about his operation, all right.

9          So, there was a host of information that was coming

10  from somebody.  This officer -- this retired detective, I

11  should say -- cannot distinguish at this point in time what

12  came from whom.

13         THE COURT:  But that's not what he said.  He said I

14  received the information from the defendant.

15         MR. CARNESI:  Judge, that's what I asked him.  He

16  said he does not recall that.  He said in the normal scheme of

17  things I would receive the information.  But he could have

18  received it from any number of references.

19         If you look at the complaint, which is what he

20  signed, it says that the information provided in the complaint

21  is based upon information and belief, the grounds for the

22  belief being predicated upon an investigation that he took

23  part in and two different wire-taps.

24         This is as it normally is, Judge, in the course of a

25  two-month investigation, whatever it is, it's a compilation of

1   information.

2           MR. TOOSSI:  Your Honor, I don't believe that there

3   is any indication in this report, actually there is no

4   indication in this report that Repedi ever met John Canova.

5   There's simply none.  And there's no indication that he ever

6   went to the club that John Canova was found at.  Yes, there's

7   compilations of information, but based on his testimony, this

8   report is based on an interview with the arrestee.

9           THE COURT:  I'm just not satisfied with that.  I'm

10  not.

11          MR. TOOSSI:  One last point, Your Honor.

12          That this complaint here for John Canova, there's no

13  indication of any aliases there.

14          THE COURT:  Yes, I know.  It's on the arrest report.

15          MR. TOOSSI:  He put in information here from a

16  fellow officer, but that doesn't reflect any information about

17  a Pepe or a Bobby.

18          THE COURT:  I don't -- yes?

19          MR. TOOSSI:  And then the last point that I'll make,

20  Your Honor, is this.  It is that the rule does not -- the

21  Second Circuit has not required the person specifically

22  remember making the report.  They have to be able to say that

23  that is their report that they adopted at the time.  That's

24  the specific.

25          And if I may just point out in our motion what the

1  Second Circuit's clearly said.  The same result follows even

2  if the witness cannot specifically --

3           THE COURT:  The witness has to be able to remember

4  where he got the information from.

5           MR. TOOSSI:  And he testified specifically that the

6  information came from the defendant.  He doesn't recall the

7  conversation, but he did testify that the information came

8  from the defendant.  It's not a matter of whether he recalls

9  the conversation.  The whole point is that he doesn't recall

10  the conversation.

11           THE COURT:  I understand that.

12           MR. DiBENEDETTO:  Judge, the one thing that past

13  recollection recorded does not excuse is a hearsay statement.

14           THE COURT:  Correct.

15           MR. DiBENEDETTO:  And Your Honor has focused in on

16  the key issue, which is where did this particular witness

17  obtain this information?  And in questioning by Mr. Carnesi,

18  he was very, very clear that he had no recollection with

19  regard to that specific question.

20           So, under those grounds, as Your Honor has

21  indicated, it is clearly a hearsay statement and should be

22  precluded.

23           MR. TOOSSI:  It is not a hearsay statement if he

24  doesn't know where he got it from.  It just means that they

25  believe it was a hearsay statement.

1          MR. CARNESI:  It is a hearsay statement.  It's an

2     out of court declaration, unless there's an exception to it.

3          MR. TOOSSI:  Excuse me.

4          He testified very clearly on direct examination that

5     that report was based on an interview with the defendant.

6     Now, does he specifically remember the conversation about an

7     alias?  No, he doesn't recall that.  But it's in the report.

8     It's accurately reflected in the report and he testified very

9     clearly on direct examination that the contents of the report

10    accurately reflect his personal knowledge at the time that he

11    created the report.

12         THE COURT:  Well, go back and ask him about the

13    aliases and whether he used information other than what he

14    received from the defendant.

15         MR. TOOSSI:  Okay.

16         THE COURT:  All right.

17         (Side-bar end.)

18

19         (In open court.)

20    DIRECT EXAMINATION

21    BY MR. TOOSSI:  (Continuing)

22    Q    Detective Lucadamo --

23         MR. TOOSSI:  May I approach, Your Honor?

24         THE COURT:  Yes.

25         MR. TOOSSI:  Detective Lucadamo, do you still have

1  in front of you 3500-NL-2?

2         THE WITNESS:  Yeah.

3  Q    You testified earlier that this is a report that you

4  created after John Canova had been arrested; correct?

5  A    Correct.

6  Q    Now, was the information that you created in this report

7  obtained from any other source other than your personal

8  observations or your interview with John Canova?

9  A    No.

10        THE COURT:  All right.

11        THE WITNESS:  No other sources.

12        THE COURT:  Then I'll allow it.

13  Q    Mr. Lucadamo, could you tell us what aliases John Canova

14  provided during this interview?

15  A    Pepe.

16  Q    Did he provide any other aliases?

17  A    It's a bad copy.  Pepe, looks like Bobby.

18  Q    Okay.  In this report, according to the report, where was

19  John Canova born?

20  A    Palermo, Italy.

21  Q    And according to this report, did John Canova wear

22  glasses?

23  A    Yes, he did.

24  Q    According to this report, who is the wife of John Canova?

25  A    Well, at the time I was advised that he was separated, so

1   his wife was Jacqueline Settele.

2   Q    According to this report, did John Canova have any

3   children?

4   A    I don't recall, and I can't see that on this copy.

5               MR. TOOSSI:  Your Honor, may I approach?

6               THE COURT:  Yes.

7               (Handing.)

8   Q    I'll ask the question again.  Does the report reflect

9   that John Canova had any children?

10  A    Yes, it does.

11  Q    And what was that child's name?

12  A    I believe it was Vita -- V-I-T-A.

13  Q    And according to the report, what was John Canova's

14  address?

15  A    86-40 79th Street in Ozone Park, New York.

16  Q    And according to this report, where was John Canova

17  arrested?

18  A    Looks like 77-04 101st Avenue, Ozone Park, New York.

19  Q    According to this report, what was the height and weight

20  of the defendant, John Canova?

21  A    Height was five foot nine.  Weight was 180 pounds.

22  Q    And how old was John Canova at the time of this arrest,

23  according to the report?

24  A    Thirty-one years.

25              MR. TOOSSI:  No further questions, Your Honor.

1          THE COURT:  Cross-examination.

2          MR. CARNESI:  Thanks.

3     CROSS-EXAMINATION

4     BY MR. CARNESI:

5     Q    Mr. Lucadamo, for how long a period of time was this

6     investigation being conducted?

7     A    From the best that I could recall, I would say two

8     months.  Possibly three.

9     Q    Okay.  And what was your role in the course of this

10    investigation?

11    A    I was investigating detective.

12    Q    As investigating detective, what exactly were your

13    responsibilities?

14    A    What were my responsibilities?

15    Q    Yeah.

16    A    To put the case together and make arrests, if necessary.

17    Q    Okay.  When you say put the case together, were there

18    other officers involved in the investigation?

19    A    Yes, sir.

20    Q    Okay.  Specifically, do you recall how many other

21    officers?

22    A    I would say approximately anywhere from five up to

23    twelve.

24    Q    Okay.  Now, some of those officers would have been

25    monitoring wire-taps; right?

1   A    Correct.

2   Q    Okay.  And as the investigating over, did they report to

3   you?

4   A    Well, they turned in reports every day that they were

5   completed with their tour.

6   Q    Okay.

7   A    And they were given to me.

8   Q    And you would, from time to time, review those reports;

9   correct?

10  A    Yes, I did.

11  Q    Okay.  And you would review them to see what types of

12  conversations were taking place on the wire-taps; is that

13  right?

14  A    Yes, sir.

15  Q    But you weren't personally involved in actually recording

16  the wire-taps, you were just getting reports from other

17  officers; right?

18  A    I really --

19  Q    If you recall?

20  A    -- don't recall.  I mean, it's possible that I did

21  monitor them also, but I don't recall.

22  Q    Okay.  How about a Sergeant Joseph Repedi?  Was he part

23  of your team?

24  A    Yes.

25  Q    Can you tell me what his responsibilities were?

1   A    Well, he oversaw the investigation and all the

2   investigations in Vice Squad at that time.

3   Q    Did you also have an undercover officer involved in this

4   operation?

5   A    Yeah, yes, there was.

6   Q    And who was that?

7   A    Jeez, I can't recall his name.

8   Q    Do you know how long a period of time he was undercover

9   in this operation?

10  A    He was placing bets with the defendant, I don't know how

11  long.

12  Q    Who was he placing bets with?

13  A    According to the information I received, with the

14  defendant.

15  Q    Wasn't he placing bets with an individual by the name of

16  Capone?  Does that refresh your recollection?

17  A    He was one of the people.

18  Q    Okay.  And as you sit here now, do you recall him placing

19  bets with the defendant as well?

20  A    I don't recall him doing it.  I wasn't present.

21  Q    Okay.  Did he ever refer to an individual he had met in

22  the course of his undercover responsibilities as John Canova?

23  A    Could you repeat that, please?

24  Q    Sure.  This individual whose name you don't remember who

25  was undercover --

1   A    Right.

2   Q    -- did he ever report back to you that he had had contact

3   with an individual known as John Canova?

4   A    Not that I recall.

5   Q    Do you recall whether or not you were aware of the name

6   John Canova before you arrested the defendant?

7   A    I don't recall, sir.

8   Q    May you have heard it on a wire-tap or in the course of

9   your briefings of the other officers?

10  A    It's possible.

11  Q    Okay.  Do you recall on the wire-tap or in the course of

12  your debriefings with the other officers ever hearing the name

13  Pepe?

14  A    I don't recall.

15  Q    Now, did you ever place any bets?

16  A    No, I didn't.

17  Q    On the arrest report it says brief details of the arrest

18  or reason for the investigation, if no arrest.

19          Do you see that section?

20  A    Details of arrest, you said?

21  Q    Yeah.  Right across it says state the offense promoting

22  gambling and then it says give the details of the arrest.

23  A    Okay.

24  Q    All right, you see that?

25  A    Yes, I do.

1    Q    Okay.  And the allegation at that time was that the

2    defendant had promoted or advanced --

3              MR. CARNESI:  I'm sorry, let me read it exactly.

4    Q    The defendant did advance or profit from unlawful

5    gambling activity; right?

6    A    Correct.

7    Q    Okay.  And in writing that in your report, that's a

8    compilation, is it not, of what the undercover officers had

9    told you, what your investigation had yielded, and also what

10   you had been aware of from the wire-tap; is that right?

11   A    Culmination of everything, yes.

12   Q    Right.  It's not your personal information; is it?  What

13   you personally observed?

14   A    No.

15   Q    Okay.  And once again, I'm going to ask you the same

16   question I did earlier.  As you sit here now, do you have a

17   specific recollection of having a conversation with

18   Mr. Vernace about an alias?

19             MR. TOOSSI:  Objection, asked and answered.

20             THE COURT:  I'll allow you to answer.

21             THE WITNESS:  I do not recall.

22             MR. CARNESI:  Okay, thank you, sir.

23             THE WITNESS:  You're welcome.

24             MR. TOOSSI:  No redirect, Your Honor.

25             THE COURT:  You may step down, thank you.

1           THE WITNESS:  Thank you, Your Honor.

2           (Witness excused.)

3           MR. TOOSSI:  Your Honor, the Government now calls

4    David Cotton.

5           (Witness enters and takes stand.)

6           THE COURTROOM DEPUTY:  Good morning.

7           THE WITNESS:  Good morning.

8           THE COURTROOM DEPUTY:  Please, raise your right

9    hand.

10

11          (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **D A V I D    C O T T O N**,

2           called by The Government, having been

3           first duly sworn, was examined and testified

4           as follows:

5

6           THE COURTROOM DEPUTY:  Thank you, please take a

7  seat.

8           Please, state your name and spell it for the record.

9           THE WITNESS:  My name is David Cotton --

10 C-O-T-T-O-N.

11          MR. TOOSSI:  May I enquire, Your Honor?

12          THE COURT:  Yes.

13 DIRECT EXAMINATION

14 BY MR. TOOSSI:

15 Q    Mr. Cotton, by whom are you employed?

16 A    I am employed with the Federal Bureau of Investigation.

17 Q    And where is your office located?

18 A    In Clarksburg, West Virginia.

19 Q    What is your position in the Federal Bureau of

20 Investigation?

21 A    My title is training administrator.

22 Q    How long have you been employed with the FBI?

23 A    Just over 25 years.

24 Q    What are your responsibilities as a training

25 administrator?

1  A    As the training administrator, I am responsible for the

2  training and education on all biometric services that the FBI

3  offers and that includes fingerprint examination, facial

4  examination, as well as criminal history record information.

5  Q    What training have you received in the field of

6  fingerprint comparison?

7  A    I've received continuous training for 25 years, but when

8  I started the FBI 25 years ago I received the initial

9  fingerprint training, which lasted approximately 14 weeks.

10       Through the years I've received subsequent training,

11  which is more advanced.  And then of course, as I grew in my

12  career, I received testimony and more advanced training in

13  terms of the science of fingerprints themselves.

14  Q    How many occasions have you had to compare fingerprints?

15  A    In my 25 years I have compared hundreds of thousands of

16  fingerprints.

17  Q    Other than the FBI training, did you receive any

18  certifications or training in the field of fingerprint

19  comparison?

20  A    Yes.  I am certified with the International Association

21  for Identification or IAI as it is commonly known.

22  Q    What is a known or inked fingerprint?

23  A    A known fingerprint is one that was intentionally or

24  deliberately recorded.

25       On the palm or surface of the hand there are raised

1  portions of skin known as friction rims and when a thin coat

2  of printer's ink is applied to those ridges and placed on a

3  contrasting background, it will leave an impression or

4  fingerprint, and that is what we call a deliberate

5  reproduction of the fingerprint.

6  Q    Can you tell us how fingerprints are compared and

7  identifications effected?

8  A    Yes.  I receive submissions and am asked to compare the

9  two and we use a methodology known as ACE-V, which is an

10 acronym ACE, dash, V.  The A stands for analysis; C for

11 comparison; E, evaluation and then; V, is verification.

12 Q    What are the basic factors in the use of fingerprints as

13 identification?

14 A    The basic factors that support fingerprint identification

15 are that they are persistent and unique.  Persistent in that

16 they are formed in, while someone is a fetus at the third or

17 fourth month of gestation and they are persistent through life

18 until death and decomposition, and that's barring any

19 permanent injury or scarring.

20        MR. TOOSSI:  Your Honor, at this time the Government

21 moves, pursuant to Rule 702, to have Mr. Cotton qualified as

22 an expert witness in connection with fingerprint

23 identification.

24        THE COURT:  Any objection?

25        MR. CARNESI:  No, Your Honor.

1          THE COURT:  So-ordered.

2          MR. TOOSSI:  Your Honor, at this time, the

3     Government moves into evidence Government's Exhibit 904.  It

4     is a stipulation -- I'm sorry, I don't move it in, I offer it

5     for evidence.  Government's Exhibit 904 is a stipulation

6     between the parties.

7          Your Honor, may I read it?

8          THE COURT:  Yes.

9          You're not moving it in?

10         MR. TOOSSI:  I was going to publish it.  Yes,

11    Your Honor, sorry.

12         MR. CARNESI:  No objection.

13         THE COURT:  All right.  I will receive Government's

14    Exhibit 904.

15         (Plaintiff's Exhibit 904 was received in evidence.)

16         MR. TOOSSI:  May I publish it to the jury,

17    Your Honor?

18         THE COURT:  Yes.

19         (The above-referred to Exhibit was published to the

20    jury.)

21         MR. TOOSSI:  It is hereby stipulated and by

22    Assistant United States Attorneys Evan M. Norris, Amir

23    H. Toossi and M. Kristin Mace, and the defendant Bartolommeo

24    Vernace, by his attorneys Charles F. Carnesi, Esq. and Joseph

25    DiBenedetto, Esq., that:

1          One, if called to testify, a custodian of record

2  employed by the Nassau County Police Department would testify

3  that the Government Exhibit --

4          THE COURT:  Your Exhibit is not fully on the screen.

5          MR. TOOSSI:  Oh, I'm sorry, yes.

6          -- Government's Exhibit 841 is a true and accurate

7  copy of the fingerprints taken from John Canova on

8  September 5th, 1979.

9          Two, if called to testify, a custodian of records

10 employed by the Federal Bureau of Investigation would testify

11 that Government's Exhibit 842 is a true and accurate copy of

12 the fingerprints taken from the defendant Bartolommeo Vernace

13 on January 20th, 2011, when he was arrested in this case.

14         Government's Exhibits 841 and 842, as well as the

15 stipulation, are admissible in evidence.

16         Your Honor, at this time the Government offers

17 Government's Exhibits 841 and 842 in evidence.

18         THE COURT:  All right.

19         MR. CARNESI:  No objection.

20         THE COURT:  Received.

21         (Government's Exhibits 841 and 842 were received in

22 evidence.)

23         MR. TOOSSI:  May I publish this to the jury,

24 Your Honor?

25         THE COURT:  Yes.

1          (The above-referred to Exhibits were published to

2   the jury.)

3          MR. TOOSSI:  May I approach the witness, Your Honor?

4          THE COURT:  Yes.

5          MR. TOOSSI:  Mr. Cotton, I'm showing you what's now

6   in evidence as Government's Exhibit 841 and 842.

7          (Handing.)

8   Q    Have you seen these documents before?

9   A    Yes.

10  Q    Where did you see them?

11  A    In my office in Clarksburg, West Virginia.

12  Q    How do you know that you've seen these Exhibits?

13  A    My highlight's on here, as well as my signature and date

14  on both Exhibits.

15  Q    Would you describe them for the record.

16  A    Okay.  Exhibit 841 is a standard ten-print fingerprint

17  card bearing the name of Ganova -- G-A-N-O-V-A, John, birth

18  date 3/29/48.

19          And Government's Exhibit 842 is also a standard

20  ten-print fingerprint card, bearing the name of Vernace,

21  Bartolomeo Charles.

22  Q    You referred to these as ten-prints.  What does ten-print

23  mean?

24  A    Ten-print meaning that there are ten fingerprints or ten

25  blocks, ten rolled fingerprints on here.

1  Q    Did you have an occasion to compare the fingerprints on
2  those two Exhibits?
3  A    Yes.
4  Q    And what were the results of your comparison?
5  A    The results were that I concluded that these fingerprints
6  were made by one and the same individual.
7  Q    Okay.
8           MR. TOOSSI:  I'd like to have you step off the stand
9  for just a moment.
10          (Witness steps down.)
11          MR. TOOSSI:  Your Honor.
12          THE COURT:  Yes.
13          MR. TOOSSI:  Government's Exhibit 843 is a
14  demonstrative Exhibit.
15          MR. CARNESI:  I have no objection.
16          MR. TOOSSI:  We offer it in evidence, Your Honor.
17          THE COURT:  Received.
18          (Government's Exhibit 843 was received in evidence.)
19          MR. TOOSSI:  I'm showing you Mr. Cotton, what is
20  Government's Exhibit 843.
21  Q    Mr. Cotton, what is Government's Exhibit 843?
22  A    843 is an example intended to educate on how we perform
23  the ACE-V that I described earlier, how we compare the
24  fingerprints and arrive at a conclusion.
25          This is a charted enlargement of two of the

1  fingerprints, one coming from S-1 or the first Exhibit, S-2

2  coming from the second Exhibit.  These are fingerprints.

3          I explained to you what a known fingerprint was

4  where a thin layer of printer's ink is placed on the friction

5  ridges and put on a contrasting background.  I've taken the

6  right index finger off of each Exhibit and enlarged it for

7  demonstration purposes.

8          The black lines that you see are the ridges and the

9  white areas in between are the furrows or the valleys, and

10 that occurs again when you print and you place the hand or the

11 fingers on the contrasting background.

12         What these are here, these points that I have

13 marked, are characteristics within the fingerprints again, for

14 demonstration purposes, on what we look for when we're

15 comparing images.  And there are three main types of details

16 that we look for.  There is a bifurcation, which is a ridge

17 that runs along and then splits into two.  There is an ending

18 rim, which is a rim that runs along and then abruptly stops.

19 And then there is a dot, which is pretty self-explanatory it's

20 a dot.  We refer to it as a ridge that is both as large as and

21 as wide as itself, so it's just a small dot.

22         So, those are the things that we're looking for and

23 I've marked A, B, C, D, E and F here in submission one, as

24 well as in submission two.  For instance, I have marked a

25 bifurcation which I just spoke of, which is a rim that splits.

1    Here is another bifurcation.

2              MR. TOOSSI:  Please, refer to the letter that you're

3    referring to.

4              THE WITNESS:  Yes, sorry.  A, B as well, a

5    bifurcation.  C is a dot in both Exhibits.  D is another

6    bifurcation and that's pointing downward.  The ridge runs

7    along and then splits into two.  E, again a bifurcation, which

8    is one ridge that runs and splits into two.  And then F is the

9    same, a bifurcation that splits into two.

10             A couple other characteristics that are noticeable

11   in A and in B, the bifurcation goes along, opens and then

12   closes again creating a little bit of an island, which is a

13   unique characteristic as well.

14             So, again the ACE-V.  A, the analysis phase, we look

15   at all of that information.  Comparison, we compare both to

16   see if those characteristics are in both prints and in the

17   same spacial relationship.  The E is the evaluation where I

18   actually make the decision that yes these, in fact, were made

19   by the same individual.  And then, the V or verification is

20   when another certified examiner comes behind me and does the

21   exact same process to verify that my conclusion was correct.

22   Q    And based on your examination of these fingerprints, 841

23   and 842, are John Canova and Bartolommeo Vernace one and the

24   same person?

25   A    Yes, sir.

1           MR. TOOSSI:  No further questions, Your Honor.

2           MR. CARNESI:  I have no questions, Judge.

3           THE COURT:  All right, you may step down.

4           THE WITNESS:  Thank you.

5           (Witness excused.)

6           THE COURT:  Counsel, could you come up for a minute,

7     please.

8           (Side-bar conference held on the record out of the

9     hearing of the jury.)

10

11          (Side-bar.)

12          THE COURT:  You didn't ask for a limiting

13    instruction, so I don't know whether you -- I mean, this

14    arrest for illegal gambling wasn't charged in the indictment.

15          MR. CARNESI:  That's right, although there are

16    gambling charges in there.

17          THE COURT:  Would you like --

18          MR. CARNESI:  Yes, I would request.

19          THE COURT:  What I am going charge is that this was

20    not offered to show propensity to commit crime and they can't

21    consider it in that manner.

22          Offered as proof of the existence and continuity of

23    the conspiracy charged in Count 1 of the indictment and for no

24    other reason.

25          MR. CARNESI:  Okay.

1          MR. NORRIS:  Your Honor, Your Honor ruled on our

2     motion, on this part we had offered them both for the reasons

3     Your Honor stated but also under 404(b) for proof of identity,

4     and I don't know if Your Honor granted that part of our motion

5     or not, but that was part of the basis.

6          THE COURT:  You offered proof of identity.

7          MR. NORRIS:  Under 404(b).

8          MR. CARNESI:  And just for the record, Judge, I want

9     to renew my objection to that testimony as to the alias.

10          THE COURT:  All right.

11          MR. CARNESI:  Did you move the arrest report into

12     evidence?

13          MR. TOOSSI:  No, it can't go into evidence.  He has

14     to read from the report.

15          THE COURT:  Yes, only an adverse party can move it

16     in.

17          MR. CARNESI:  All right.

18          THE COURT:  Okay all right.

19          (Side-bar end.)

20

21          (In open court.)

22          THE COURT:  Members of the Jury, you have heard

23     evidence that the Government has offered evidence that the

24     defendant was arrested on September 4th, 1979, for promoting

25     gambling in the second degree.

1       I want you to understand that this evidence is not

2   accepted or offered to show propensity to commit any crime.

3   It is offered as proof of the existence and continuity of the

4   conspiracy charged in Count 1 of the indictment and as proof

5   of identity, and for no other reason.  You may not consider it

6   for any other reasons.

7       All right.

8       MR. TOOSSI:  Your Honor, our next witness may take

9   some time, I don't know if Your Honor wishes to take our

10  mid-morning break now.

11      THE COURT:  All right.  We'll take our

12  fifteen-minute break now.

13      Please, remember my admonitions.  Do not discuss the

14  case.  Please, keep an open mind.

15      THE COURTROOM DEPUTY:  All rise.

16      (Jury exits at 11:16 a.m.)

17

18      (In open court.)

19      (The following occurs outside the presence of the

20  jury.)

21      THE COURT:  All right.  At 11:30, we will start

22  again.

23      ALL:  Thank you.

24      (Defendant remanded.)

25      (Recess taken.)

1          (In open court.)

2          (Judge SANDRA L. TOWNES enters the courtroom.)

3          THE COURTROOM DEPUTY:  All rise.

4          Defendant enters the courtroom.)

5          THE COURT:  We're ready for the jury?

6          ALL:  Yes.

7          (Pause in the proceedings.)

8

9          (In open court.)

10         THE COURTROOM DEPUTY:  All rise.

11         (Jury enters at 11:38 a.m.)

12         THE COURT:  Be seated, please.

13         The jury is present, the defendant is present, and

14    all Counsel.

15         MR. TOOSSI:  Your Honor, the Government calls Louis

16    Diaz.

17         (Witness enters and takes stand.)

18         THE COURTROOM DEPUTY:  Good morning.

19         THE WITNESS:  Good morning.

20         Good morning, Your Honor.

21         THE COURTROOM DEPUTY:  Please, raise your right

22    hand.

23

24

25

1    **L O U I S    D I A Z**,

2           called by The Court, having been

3           first duly sworn, was examined and testified

4           as follows:

5

6           THE COURTROOM DEPUTY:  Thank you, please take a

7    seat.

8           Please, state your name and spell it for the record.

9           THE WITNESS:  My name is Louis Diaz -- L-O-U-I-S,

10   D-I-A-Z.

11          MR. TOOSSI:  May I enquire, Your Honor?

12          THE COURT:  Yes.

13   DIRECT EXAMINATION

14   BY MR. TOOSSI:

15   Q    Mr. Diaz, are you currently employed?

16   A    No.

17   Q    Are you retired?

18   A    Yes.

19   Q    Before you retired, who were you employed by?

20   A    United States Department of Justice Drug Enforcement

21   Administration.

22   Q    And that from what year to what year?

23   A    1975 to 1996.

24   Q    What was your title?

25   A    Special agent.

1  Q    And as a special agent, what were your responsibilities
2  and duties?
3  A    Fundamentally, to enforce the United States narcotics
4  laws.  Specifically, to deter and arrest those that were
5  involved in the illegal manufacture, sale and distribution of
6  narcotics.
7  Q    As a DEA special agent, did you ever act in an undercover
8  capacity?
9  A    Yes.
10 Q    Can you explain what it means to act in an undercover
11 capacity?
12 A    Fundamentally, to assume the role appropriate to the
13 investigation that you're conducting.
14 Q    Does that include posing as someone who you're not?
15 A    Yes.
16 Q    In what way?
17 A    Well, in this particular case, as a narcotics dealer.
18 Q    When you mean this particular case, are you referring to
19 an investigation that you conducted in the first half of 1981?
20 A    Yes.
21 Q    And did that investigation involve a heroin distribution
22 conspiracy?
23 A    Yes.
24 Q    Were any arrests made in connection with that
25 investigation?

1  A    Yes, there were.

2  Q    Do you recall who was arrested?

3  A    Yes, I do.

4  Q    Could you please tell us who was arrested?

5  A    Bruce Erbacher, Herbert Frank, Tony Cuccio, Ron Barlin,

6  Pauline Frank, George Gleckler, and Milagros Fantauzzi.

7            MR. TOOSSI:  Your Honor, may I approach the witness?

8            THE COURT:  Yes.

9            MR. TOOSSI:  Mr. Diaz, I'm showing you what's been

10 marked for identification as Government's Exhibit 811.

11 Q    What is Government's Exhibit 811?

12 A    Bruce Erbacher.

13 Q    Is it a fair and accurate depiction of the way that he

14 appeared when you arrested him?

15 A    Yes.

16           MR. TOOSSI:  The Government offers Government's

17 Exhibit 811 into evidence.

18           MR. CARNESI:  No objection.

19           THE COURT:  Received.

20           (Government's Exhibit 811 was received in evidence.)

21           MR. TOOSSI:  And Your Honor, we were going to post

22 these photos on the board.  We have identified the board as

23 Government's Exhibit 1-B.

24           I don't know if there's an objection.

25           MR. CARNESI:  Not at all.

1          THE COURT:  All right, I'll receive 1-B.

2          (Government's Exhibit 1-B was received in evidence.)

3          THE COURT:  Is it -- E-R-B-A-C-H-E-R?

4          THE WITNESS:  I believe so, Bruce Erbacher, yes.

5          THE COURT:  It would help the court reporter if you

6    could spell these names, please.

7    Q    Mr. Diaz, I'm going to show you what has been marked for

8    identification as Government's Exhibit 813?

9    A    Herbert Frank.

10   Q    Is this a fair and accurate depiction of Herbert Frank as

11   he appeared on the day that he was arrested?

12   A    Yes, it is.

13         MR. TOOSSI:  We would offer Government's Exhibit 813

14   into evidence.

15         MR. CARNESI:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 813 was received in evidence.)

18   Q    Mr. Diaz, I'm showing you what's been marked for

19   identification as Government's Exhibit 814.

20         What is Government's Exhibit 814?

21   A    Pauline Frank.

22   Q    Is this a fair and accurate depiction as she appeared on

23   the day that she was arrested by you?

24   A    Yes.

25         MR. TOOSSI:  We would offer Government's Exhibit 814

1   into evidence.

2           MR. CARNESI:  No objection.

3           THE COURT:  Received.

4           (Government's Exhibit 814 was received in evidence.)

5   Q    I'm showing you what's already in evidence as

6   Government's Exhibit 5.

7           What is Government's Exhibit 5?

8   A    Ron Barlin.

9   Q    Is this a fair and accurate depiction of Ron Barlin as he

10  appeared on the day that you arrested him?

11  A    Yes.

12  Q    What was Ron Barlin's full name?

13  A    As far as I know, it's just Ron Barlin.

14  Q    Okay.  I'm showing you what's already in evidence as

15  Government's Exhibit 23.

16          What is Government's Exhibit 23?

17  A    Tony Cuccio.

18  Q    Is this a fair and accurate depiction of Tony Cuccio on

19  the day that you arrested him?

20  A    Yes, it is.

21  Q    All right.

22          MR. CARNESI:  No objection.

23          THE COURT:  You're offering it?

24          MR. TOOSSI:  Yes, Your Honor.

25          It's already, this one's already in evidence,

1   Your Honor.

2          THE COURT:  All right.

3   Q   Mr. Diaz, I'm showing you what's been marked for

4   identification as Government's Exhibit 815.

5          Do you recognize this Exhibit?

6   A   That's George Gleckler.

7   Q   Is this a fair and accurate depiction of George Gleckler

8   on the day that you arrested him?

9   A   Yes, it is.

10         MR. TOOSSI:  We would move 815 into evidence.

11         MR. CARNESI:  No objection.

12         THE COURT:  All right, received.

13         (Government's Exhibit 815 was received in evidence.)

14  Q   I'm now showing you what's been marked for identification

15  as Government's Exhibit 812.

16         What is Government's Exhibit 812?

17  A   That's Milagros Fantauzzi.

18  Q   Is this a fair and accurate depiction of Ms. Fantauzzi

19  the day that she was arrested by you?

20  A   Yes, it is.

21         MR. TOOSSI:  We would move Government's Exhibit 812

22  into evidence, Your Honor.

23         THE COURT:  Any objection?

24         MR. CARNESI:  No, Your Honor.

25         THE COURT:  Received of the.

1          (Government's Exhibit 812 was received in evidence.)

2   Q    Mr. Diaz, directing your attention to January 1981.  Did

3   you receive information from a confidential informant

4   regarding Bruce Erbacher?

5   A    Yes, I did.

6   Q    What is a confidential informant?

7   A    Confidential informant is an individual who cooperates

8   with the Government in facilitating an investigation that he

9   is involved in.  He could be paid or he could be working off a

10  beef.  In other words, he's looking for a deal with the

11  Government to work out to receive some kind of consideration

12  for the Government.

13  Q    By consideration do you mean leniency?

14  A    Leniency, yes.

15  Q    And who was the particular confidential informant, if you

16  recall?

17  A    I recall his name as being Larry.

18  Q    Did there come a time when Larry purchased heroin from

19  Bruce Erbacher?

20  A    Yes, there came a time.

21  Q    Can you tell us what happened?

22  A    Basically, it was a controlled buy, meaning that I drove

23  the informant to the vicinity, to the residence of Bruce

24  Erbacher and before he went there, he was searched to ensure

25  that he didn't have narcotics on him at the time.

1          And then, I observed him enter the apartment, the

2     building where Bruce Erbacher lived.  He was in there for a

3     while and he came out, at which time when he did come out, he

4     showed me the sample of heroin that he had purchased.

5     Q    All right.  In terms of the sale, were you able to

6     observe the sale or no?

7     A    No, I just observed him go in and out.

8     Q    Now, did there come a time when Larry introduced you to

9     Bruce Erbacher?

10    A    Yes.

11    Q    What was the purpose of Larry introducing you to Bruce

12    Erbacher?

13    A    Well, Larry introduced me to Bruce Erbacher as a

14    narcotics supplier to make purchases of heroin from Bruce.

15    Q    Did you have conversation with Erbacher about heroin?

16    A    Yes.

17    Q    What was the substance that have conversation?

18    A    Fundamentally, I explained to Bruce that I had, I was a

19    source of supply, I was one of the source of supply for

20    dealers, drug dealers in Philadelphia.  And that my source of

21    supply lost his source of supply and I was looking for another

22    source of supply to supply my people in Philadelphia.

23    Q    Was any of that true?

24    A    No.

25    Q    Are you familiar with something known as a backstory?

1  A    Yes, of course.

2  Q    What is a backstory?

3  A    It's a story that supports who you are at the time.

4  Q    And as an undercover agent, would you use a backstory?

5  A    Yes.

6  Q    For what purpose?

7  A    For that purpose, to enforce, to support who you are as

8  that person in that role.

9  Q    During the course of this conversation, did Erbacher tell

10  you anything about his suppliers?

11  A    Yes.

12  Q    What did he tell you about his suppliers?

13  A    He told me these people were well organized and that they

14  were into gambling and loansharking.

15  Q    And when he said that they were organized what, if

16  anything, did you understand him to mean by that?

17  A    Italian Mafia, organized crime, Italian Mafia,

18  La Cosa Nostra.

19  Q    Why did you draw that conclusion?

20  A    Because during that period of time and during my

21  experience as a law enforcement officer, that was really the

22  main label that was affiliated with Italian Mafia families,

23  organized crime.  At that time.

24  Q    Did there come a time when you purchased heroin from

25  Bruce Erbacher yourself?

1   A    Yes.

2   Q    What quantities did you purchase?

3   A    Multi ounces.

4   Q    Do you recall specifically as you sit here today how many

5   ounces you purchased from him?

6   A    From two to four ounces.

7   Q    Do you recall on how many different occasions you

8   purchased heroin from Bruce Erbacher?

9   A    Best I remember, from three or four occasions.  Three or

10  four occasions.

11  Q    Did there come a time when Bruce Erbacher introduced you

12  to anyone else with whom he was selling heroin?

13  A    Yes.

14  Q    Who did he introduce you to?

15  A    Herbert Frank.

16  Q    Was that the first time that you'd ever seen Herbert

17  Frank?

18  A    No.

19  Q    When had you seen him before?

20  A    Well, we had established surveillance on the residence of

21  Bruce Erbacher and we observed an individual parked near the

22  vicinity of Erbacher's residence and then, observed this

23  individual enter the apartment building for Bruce Erbacher.

24  And then sometime thereafter, we observed him leave, get into

25  his vehicle, and that person turned out to be subsequently

1  Herbert Frank, as a result of making a search, running his

2  plates.

3  Q    Incidentally, you've mentioned Bruce Erbacher's home a

4  couple times now.  Do you recall where Bruce Erbacher's home

5  was?

6  A    In the vicinity of, I think it was on 10th Street, if I

7  recall correctly.  10th street on the East Side.

8  Q    Is that in Manhattan?

9  A    Yes.

10  Q    Now, returning to your meeting with Herbert Frank, did

11  you and Herbert Frank discuss the sale of heroin?

12  A    Yes.

13  Q    Where did that meeting take place?

14  A    In Bruce Erbacher's apartment.

15  Q    What in substance was said during that conversation?

16  A    Basically, I ran down the same story that I gave Bruce,

17  that basically I was looking for new sources of supply for my

18  people in Philadelphia and I was looking for heroin on a

19  steady basis.  That it had to be readily available and if it

20  was, we would parlay.  During the same conversation Herbert

21  Frank told me that his people were well organized.  Well

22  organized.  They were organized.

23  Q    And when he told that you that what, if anything, did you

24  say?

25  A    I said connected.  Family.

1  Q    And what did he respond to that?

2  A    He did, yes.

3  Q    What did he say?

4  A    He says you got it.

5  Q    From this exchange what, if anything, did you understand

6  about Herbert Frank's suppliers?

7  A    That they were involved with organized crime, they were

8  Italian Mafia.

9  Q    Over the next few weeks, did you purchase any more heroin

10  from Bruce Erbacher?

11  A    Yes.

12  Q    In what amounts?

13  A    As best I remember, multi ounces, couple ounces and

14  perhaps at one occasion what we call an eighth of a key, which

15  was four ounces of heroin.

16  Q    Did there come a time when you told Erbacher that you

17  wanted to purchase larger amounts of heroin?

18  A    Yes.

19  Q    Did he agree to do so?

20  A    Yes.

21  Q    How much heroin did he agree to sell you?

22  A    Half a kilogram.

23  Q    And did you and Erbacher agree on a price?

24  A    Yes.

25  Q    Did there come a time when you went to Erbacher's home to

1  purchase that half kilo of heroin?

2  A    Yes.

3  Q    Did you take any money to that meeting?

4  A    Yes.

5  Q    Did you show it to Erbacher?

6  A    Yes.

7  Q    Why?

8  A    Well, to demonstrate that I was good for the money.

9  Q    And so where did that money come from?

10 A    Well, it was considered official advanced funds.  It was

11 Government money, for that purpose.

12 Q    Subsequent that meeting, were you able to consummate this

13 deal for half a kilo of heroin?

14 A    No.

15 Q    Why not?

16 A    According to Bruce, he was having difficulty or his

17 people were having difficulty getting together for some

18 reason.  There was some kind of a struggle or something.

19 Q    Did you continue to speak with Erbacher regarding the

20 sale of heroin?

21 A    Yes.

22 Q    Did there come a time when Erbacher told you more about

23 his suppliers?

24 A    Yes.

25 Q    What did he tell you about his suppliers?

1  A    Well, he told me that there would come a time, if not

2  relatively soon, that I could meet his people because we had

3  established a pretty good relationship during the course of

4  our negotiations and business transactions.

5  Q    Did he tell you anything about his people?

6  A    Yes, he told me again these were basically the same

7  people that he was dealing with, that they were organized

8  people and that eventually I would get to meet them.  And that

9  he mentioned that somewhere during the course of the

10 conversation their names as being Ron and Pepe.

11 Q    Did there come a time when you placed Erbacher under

12 arrest?

13 A    Yes.

14 Q    Were you able to purchase the half kilo of heroin from

15 him before you placed him under arrest?

16 A    No.

17 Q    Why did you place him under arrest before you were able

18 to purchase the half kilo of heroin?

19 A    Well, for one, I, since the deal wasn't going down, I

20 felt, I felt I didn't want him to be on the loose.  I didn't

21 want to risk him being on the loose, I didn't want to wait any

22 longer for the heroin.  And also I had a feeling he might

23 cooperate once he was arrested.

24 Q    And when you say he might cooperate, what do you mean by

25 that?

1  A    We call it flip.  In other words, he might provide

2  information against the people we were dealing with.

3  Q    And after you arrested him, did he, in fact, cooperate?

4  A    Yes, he did.

5  Q    What happened next?

6  A    There came a time when he made a phone call to Herbert

7  Frank's apartment.

8  Q    And what was the purpose of making that call?

9  A    To see if he could still get the half kilo of heroin.

10 Q    And did he speak to anybody when he made those calls, as

11 you recall?

12 A    As I recall, he spoke to Pauline and he may have spoke to

13 someone else.  I believe he may have spoken to someone else,

14 but I don't remember exactly who it was.

15

16              (Continued on following page.)

17

18

19

20

21

22

23

24

25

1  BY MR. TOOSSI:

2  Q    Did there come a time when you obtained an arrest warrant

3  for Herbert Frank?

4  A    Yes.

5  Q    What did you do after you obtained an arrest warrant for

6  Herbert Frank?

7  A    We proceeded to the apartment of Herbert Frank, where we

8  executed the arrest warrant.

9  Q    Can you tell how you approached the door?

10 A    Well, once we got to the floor where the apartment was

11 located, I went to the door and we listened --

12 Q    Did you hear anything?

13 A    Yes, we heard noise and conversation.

14 Q    What did you do next?

15 A     -- at which point we knocked on the door.

16 Q    Did the people inside open the door?

17 A    Yes.

18 Q    Who opened the door?

19 A    Pauline.

20 Q    Pauline Frank?

21 A    Yes.

22 Q    After she opened the door, did you enter the apartment?

23 A    Yes.

24 Q    What did you see when you entered the apartment?

25 A    From what I remember, it was a small apartment, and there

1  was a couple of suitcases not far from the entrance of the

2  door.  Besides seeing Pauline Frank, there was an individual

3  who we subsequently identified as Ron Barlin.  He was in a

4  chair or on couch, as far as I remember.  After making a

5  cursory search of the apartment, I discovered this person Tony

6  Cuccio who was laying down on the bed in the bedroom.

7  Q    The photo that's in evidence of Tony Cuccio, you can see

8  there's a bandage on his head.  Did you learn why Anthony

9  Cuccio had a bandage on his head?

10 A    Yes.

11 Q    Why did he have a bandage on his head?

12 A    They tried to assassinate him a few days earlier.  He

13 received a head wound.

14 Q    Was he in the bed?

15 A    Yes.

16 Q    Was Herb Frank in the apartment?

17 A    No.

18 Q    What did you do next?

19 A    As best as I remember, I think there came a time where I

20 might have -- I don't recall this specifically -- where I

21 might have gone for the search warrant, but I don't recall at

22 this time.  However, there came a time when Tony asked me if

23 he could go to his bags, the suitcase, at which time I allowed

24 him to do so.

25 Q    What happened?

1    A    Once he went to the suitcase and opened the suitcase, I

2    saw what was the stock of a shotgun or rifle, and I stopped

3    him immediately, and it turned out to be a sawed-off shotgun.

4    Q    Did anything else happen that you recall?

5    A    Well, during the course of being in the apartment at that

6    time, I remember Pauline going to the bathroom, and after a

7    while, she was in the bathroom for a while, and I heard the

8    toilet flushing a few times.  As I was about to make entry,

9    she came out.

10            MR. TOOSSI:  Just one moment, your Honor.

11            (Pause.)

12   Q    You mentioned that, just a moment ago, that Pauline Frank

13   went into the bathroom and flushed the toilet several times.

14   What, if anything, did you find significant about that?

15            MR. CARNESI:  Objection.

16            THE COURT:  Sustained.

17   Q    Did there come a time when you obtained a search warrant

18   for the residence?

19   A    Yes.

20   Q    Did you and your team search the apartment?

21   A    Yes.

22   Q    What, if anything, did you find?

23   A    We found multi ounces of heroin and cocaine, and we also

24   found a three-beam Ohaus scale.

25   Q    Do you recall how much heroin precisely you found in the

1  apartment that day, as you sit here today?

2  A    I recall approximately maybe three or four ounces.  A

3  couple of ounces, maybe.

4  Q    What significance, if any, did you draw from the fact

5  that you found a scale?

6  A    That they were definitely in the business of distributing

7  heroin.

8  Q    And the amounts of heroin that you found -- you just

9  mentioned that you found a couple of ounces of heroin -- in

10  your experience in the DEA, was that amount of heroin

11  consistent with personal use?

12  A    No.

13  Q    Or sale?

14  A    No.  For sale.

15  Q    Why do you say that?

16  A    Because basically, if for personal use, usually it's gram

17  quantities and they are in glassine envelopes.  Particularly

18  in this particular case, they were not drug addicts.  From the

19  nature of the course of the investigation and from what I

20  learned, these people were specifically dealers.

21  Q    After you found the heroin and cocaine, the scale and the

22  shotgun, what did you do?

23  A    There came a time when we were just waiting for the

24  warrant, and when the warrant came, we again -- I believe that

25  was --

1  Q    After the search warrant was executed, after you searched

2  the apartment, were Pauline Frank and Ron Barlin and Anthony

3  Cuccio placed under arrest?

4  A    Yes.

5  Q    During the course of your time in the apartment, did

6  anything else happen?

7  A    Yes, there was a phone call.

8  Q    What happened?  What did you do when there was a phone

9  call?

10  A    I picked up the receiver.  I answered the call.

11  Q    And what happened when you answered the call?

12  A    The male voice on the other side of the phone asked if

13  Herbie was there, and I told him, no, he wasn't.

14         He says, Look, is Pepe, is Pauline, there?

15         I says, Yes.

16         Let me speak to her.

17         Then I signaled for Pauline to get on the phone.

18  She got on the phone on another extension, and in the

19  conversation that ensued, Pepe asked -- this individual

20  identified himself as Pepe -- asked Pauline if everything was

21  okay, and she said, yes.

22         Pepe then asked Pauline if Tony was there.  She

23  said, yes.  He said, Put him on.  At that time, Tony Cuccio

24  got on the phone, and Pepe asked him, Is everything okay?, and

25  Tony said, no, at which time they both hung up.

1  Q    Okay.  Did Tony Cuccio do anything after that

2  conversation ended?

3  A    Yes.

4  Q    The call ended?

5  A    He threw me a look to say --

6            MR. CARNESI:  Objection.

7            THE COURT:  Sustained.

8  Q    Did there come a time when Herbert Frank returned to the

9  apartment?

10 A    Yes.

11 Q    Did he return alone or with other people?

12 A    With other people.

13 Q    How many other people?

14 A    Two others.

15 Q    And who were those two people?

16 A    Milagros Fantauzzi and George Gleckler.

17 Q    Was Herbert Frank placed under arrest?

18 A    Yes.

19 Q    Was anything recovered from him?

20 A    Yes.

21 Q    What, if anything, was recovered from him?

22 A    A substantial amount of money.

23 Q    Where was that money?

24 A    A good amount of it was in the briefcase that he was

25 carrying, and another amount was in his boots.

1  Q    Was anything recovered from Ms. Fantauzzi?

2  A    Yes.

3  Q    What was recovered from her?

4  A    Half kilo of cocaine.

5  Q    What happened next?

6  A    They were all placed under arrest and advised of their

7  constitutional rights.

8  Q    Subsequently, were you ever able to identify -- let me

9  ask you, going back for just a moment:  Do you recall Bruce

10 Erbacher's exact address?

11 A    Yes.

12 Q    What was it?

13 A    5 East 10th Street.

14 Q    Were you ever able to identify --

15            MR. CARNESI:  Judge, can we just know the borough?

16            THE COURT:  I'm sorry.

17            MR. CARNESI:  The address, 5 East 10th Street.

18            THE COURT:  What borough?  Mr. Diaz, what borough?

19            THE WITNESS:  5 East 10th Street, Manhattan.  Sorry.

20 Q    Do you recall how much money specifically you recovered

21 from Herbert Frank?

22 A    I think it was approximately $50,000.

23 Q    Do you recall the specific amount, exactly?

24 A    I have a vague recollection that it might have been

25 47,000 all told, perhaps.

1  Q    Were you ever able to identify the male caller who

2  identified himself as Pepe?

3  A    No.

4  Q    After these seven arrests that you have just discussed

5  with us, what attempts, if any, were made to find Pepe?

6  A    None.

7  Q    Why not?

8  A    We didn't have enough information to go on.

9  Q    What information did you have that would allow you to

10 identify Pepe?

11 A    Say it again?

12 Q    What information did you have that would allow you to

13 identify Pepe?  I'll withdraw the question?

14       Was Pepe nonetheless charged in this case.

15 A    Yes.

16 Q    Under what name?

17 A    John Doe, a/k/a "Pepe."

18 Q    Was John Doe a/k/a "Pepe" ever arrested, to your

19 knowledge?

20 A    No.

21 Q    In connection with your testimony today, did you do

22 anything to -- did you meet with government prosecutors to

23 discuss your testimony?

24 A    Yes.

25 Q    During those meetings, were you ever shown any prior

1  testimony that you had given in connection with this case?

2  Testimony?

3  A    No.

4  Q    What were you shown?

5  A    My reports.

6  Q    Did your reports refresh your recollection somewhat to

7  what had happened at that time?

8  A    Yes.

9  Q    Mr. Diaz, have you written a book about your life,

10 including your time in the DEA?

11 A    Yes.

12 Q    Are the contents of that book true?

13 A    Yes.

14 Q    Does it contain anecdotes about your situation growing

15 up?

16 A    Yes.

17 Q    Does it contain anecdotes about -- that are unflattering

18 to you?

19 A    To some degree, yes.

20 Q    Why did you include anecdotes that were unflattering to

21 yourself in your book?

22 A    Well, it was appropriate to the theme of what I was

23 trying to reflect in Dancing with the Devil.

24 Q    Dancing with the Devil is the name of the book?

25 A    Yes, sir.

1      THE COURT:  I'm sorry.  I didn't hear you.

2  Q    Dancing with the Devil is the name of the book?

3  A    Yes, a Simon & Schuster publication.

4  Q    What was the title a reference to?

5  A    The fact that I dealt with nefarious people all my life.

6  Q    Okay.

7  A    Even though I danced with the devil, I walked with God.

8  Q    Are there anecdotes in the book that you used your

9  position in the DEA, that you got people that you cared about

10 out of trouble?

11 A    Yes.

12 Q    Is there an incident depicted in the book in which you

13 used your position to get yourself out of trouble?

14 A    Yes.

15 Q    Are there incidents in the book in which you violated the

16 DEA policy on occasion?

17 A    Yes.

18 Q    Can you tell us about the instance in your book that you

19 violated DEA policy?

20 A    Well, there's the specific DEA policy which says you

21 should not front money, which means that you cannot give

22 monies to the person that you are dealing with --

23      MR. TOOSSI:  Your Honor, may I have the court read

24 back the last question?

25      (Record read.)

1  A      -- without a direct exchange of product; in this case,

2  narcotics.

3  Q    Did you ever front money without authorization?

4  A    Yes.

5  Q    Did you ever arm -- was there a policy about giving

6  firearms to confidential informants?

7  A    Yes.

8  Q    Did you ever violate that policy?

9  A    Yes.

10  Q    On how many occasions?

11  A    Once.

12  Q    Why did you give a confidential informant a gun?

13  A    Because we were involved in a very heavy, serious,

14  dangerous undercover situation, in which I feared for the

15  informant's life as well as mine.

16          MR. TOOSSI:  No further questions, your Honor.

17          THE COURT:  Cross-examination.

18          MR. CARNESI:  Thank you, your Honor.

19  CROSS-EXAMINATION

20  BY MR. CARNESI:

21  Q    Good afternoon, Mr. Diaz.

22  A    Good afternoon, counselor.

23  Q    My name is Charles Carnesi.  I represent Mr. Vernace?

24          Mr. Diaz, in that incident that you told us about

25  where you armed an informant, was that the only occasion that

1   you saw that informant with a gun.

2   A     As far as I remember, yes.

3   Q     You didn't know him to carry guns on his own?

4   A     Yes.

5   Q     I'm sorry?

6   A     I did know him to carry, yes.

7   Q     And although you knew him to carry guns, he wasn't

8   authorized to do so, was he?

9   A     No, he wasn't.

10  Q     You didn't report him for carrying a gun, did you?

11  A     No, I did not.

12  Q     Did you ever use your gun in an unauthorized manner?

13  A     Not that I remember, no, sir.

14  Q     Do you remember driving to the hospital with your brother

15  in 1975 while your brother was having a seizure, and do you

16  remember putting a gun to his head and telling him you would

17  put a bullet in his brain if he didn't stop?

18  A     Not exactly like that, sir, but that's close to what

19  happened.

20  Q     And that's what you wrote in your book; right?

21  A     Yes.  Okay.  Yes.  I didn't tell him that.  I didn't tell

22  him that.

23  Q     Isn't that what you said, "and told him you would put a

24  bullet in his brain if he didn't stop"?

25  A     I don't remember telling him that specifically.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1  Q    Let me show you LD-37, page 105.

2  A    Thank you, counsel.

3  Q    Sure?

4         (Pause.)

5  A    Counsel, I wrote this book in concert with Neal

6  Hirschfeld, a coauthor.  Perhaps that was his take on the

7  situation.

8  Q    That's not one of the unflattering things you wrote about

9  yourself?

10 A    Well, that was unflattering, yes.

11 Q    Was it true or was it?

12 A    I had the intention of doing that, but I didn't tell my

13 brother I was going to do that.

14 Q    Do you remember saying, I quickly put my gun away and

15 thanked God in heaven that I had not used it?

16 A    Yes.

17 Q    Was that your sentiment?

18 A    Yes.

19 Q    Do you remember actually describing the incident, saying,

20 In the next instant, I went cold.  My finger actually started

21 to pull the trigger.  Do you remember writing that in your

22 book?

23 A    Yes, I do.

24 Q    Do you remember sometime later taking your brother to the

25 hospital on a different occasion and interacting with a doctor

1  there?

2  A    Yes.

3  Q    Do you remember pulling your gun on the doctor?

4  A    I didn't pull a gun on the doctor.

5  Q    Do you remember saying, Grabbing the doctor by the

6  throat, I slammed him up against the wall.  Then I pulled my

7  gun and put the barrel up his nostril?

8  A    That's not true, no.  That's my coauthor exaggerating.  I

9  did put him up against the wall.

10 Q    Did you read the book before it went to press?

11 A    Of course.

12 Q    Were you aware of the fact that that story, that

13 anecdote, was in the book?

14 A    I believe so.  Yes, sir, I do remember now.

15 Q    Now, it's your testimony that it never happened?

16 A    As far as putting gun in his nose, no.

17 Q    Did you pull the gun on him?  What did you do?

18 A    No, I put my finger in his nose, as far as I remember.

19 Q    Do you remember the doctor asking for help?

20 A    Yes.

21 Q    Do you remember telling the doctor, You keep your mouth

22 shut, this never happened?

23 A    Yes.

24 Q    You told him that; right?

25 A    Yes.

1 Q     You tried to intimidate the doctor from telling what you

2 had done to him?

3 A     That is correct, yes.

4 Q     Do you remember an incident at the Brooklyn House of

5 Detention where you interviewed an inmate about information

6 dealing with a major Brooklyn gun runner and drug runner?

7 A     I don't know about him being a major gun runner, drug

8 runner.

9 Q     Isn't that how you described him in your book?

10 A     I don't remember exactly, sir.

11 Q     That's page 122.

12        THE COURT:  This is still LD-37?

13        MR. CARNESI:  Yes, your Honor.

14 A     Thank you.

15 Q     You are welcome?

16        (Pause.)

17 A     That's what the guard was saying, not that I said.

18 Q     Did you go and interview that individual?

19 A     Yes.

20 Q     When that individual started to provide you with

21 information, did you recognize the person he was discussing?

22 A     Yes, sir.

23 Q     Did you recognize him to be a friend of yours?

24 A     Yes, sir.

25 Q     Did you recognize this friend of yours to be a drug

1   dealer?

2   A    No, sir.

3   Q    You didn't know he was a drug dealer?

4   A    No, sir.

5   Q    You didn't know he was involved in guns?

6   A    Yes, I did.

7   Q    Now, the information that you were gathering from this

8   inmate I'm assuming was being done to assist you with

9   investigations or to determine whether an investigation was

10  going to be started; right?

11  A    That's correct, sir.

12  Q    He didn't think he was speaking to a friend of the

13  individual he was discussing, did he?

14  A    No, sir.

15  Q    You didn't tell him that, did you?

16  A    No, sir.

17  Q    And was it your understanding that he believed that he

18  was speaking to an agent of the DEA and that this information

19  was going to be kept confidential?

20  A    It was my understanding that he was speaking to an agent.

21  As far as confidential, if it went into a report and became

22  public, it wouldn't be confidential, would it?

23  Q    No.  Do you believe that he expected that the officer

24  from the DEA was going to go back and inform the person that

25  he was discussing?

1   A    No.

2   Q    Did you do that?

3   A    No.

4   Q    A year or so later, I happened to stop by at a bar in

5   Brooklyn, and who did I chance to run into?  The same friend

6   that prison snitch had tried to set up for a bust.  The two of

7   us got to talking about good old times:  Pulling the fire

8   department alarm, running like hell; the wise guys on the

9   corner; the fistfights down at the schoolyard.

10          Do you remember running into the individual at a bar

11  a year or so later.

12  A    Yes.

13  Q    Do you remember having that conversation?

14  A    Yes.

15  Q    Do you remember that you told him about the snitch in the

16  Brooklyn House of Detention who had been bartering for a break

17  by trying to drop a dime on him, and "how I nipped the whole

18  thing in the bud.  When I finished my tale, my friend threw

19  his arms around me and hugged me."

20          Do you remember that?

21  A    Yes, I do.  But I don't believe I said to that extent.

22  Again, that's my coauthor embellishing.

23  Q    Again, before the book went to press, you read what was

24  attributed to you, did you not?

25  A    Yes, sir.

1    Q    Do you remember the individual who you referred to as

2    Perky, your friend, telling you, That snitch, he ain't doing

3    no snitching no more.  Do you remember that?

4    A    Yes, sir, I do.

5    Q    The individual that you gave the gun to, the informant

6    that you discussed earlier, that was Geronimo?

7    A    That's correct.

8    Q    Do you remember recounting in the book an incident that

9    you had in an elevator, where you had a sudden desire to pull

10   your gun?

11   A    Not about pulling my gun.

12   Q    What do you recall about the incident?

13   A    I remember an incident in the elevator where I was in the

14   company of what I considered some sultry, surly-looking

15   fellows.  They were looking me up and down.  I opened up my

16   jacket and tapped my revolver.

17   Q    Shortly after that, were your -- did you surrender your

18   gun shortly after that?

19   A    Yes, I did.

20   Q    Was that because you didn't feel that you were

21   emotionally stable enough to carry a gun at that time?

22   A    Yes.

23   Q    Did you ever try to use the gun on yourself?

24   A    No.

25   Q    Do you recall recounting an incident -- page looks like

1  319 -- and stating these words:  "Like when I put my .38

2  caliber revolver to my head, cocked the hammer and started to

3  squeeze the trigger"?

4  A    Yes.

5  Q    Was that accurate, or was that your co-writer?

6  A    No.  That's correct.  But it was not in conjunction with

7  that incident.

8  Q    Okay.  You said on direct examination a little while ago

9  that the people who you described dealing with in the course

10  of your investigation back in 1981 were not drug users?  Do

11  you remember that?

12  A    Yes, sir.  Drug addicts, for that matter.

13  Q    Would that include Erbacher?

14  A    If I recall correctly, I believe Erbacher used from time

15  to time, but he was not an addict, what I would call an

16  addict.

17  Q    Do you recall referring to Mr. Erbacher as a heroin user?

18  A    I believe that might be true.  I believe that might be

19  correct.

20  Q    Did you ever learn whether Mr. Barlin or Mr. Cuccio used

21  drugs?

22  A    No.

23  Q    Now, you first contacted Mr. Erbacher or became aware of

24  Mr. Erbacher through another informant; is that right?

25  A    Through an informant, yes.

1   Q    Do you recall approximately when that was?

2   A    Not exactly.  I knew it was sometime before, a couple of

3   months, maybe before May sometime, but not exactly when, sir.

4   Q    Could it be sometime in early January, the early January

5   1981?

6   A    It's possible.

7   Q    Would that being be the right time rather than May?

8   A    Yes.

9   Q    In your experience as a DEA agent, there is an operation

10  known as a buy-and-bust; right?

11  A    Yes, sir.

12  Q    What is that?

13  A    Buy-and-bust is where you actually -- you don't actually

14  pay and leave with the narcotics.  You show the money, he

15  gives the drugs, and you lock him up right there.

16  Q    Immediately?

17  A    Immediately; correct.

18  Q    Now, there's another investigation that's more of a

19  long-term investigation; right?

20  A    I'm sorry?

21  Q    This was not a buy-and-bust, this investigation?

22  A    No, not in that particular instant, no.

23  Q    How would you describe this investigation?

24  A    It was, for all intents and purposes, it was starting to

25  be a long-term investigation.  It had a potential of becoming

1  a long-term investigation.

2  Q    And the difference between the two is, in the long-term

3  investigation, you don't make the arrest immediately, you see

4  how high in the process, meaning who your different

5  individuals are dealing with; right?

6  A    Normally, yes.

7  Q    Now, after the informant purchased a quantity of

8  narcotics from Mr. Erbacher, you yourself purchased a

9  quantity; right?

10  A    Yes.

11  Q    Do you remember how much that was?

12  A    As best, I remember it was a couple of ounces on one

13  occasion, maybe one ounce on one occasion, two ounces on

14  another.

15  Q    Let's start one by one.  On the first occasion, how long

16  after the informant had interacted with Mr. Erbacher did you

17  actually make a purchase from him?

18  A    I don't remember exactly.

19  Q    LD-28 at page 23?

20        Now, you testified under oath at the trial of

21  Mr. Frank; right.

22  A    Yes, sir.

23  Q    I would ask you to just take a look at that page, and see

24  if it refreshes your recollection as to what the date was that

25  you testified about on that occasion?

1          (Pause.)

2     A    Okay.

3     Q    Do you recall that?

4     A    Yes.

5     Q    When was it?

6     A    February 10.

7     Q    And how much heroin did you purchase from Mr. Erbacher at

8     that time?

9     A    According to my testimony, an ounce.

10    Q    On March 4 of 1981, did you make another purchase?

11    A    Yes.

12    Q    Who did you purchase that quantity from?

13    A    This was seized from Bruce Erbacher.

14    Q    On March 4?

15    A    Yes -- no.  May.  Wait a minute.

16         (Pause.)

17    A    It appears that I purchased the ounce of heroin from

18    Bruce Erbacher on March 4, and I seized two ounces of heroin

19    from Bruce Erbacher on May 12, according to my testimony.

20    Q    I would like to go through them in series.

21    A    What?

22    Q    I would like to go through them in series.  If you would,

23    the first one, is it still your testimony that the first one

24    was on February 10, or do you recall at all?

25    A    According to this, February 10.

1  Q    Does it refresh your recollection, or are you just

2  relying on what you testified to previously?

3  A    No.  I'm relying on this.  Doesn't refresh me.

4  Q    You don't have any recollection?

5  A    I know I purchased these amounts from him, but I don't

6  remember exactly, no.

7  Q    How about on March 4 of 1981, do you recall making any

8  purchases from him at that time?

9  A    I don't remember a specific date, no.

10  Q    Now, you testified earlier that you arrested Mr. Erbacher

11  around May 12 of 1981; is that accurate?

12  A    I believe so, yes.

13  Q    And when you arrested Mr. Erbacher, was he with anybody

14  else, or did you arrest him alone?

15  A    I don't remember.  I didn't arrest him alone.  My partner

16  was with me.

17  Q    But you don't recall him being with anyone, do you?

18  A    I don't remember, no.

19  Q    Now, you told us that at some point, Mr. Erbacher had

20  agreed to cooperate; right?

21  A    Yes.

22  Q    And did you do anything to memorialize the fact that he

23  was agreeing to cooperate?

24  A    No, sir.

25  Q    Didn't you have him write out a statement to that effect?

1  A    I don't remember, sir, no.

2  Q    That's LD-28, page 25?

3         (Pause.)

4  Q    Let me show you what has been turned over to me as LD-15,

5  and ask you if that refreshes your recollection about taking

6  Mr. Erbacher's statement in writing?

7         (Pause.)

8  A    Yes.

9  Q    Does that refresh your recollection?

10  A    Yes.

11  Q    So, at the time when he was arrested, Mr. Erbacher's was

12  given a pen or pencil, piece of paper, and asked to write out

13  a statement; right?

14  A    I take it it's so, yes.

15         MR. TOOSSI:  Your Honor, I don't mean to interrupt

16  counsel.  I just want to confer with him briefly.

17         THE COURT:  Yes.

18         (Pause.)

19  Q    Now, the purpose in asking him to do that was so that you

20  would have some record of what was going on; right?

21  A    As far as I remember, that could have been also

22  procedure, because basically, if you see the statement

23  yourself, he's not agreeing to cooperate.  He's just -- he's

24  just referring that I advised him of his rights.  I don't

25  believe I read there where he said he would cooperate.  I may

1  have missed it.  Basically, he was reiterating that he

2  understood his rights.

3  Q    "Also, that although I have freely decided to cooperate

4  and speak with the agents of the DEA" --

5  A    Okay.

6  Q     -- do you remember reading it?

7  A    Let me see it again, please?

8  Q    Sure.

9  A    Thank you.  Where was that?

10  Q    It's in the middle here.

11  A    Okay.

12          (Pause.)

13  A    Okay.

14  Q    Now, as you sit here, do you recall whether

15  Mr. Erbacher's wrote that statement out himself, or whether it

16  was written for him and he was just asked to sign it?

17  A    I'm sorry.  I'll have to see it again, please.

18  Q    Sure.

19  A    That's my handwriting.

20  Q    So then, you wrote it out and then handed it to him to

21  sign; right?

22  A    Correct.

23  Q    Now, on direct examination, you told us that

24  Mr. Erbacher's also made some statements at that time

25  regarding a Ron and a Pepe; right?

1  A    Most certainly, that's correct.

2  Q    You didn't tell us that he made statements when he was

3  arrested?

4  A    Not those statements in particular, I don't remember

5  saying that.

6  Q    You don't -- did he make any statements about Ron or Pepe

7  or anybody else at that time?

8  A    I don't remember if it was at that time, no.

9  Q    Did he, at any time subsequent to his arrest, make any

10  statements concerning a Ron and a Pepe that were written down?

11        MR. TOOSSI:  Objection, your Honor, hearsay.

12        THE COURT:  I'm sorry?

13        MR. TOOSSI:  Objection, your Honor, hearsay.

14        THE COURT:  No.

15        You may answer yes or no.

16  A    I don't remember, counselor.

17  Q    We know you had a pen and paper.  Do you recall writing

18  anything else down that you say Mr. Erbacher's said at the

19  time he was arrested?

20  A    No, I don't, counselor.

21  Q    Now, besides the pen and the paper, you also had a

22  tape-recorder; right?

23  A    I don't remember having a tape-recorder.

24  Q    Didn't you tell us just a little while ago, on direct

25  examination, that he agreed to make phone calls for you?

1    A    Yes.

2    Q    Did you record those phone calls?

3    A    I don't remember.

4    Q    Do you remember, as you sit here now, having heard those

5    phone calls or recording those phone calls at the trial?

6    A    I don't remember.

7    Q    During the trial, did you sit at the table as the case

8    agent?

9    A    Yes -- no, sir.  I believe, if I may, I was mostly on

10   trial as a witness.  I may have sat at the table.  I don't

11   remember exactly.  Customarily, you do.

12   Q    This is LD-20-A, referring to the day of the arrest:

13   "And did he make certain phone calls that day?

14            "ANSWER:  Yes, he did.

15            "And were those tape-recorded?

16            "ANSWER:  Yes, sir."

17            Do you recall giving that testimony during the

18   course of the trial.

19   A    If that is my testimony, it refreshes my memory, then.

20   Q    Take a look, to make sure.

21            THE COURT:  This is page?

22            MR. CARNESI:  I'm sorry, your Honor.  It's page 25.

23            THE COURT:  Thank you.

24   A    It's a long time ago, counselor.

25   Q    Sure?

1            (Pause.)

2   A    Okay, according to this, yes.

3   Q    Does that refresh your recollection at all, or you're

4   just again going by the transcript?

5   A    No, going by the transcript.

6   Q    As you sit here now, you don't recall sitting with

7   Mr. Erbacher's prior to going to that apartment and recording

8   phone calls?

9   A    I don't.

10  Q    Do you recall recording Mr. Erbacher's statements to you?

11  A    No, sir, I don't.

12  Q    Now, at the time that you made that arrest on May 12 and

13  during the course of this investigation, did you make notes as

14  to each step of activity that you were taking?

15  A    No, sir.

16  Q    You didn't make any notes?

17  A    Not that I remember, no.

18  Q    Well, when you interact with an individual in an

19  undercover capacity like Mr. Erbacher's, what do you do at the

20  time to memorialize what happened?

21  A    Write a report.

22  Q    When do you write the report?

23  A    Soon thereafter.

24  Q    So, it is your testimony that you don't write anything

25  contemporaneously, and by "contemporaneously," I mean when

1    everything is fresh in your mind that night or the next day?

2    It doesn't get memorialized into a report?

3    A    I was in the habit of always writing my reports as soon

4    as possible.

5    Q    Were you also in the habit of destroying your reports,

6    contrary to DEA guidelines?

7    A    No, sir, that I remember, no.

8    Q    This is LD-34.  This is your sworn testimony during the

9    same proceeding, and this is at page 1228, going from the

10   preceding page 1227:  "Did you make notes of what had

11   transpired on March 4, 1981?

12          "ANSWER:  As best I remember, as soon as I got back

13   to the office.

14          "QUESTION:  Was it the same day?

15          "ANSWER:  I believe so.

16          "QUESTION:  Where are those notes now?

17          "ANSWER:  Again, I destroyed them."

18          Do you remember giving that testimony under oath

19   back during the course of that trial.

20   A    No, I don't, sir.

21   Q    Okay?

22          (Pause.)

23   A    That's what it says there.

24   Q    So, before you even testified about these events back in

25   that trial, I believe it was in 1981, you had already

1  destroyed your notes; right?

2  A    According to that statement, that's what it says.

3  Q    And you know it was a DEA policy that you were to

4  safeguard your notes; right?

5  A    There was a policy to that effect, yes.

6  Q    Isn't it a fact that you not only destroyed your notes,

7  but you destroyed another agent's notes, Agent Kobell?

8  A    I don't remember doing that, sir.

9  Q    Agent Kobell worked with you on this investigation?

10 A    Yes, sir, that's correct.

11 Q    He was present during the search and arrest?

12 A    Yes, he was.

13 Q    This is LD-35, page 1501?

14       Mr. Diaz, this is not your testimony, all right, but

15 I would ask you to look at it to see if it refreshes your

16 recollection that you took possession of Agent Kobell's notes,

17 and that as of the time of trial, they were not available.

18       MR. TOOSSI:  Your Honor, can I see that document,

19 please?

20       MR. CARNESI:  Sure.

21       (Pause.)

22       THE COURT:  This is LD-35?

23       MR. CARNESI:  Yes, your Honor.

24 A    This Q&A, whose Q&A is this?

25 Q    That's Kobell.  Again, don't read it out loud.  Just read

1  it to yourself, since you don't remember, and see if that

2  refreshes your recollection as to what happened to Kobell's

3  notes?

4           (Pause.)

5  A   Does not.

6  Q   You don't recall?

7  A   No.

8  Q   Do you recall ever taking possession of Kobell's notes?

9  A   No.  I don't see why I should.  He should have wrote the

10 report based on his notes, not my report.

11 Q   Did you ever discuss it with Kobell?

12 A   I'm not sure.

13 Q   Did he ever ask you for his notes?

14 A   I don't think so.

15 Q   Did he ever ask you to return his notes?

16 A   No, I don't think so.

17 Q   Did there come a time when you arrested Mr. Barlin?

18 A   Who?

19 Q   Mr. Barlin.

20 A   Yes.

21 Q   And when you arrested him, did you take possession of

22 certain property from him?

23 A   I don't remember.

24 Q   Do you remember taking money from him?

25 A   I don't remember.

1  Q   As you sit here now, do you remember taking two dollars

2  and change from Mr. Barlin?

3  A   I don't remember, no.

4  Q   In any event, do you remember conducting a search of

5  Mr. Barlin's safety deposit box?

6  A   I remember making a search of a safety deposit box, but I

7  don't remember if it was Mr. Barlin's or not.

8  Q   Let me go back for a moment to the money with Mr. Barlin.

9  This is LD-33 at page 1127:

10         "QUESTION:  How much money did you turn back to

11  Ronald Barlin, if you know, yesterday, that was the property

12  taken from him as of May 13, 1981?

13         "ANSWER:  Besides the gold chain, it was

14  approximately two dollars or so.

15         "QUESTION:  Two dollars and 80 cents?

16         "ANSWER:  I think so."

17         Do you recall giving those answers to those

18  questions under oath during the course of that trial.

19  A   No, I don't.

20  Q   Okay.

21  A   He got his two bucks back; right?

22  Q   Yes, he got his two bucks back?

23         As you sit here now, do you recall what you said

24  under oath back then during that trial.

25  A   Say it again, counselor?

1   Q     Sure?

2               I'm sorry.  I had my back to you.

3               As you sit here now, do you recall what you said

4   under oath concerning property that you had taken from

5   Mr. Barlin.

6   A     I'm sorry.  I don't get it.  Say it again.

7   Q     Sure.  How much money did you take from Mr. Barlin when

8   he was arrested?

9   A     According to my testimony, the report you just showed me,

10  two dollars and 81 cents.

11  Q     Do you recall executing a search warrant on a safety

12  deposit box based on a key that you had gotten from

13  Mr. Barlin?

14  A     I do recall that, yes.

15  Q     What did you find in the safety deposit box?

16  A     I don't remember, sir.

17  Q     Did you find anything?

18  A     I don't remember, sir.

19  Q     In order to get into that safety deposit box, you applied

20  for a warrant; right?

21  A     I believe so, yes.

22  Q     This is LD-40.  In support of that warrant, you filed an

23  affidavit; correct?

24  A     I assume so, yes.

25  Q     In the affidavit, you state that Erbacher's identified

1  Ron Barlin as a heroin source.  Do you remember that?

2  A    I remember Erbacher's stating the name Ron as one of his

3  sources.

4  Q    You don't ever recall him using the name Ron Barlin?

5  A    No, sir.

6  Q    You inserted the name Barlin, because at that point, you

7  had already been to the apartment and you had already placed

8  Mr. Barlin under arrest; right?

9  A    I presume so, yes.

10  Q    You knew the name Barlin?

11  A    Excuse me?

12  Q    You knew his name, you had identified him?

13  A    At that time , yes.

14  Q    At that time, you were applying for the warrant?

15  A    Right.

16  Q    Where, in any recorded conversation or written document

17  contemporaneous to the event, meaning any notes you may have

18  taken --

19  A    I understand, counsel.

20  Q    -- or any recorded statement that you had taken does

21  Erbacher refer to Ron?

22  A    To Ron specifically?

23  Q    Yes.

24  A    I don't remember it being in any recorded conversation,

25  exactly.  I don't remember.

1  Q    Do you remember, during the course of your investigation,

2  that Mr. Erbacher would sometimes feed you misinformation,

3  incorrect information?

4  A    I don't remember that being the truth, being the fact,

5  being so.

6  Q    Did Ron introduce you to Herbert Frank?

7  A    Did who?

8  Q    I'm sorry.  My mistake?

9       Did Bruce Erbacher introduce you to Herbert Frank.

10 A    Yes, he did.

11 Q    When he introduced you to Herbert Frank, did he give you

12 correct information about Mr. Frank's identity?

13 A    Be more specific, counselor.

14 Q    Sure?

15      Do you refer to him, meaning Erbacher, calling Frank

16 by the name of Robert, I believe?

17 A    For some reason, I recall that.  I recall that.

18 Q    He didn't call him Herbert, he didn't call him Mr. Frank;

19 right?  He gave you a wrong name for the individual you were

20 going to meet?

21 A    Again, I'm not sure.

22 Q    How about Mr. Frank, when you first met him, did he

23 introduce himself as Herbert Frank?

24 A    I don't remember, sir.

25 Q    Do you remember him introducing himself as Robert?

1  A    I don't remember, sir.

2  Q    This is LD-12.  This is a report that you prepared,

3  according to the report, on March 9 of 1981?

4         Now, this is referring to the activities on March 4

5  of 1981, so this report is typed up or made some five days

6  later.  And if you'd just look at the bottom paragraph to see

7  if that refreshes your recollection as to how Mr. Frank,

8  Herbert Frank, introduced himself.

9         (Pause.)

10 A    It doesn't refresh my recollection.

11 Q    Do you see the section I'm talking about?

12 A    Yes, I do.

13 Q    Do you recall writing in your report that he introduced

14 himself as Robert?

15 A    I see that, but it doesn't refresh my memory for some

16 reason.

17 Q    By that time, you knew the true identity of Herbert

18 Frank, did you not?

19 A    I believe so, yes.

20 Q    How did you know that the individual who you were meeting

21 with wasn't Robert, but was actually Herbert Frank?  How did

22 you know that on the that date?

23 A    I'm going by the fact that the person who was driving the

24 vehicle, that the registration came back to Herbert Frank.

25 The description fit that individual that I was meeting with.

1  So, one and one is two.  Looks like it, he walks like him, and

2  his name was Herbert Frank, so it was Herbert Frank.

3  Q    Right.  So, in other words, you were told by a

4  Mr. Erbacher that he was going to meet his connection; right?

5  A    At one point, yes.

6  Q    And based on the statement that he was going to meet the

7  fellow involved in the drugs with him, an attempt was made to

8  surveil where Mr. Erbacher went; right?

9  A    I don't remember that at all.  I assume that was the

10 case, but --

11 Q    And the purpose of the surveillance was to see who the

12 individual was, to see if he showed up in a car, the plate

13 number of which you were able to record, and see if you could

14 trace it back, to do some investigative work and identify who

15 Erbacher was talking about; right?

16 A    Yes, sir.

17 Q    You weren't going by the identity that Erbacher was

18 giving you, you didn't accept his representation as to what

19 the name was, you went out and conducted an investigation to

20 find out who that person was, to see if you could confirm the

21 identity of that individual; right?

22 A    That's a fair statement, yes.

23 Q    And in doing that, because you took that investigative

24 step, you were able to determine that when this person who you

25 previously seen came and identified himself with whatever name

1    he was using, Robert or any other name, you were able to

2    determine that that was misinformation, that he was actually

3    Herbert Frank; right?

4    A    For all I knew, that was a nickname.  But I knew that was

5    Herbert Frank, given, again, the run of the registration and

6    the description of the individual that I was dealing with.

7              MR. CARNESI:  Judge, I don't know if this is a good

8    time.  I'm about to change topics.

9              THE COURT:  Yes.

10             MR. CARNESI:  Thank you.

11             THE COURT:  Members of the jury, we're going to

12   recess for lunch.  Please remember my admonitions.  Do not

13   discuss the case.  Keep an open mind.

14             (Jury excused.)

15             THE COURT:  We are adjourned until 2:00 p.m..

16             (Lunch recess.)

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2              (In open court.)

3              (Judge SANDRA L. TOWNES enters the courtroom.)

4              THE COURTROOM DEPUTY:  All rise.

5              THE COURT:  Be seated, please.

6              Are we ready to bring the jury in?

7              MR. NORRIS:  Yes, Your Honor.

8              MR. TOOSSI:  We're bringing the witness in right

9    now.

10             THE COURT:  Okay.

11             (Witness resumes stand.)

12             THE COURT:  We'll bring the jury in.

13             (Pause in the proceedings.)

14

15             (In open court.)

16             THE COURTROOM DEPUTY:  All rise.

17             (Jury enters at 2:21 p.m.)

18             THE COURT:  Please, be seated.

19             The record will reflect that all of the jurors are

20   present, the defendant, and Counsel.

21             Mr. Diaz is still on the stand, and still under

22   oath.

23             THE WITNESS:  Yes, Your Honor.

24             MR. CARNESI:  Okay.

25

1  **L O U I S    D I A Z**,

2        called as a witness, having been previously duly

3        sworn, was examined and testified as follows:

4

5  CROSS-EXAMINATION

6  BY MR. CARNESI: (Continued)

7  Q    Mr. Diaz, I asked you earlier if during the course of

8  your investigation you had received different names for

9  Mr. Frank, do you remember that?

10  A    I received one -- I received a telegram --

11  Q    No, Mr. Erbacher gave you names for Mr. Frank that were

12  not accurate; right?

13  A    No.

14        MR. CARNESI:  May I approach again.

15  Q    This is 35-LD-13, this is a report that you prepared on

16  April 7th dealing with events that occurred on March 24th and

17  March 25th.

18  A    I believe he referred to him as Robert on one or two

19  occasions.

20  Q    Okay.  And he referred to him, meaning Herbert Frank,

21  right?

22  A    Herbert Frank; correct.

23  Q    And Herbert Frank referred to Herbert Frank as Bobby;

24  right?

25  A    I don't remember that, sir.

1   Q    Okay.  Take a look at your report.

2   A    Okay.

3   Q    Okay.  Does that refresh your recollection?

4   A    Actually, it doesn't.

5   Q    Do you recall the first time you met Herbert Frank?

6   A    Of course, yes, I do.

7   Q    Okay.  Do you recall him introducing himself to you?

8   A    Not like officially, like I'm so-and-so, no.

9   Q    Do you recall how he referred to himself?

10  A    No.

11  Q    You don't recall him referring to himself as Robert?

12  A    I don't remember him saying I'm Robert, you know, no.

13  Q    Do you remember me asking you questions about that this

14  morning?

15  A    I believe so, yes.

16  Q    Okay.

17          MR. CARNESI:  Give me 8042.

18  Q    Now, while we're finding that particular document, you

19  told us that while you were in the apartment, you had received

20  or you answered a telephone call; is that right?

21  A    Which apartment?

22  Q    In the Franks' apartment?

23  A    Yes.

24  Q    Okay.  And did you answer more than one phone call?

25  A    As best I remember, it was just one call, sir.

1  Q    Just the one?

2  A    That I remember, yes.

3  Q    Okay.  Did you make any attempt to record that call?

4  A    I don't believe so, no.

5  Q    Okay.  You did record calls earlier; did you not, from

6  Mr. Erbacher into the Franks' apartment?

7  A    I don't recall doing so, no.

8  Q    Do you remember talking about that on cross-examination a

9  little while ago?

10  A    You mean here?

11  Q    Yes?

12  A    I believe we did, yes.

13  Q    Okay.  Now, at the time that you received this call, you

14  told us that the caller asked for certain individual; right?

15  A    Yes.

16  Q    By name?

17  A    Yes.

18  Q    Who did he ask for again?

19  A    Herbie.

20  Q    Who else?

21  A    And Tony Cuccio.  Tony.

22  Q    Anybody else?

23  A    That I remember, no.

24  Q    Didn't you tell us on direct examination that he asked

25  for Pauline and you put Pauline on the phone?

1   A    Oh, yes.  Yes, you're right.

2   Q    That refresh your recollection?

3   A    Yes, it does, yes.

4   Q    Those are three people that he asked for; right?

5   A    Yes, sir.

6   Q    Never asked for Ron; did he?

7   A    That I remember, no.

8   Q    Now, at the time when you received this phone call, did

9   you take any notes or memoranda memorializing what you say was

10  told to you in the phone call?

11  A    No.  That I remember, no.

12  Q    Now, at some point during the investigation, you tried to

13  purchase larger amounts of heroin; right?

14  A    It was my intent to do so, yes, sir.

15  Q    Okay.  And at some point, you had a conversation with

16  Mr. Erbacher concerning a prospective purchase of a half a

17  kilogram of heroin?

18  A    That is correct, yes, sir.

19  Q    Okay.  Do you remember when that was, that you had the

20  conversation?

21  A    As best I recall, it might have been during the month of

22  May, maybe.  As best I recall.

23  Q    Could it have been late April?

24  A    Maybe.

25  Q    Okay.  Did you record that conversation?

1   A    I don't remember, sir.

2   Q    Have you ever heard a recording of that conversation?

3   A    I don't remember.  I may have, but I don't remember.

4   Q    Okay.  On what instrument would that conversation have

5   taken place?

6   A    What instrument?

7   Q    Yes.  What telephone?  Did you call him?  Did he call

8   you?

9   A    Well, when I called him, I would call him from my office,

10  from my undercover phone.

11  Q    Okay.

12  A    And I would make a recording of course.

13  Q    When you say your undercover phone, can you explain to us

14  what you mean by that?

15  A    Basically, it was a phone that was just listed under, I

16  believe under my name at the time, with a different, with a

17  different, you know, with a fictitious residence.

18  Q    When you say your name, it was under the name of Louis

19  Diaz?

20  A    No.  My undercover name.

21  Q    Okay.  And what was the area code on that number?

22  A    I believe it would have been -- well, the number that he

23  had to call me, if I'm not mistaken, were two numbers.  One

24  was a Philly number, Philadelphia phone number and another one

25  was a local New York number, but I know for sure he had a

1    Philadelphia number because we planned that.

2    Q    Okay.  And what was the purpose of planning that, that he

3    would call you on a specific number?

4    A    Well, the specific number, at the 212 number would be so

5    I could record the conversation because we had the phone

6    rigged so it could record the conversation.

7    Q    Well, the Philly number, who did you give that number to?

8    A    To Bruce.

9    Q    Anybody else?

10   A    Not that I remember, no.

11   Q    That was the number that was set up especially for Bruce

12   Erbacher's purposes so that he would believe you were this

13   drug dealer from Philadelphia; right?

14   A    That's correct, yes, sir.

15   Q    Okay.  So, the only conversations that were going to take

16   place over that phone would have been conversations between

17   you and Bruce Erbacher related to this drug transaction or

18   drug investigation; right?

19   A    It's a fair statement, yes.

20   Q    Okay.  Did you record those conversations?

21   A    No, sir.

22   Q    You went through the trouble of setting up a certain

23   number, specific number.  Why wouldn't you record the

24   conversations?

25   A    Well, that number came back to my home, was forwarded

1  from the Philly number to my home.  And the thing is, I told

2  him, if I best remember, to call me at that other number.  But

3  I called him more than he called me.  So, when I called him,

4  you know, I was able to record the conversations because the

5  phone was rigged to do that.

6  Q    But whenever he called you about drug dealings, he would

7  call on the number that you specifically set up for that

8  purpose, the Philadelphia number; right?

9  A    He hardly ever called me on that number, sir.

10 Q    So then, if he hardly called you on that number, you were

11 making phone calls and then the phone that you were using

12 would have been recording the conversation; right?

13 A    Yes, the one that we set up for that, yes.

14 Q    Okay.  Again, did you ever hear a conversation between

15 you and Mr. Erbacher that was recorded referring to a half a

16 kilogram purchase of heroin?

17 A    Yes.

18 Q    You've heard the conversation?

19 A    You mean, did I have a conversation with him regarding

20 half a kilogram?

21 Q    I'm sorry, maybe I wasn't clear.  Did you ever hear a

22 recording of that conversation?

23 A    Of which conversation, sir.

24 Q    You asking for half a asking of heroin?

25 A    Yes, I believe so.

1   Q    Do you have a recording of that conversation?

2   A    No, I don't have it.

3   Q    You've heard recording of that conversation?

4   A    I believe so, sir, yes, I believe so.

5   Q    Now, on May 1st, you had another conversation with

6   Mr. Erbacher in which he tells you that he's unable to get a

7   half a kilogram of heroin; right?

8   A    I believe that's correct, yes.

9   Q    Do you recall over what instrument that conversation took

10  place?

11  A    That might have been over the phone, I don't remember

12  exactly, sir.

13  Q    Well, if the report says a telephone conversation --

14  A    Well then that's it, then.

15  Q    What telephone?

16  A    I presume it was the 212 phone.

17  Q    Have you heard a recording of that?

18  A    I believe I may have, yes.

19  Q    Do you know where that recording is today?

20  A    I'm sorry, sir?

21  Q    Do you know where that recording is today?

22  A    Probably destroyed.  It's been 30-something years ago.

23  Q    Do you recall that recording ever being played at the

24  trial that was a year ago?

25  A    I believe it was, sir, yes.

1  Q    You specifically recall that phone call?

2  A    I believe I did, sir, yes, I believe I remember that.

3  Q    Did you ever record a conversation with Mr. Erbacher

4  referring to Ron and Pepe?

5  A    I don't remember having done so, no.

6  Q    Did Mr. Erbacher ever tell you that he could deal

7  directly, not through Frank but deal directly, with these

8  individuals Ron and Pepe?

9  A    I believe that was what he meant to say to me, yes, I

10 believe that's what he said me, yes.

11 Q    Okay.  And at the time when he told you that, did you

12 record that in your notes?

13 A    I don't remember, sir.

14 Q    Do you remember whether or not you ever recorded that

15 conversation containing a reference to Ron and Pepe?

16 A    I don't remember, sir.

17 Q    When you were working this investigation, were you the --

18 did you have a supervisor?

19 A    Yes, sir.

20 Q    Okay.  And who was your supervisor?

21 A    Jeff Hall.

22 Q    And would you have to report to him as the investigation

23 was proceeding?

24 A    Occasionally, yes.  And he read my reports, yes.

25 Q    You actually filed reports with him?

1  A    Yes.

2  Q    Did you ever file a written report to him while the

3  investigation was going on to say that you had someone

4  involved in the investigation who had the ability to meet

5  directly with higher-ups?

6  A    If it was in my report, then he guess he read that, he

7  knew that.

8  Q    Was it -- do you have a report that ever said that?  Do

9  you remember ever writing a report?

10 A    I believe so, yes, sir.

11 Q    Didn't you just tell us or didn't you say in your report

12 that even though Erbacher, according to you, was telling you

13 that he had the ability to meet with these other people, you

14 told him no, no, don't bother, just deal with the people

15 you're dealing with, Frank.  Do you remember saying that to

16 him?

17 A    When?

18 Q    During the course of the investigation.

19 A    During the course of the investigation.

20 Q    Yeah?

21 A    If I remember correctly, I told him to be leery of doing

22 something like that.  But he said he had dealt with them

23 before and that their names were, he mentioned the names Ron

24 and Pepe.

25 Q    Did you follow up with him in the course of the

1   investigation the way you did to find out who Frank was?  Did

2   you follow up with Erbacher to find out who Ron and Pepe were?

3   A    We didn't have enough to go on, sir.

4   Q    Well, he's telling you he's ready to meet them.  Did you

5   tell him okay, see if you can meet them tomorrow?

6   A    I don't remember ever saying that, no.

7   Q    Now you told me earlier this morning that Diaz -- I'm

8   sorry, I said Diaz -- you knew Erbacher was a heroin user;

9   right?

10  A    That he used heroin?

11  Q    Yes:

12  A    Yes.

13  Q    Did you also know him to be somebody who might exaggerate

14  for his own benefit?

15  A    No.

16       MR. CARNESI:  Give me 6518.

17  Q    You talked to him about larger amounts of heroin; right?

18  Half a kilo?

19  A    Yes, sir.

20  Q    Was he able, ever able to obtain a larger amount of

21  heroin for you?

22  A    Not a half a kilo, no.

23       MR. CARNESI:  This is LD-34.  It's 1222.

24       Do you have 6518?

25  Q    Did he tell you on more than one occasion that he was

1  able to obtain large amounts of high quality drugs?

2  A    On more than one occasion?

3  Q    Yeah.

4  A    He may have.

5  Q    Did he ever obtain for you large amounts of high quality

6  drugs?

7  A    No, sir.

8  Q    Did it appear to you at any time that he was just

9  exaggerating to keep you on the hook so that he could continue

10 to sell you whatever he had available?

11 A    No, I never particularly -- I don't remember taking it

12 that way, no, sir.

13 Q    Now, as we go through the various reports that you

14 conducted, is there any report that you wrote yourself, had

15 filed, referring to Ron and Pepe or more specifically, Pepe,

16 that was made before the arrest in this case?  And this case,

17 I mean the heroin case you were involved in, obviously.

18 A    I believe so.  I believe so, yes.

19 Q    Could you tell me what one?

20 A    I don't remember.

21 Q    Well, if I tell you --

22       MR. CARNESI:  8010.

23 Q    -- that the report of the phone call on 5/13/81, the Pepe

24 phone call as we described it, was reported on May 29th of

25 '81, over two weeks later, would that be accurate?

1  A     I don't know --

2  Q     Take a look.

3  A     -- I'd have to see the report.

4         Thank you.

5  Q     Sure.

6         MR. CARNESI:  8023, Joe.

7  A     This is only reflecting the telephone conversation.

8  Q     Right.

9  A     It's not referring to what you asked specifically about,

10 whether or not I mentioned in any of my reports the name Ron

11 and Pepe.

12 Q     Okay.

13 A     Prior to this.

14 Q     We're going to go through report by report, you'll point

15 it out to me.

16 A     Yeah.

17 Q     What I'm asking you is, that's the report of the

18 telephone conversation and that report was written 16 days

19 after the arrest; right?

20 A     It appears to be, yes.

21 Q     Okay.

22 A     Typed.

23 Q     Typed.  Because there should be notes; right, that were

24 written closer in time; right?  But you destroyed the notes;

25 right?

1 A     Sir, I write after I listen, if there's any tapes, I

2 write my reports on the yellow, legal yellow paper.  The legal

3 yellow is given to my secretary and she writes the report when

4 she gets around to it, as soon as possible.  But I'm not the

5 only case that she's working on.

6 Q     And my question to you is what happened to the reports

7 that you say were written concerning that phone call at or

8 around the time of the phone call?

9 A     I didn't say that I made notes regarding that, sir.

10 Q     You didn't make any notes?

11 A     I don't remember making notes regarding that.

12         MR. TOOSSI:  Your Honor --

13 Q     When you just looked at this and referred to notes on a

14 yellow piece of paper that you submitted for this report, what

15 were you referring to?

16 A     I wrote my report, which mimics that report, which

17 mirrors that report --

18         THE COURT:  You have an objection.

19         MR. TOOSSI:  I do have an objection.  The document

20 reader is published to the jury and there is a document on the

21 document reader that's not in evidence.

22         THE COURT:  I don't see it, the document.

23         MR. CARNESI:  I didn't put it up, I'm just inquiring

24 of the officer whether he recalls any of this.

25         THE COURT:  All right.

1    MR. CARNESI:  I'm sure if there is a report, they'll

2    put it up.

3    Q    You told us that --

4         MR. CARNESI:  I'm sorry, I've lost my place for a

5    moment.

6    Q    Okay, you told us that you had a conversation with

7    Mr. Erbacher in which Mr. Erbacher tells you about Mr. Frank's

8    people and about supplying large amounts of high-grade drugs,

9    high quality heroin on a weekly basis, you say here.

10        Do you recall when that conversation took place?

11   A    I don't recall exactly, no, sir.

12   Q    Okay.  Do you recall whether at the time that it took

13   place you made any notes so that you could report back to your

14   supervisor the progress of this investigation that now you're

15   being told you can get high quality large quantity drugs?

16   A    I wrote the report based on my memory.

17   Q    The telephone conversation that's referenced in this

18   report, do you recall whether or not there's a recording of

19   it?

20   A    Which one, sir?

21   Q    The conversation which allegedly took place on May 1st

22   between you and Bruce Erbacher?

23   A    Regarding?

24   Q    Regarding his ability, through Mr. Frank's people who

25   he's identifying for you, to get large quantities of high

1   quality heroin?

2   A    I don't remember, but it should be listed in the custody

3   of evidence if it is or not.  In my reports, it should be

4   listed.  If it's not...

5   Q    Look at your report, it's LD-16, page one of three pages.

6            (Handing.)

7   A    I see it, sir.

8   Q    Okay.  Does that refresh your recollection that,

9   according to your position, that was an unrecorded

10  conversation as well?

11  A    That's correct.

12  Q    Now, you told us that at the time of his arrest,

13  Mr. Erbacher had agreed to make phone calls and to cooperate,

14  as it says in that written statement there; right?

15  A    Say it again, sir?

16  Q    At the time of his arrest or shortly thereafter,

17  Mr. Erbacher agrees to make phone calls on your behalf and as

18  it describes in that written statement I showed you this

19  morning, he agrees to cooperate; right?

20  A    Yes.

21  Q    While Mr. Erbacher was cooperating, did you ever ask him

22  to contact Ron or Pepe?

23  A    I don't recall having done so, no.

24  Q    Did you ever make any efforts at any point in time

25  through Mr. Erbacher to gain more information about the

1   identities of Ron or Pepe?

2   A    I don't recall so, no, sir.

3   Q    And you were present at some points during the trial of

4   this matter, of this investigation, heroin investigation;

5   right?

6   A    Say again?

7   Q    You were present during the trial?

8   A    Of course.

9   Q    At some points you testified?

10  A    Yes.

11  Q    And I think you told is earlier this morning that you

12  were present at the table as the case agent?

13  A    I believe I was occasionally, yes.

14  Q    Okay.  Did you ever have contact with Mr. Erbacher after

15  he was arrested about his cooperation?

16  A    I don't remember.

17  Q    Did Mr. Erbacher?

18         MR. TOOSSI:  Your Honor, may we have a side-bar?

19         I think I know where Defense Counsel is going with

20  this and I think we need to have a side-bar, please,

21  Your Honor.

22         THE COURT:  All right, come on up.

23         (Side-bar conference held on the record out of the

24  hearing of the jury.)

25

1              (Side-bar.)

2          MR. TOOSSI:  Your Honor, during the trial against, I

3     believe, six of the seven people that were arrested, not

4     including Mr. Erbacher, Ronald Rubenstein the attorney for Ron

5     Barlin, represented to the Court that Mr. Erbacher wanted to

6     withdraw his claim, retract his claim that he had ever told

7     Agent Diaz anything about Ron and Pepe.

8              Mr. Erbacher never testified to that.  There was no

9     indication that Mr. Erbacher actually said that other than

10    Mr. Rubenstein's representation.  And I believe that any

11    eliciting of what Mr. Erbacher would have said, his

12    recantation would be inadmissible hearsay.

13             Furthermore, Your Honor, during Mr. Erbacher's plea

14    allocution he was asked to name his co-conspirators and he,

15    for lack of better word, flipped out and it was very clear he

16    did not want to implicate anybody else.  And based on my

17    knowledge of the case and based on the background, I don't

18    believe that Mr. Erbacher ever really recanted his

19    identification of others.  I believe that he was afraid of his

20    co-conspirators.

21             Setting that aside, it's still inadmissible hearsay

22    what Mr. Erbacher said or what Mr. Erbacher said through

23    Mr. Rubenstein at the trial.

24         MR. CARNESI:  Judge, what happened, obviously,

25    Erbacher's cooperating.  At some point, he decides he's not

1   going to testify.  What the rationale was behind that, I'm not

2   sure.

3          The U.S. Attorney decides they're not going to use

4   him, I don't know if the decision was unilaterally on his

5   part, but I do know that at one point during the trial he

6   comes to court, he is there, along with his own attorney and

7   Mr. Rubenstein, this is something during the trial, and they

8   are discussing with the U.S. Attorney the Assistant

9   U.S. Attorney that they may want to put Mr. Erbacher on the

10  stand and that he is prepared to testify and it's represented

11  in the minutes -- through Mr. Rubenstein but again, with

12  Mr. Erbacher standing, Mr. Erbacher and his attorney standing

13  beside him -- that, Mr. Erbacher is willing to take a lie

14  detector test that he never said anything about.

15         THE COURT:  I'm not going to allow that.  I'm not

16  going to allow that in.  If you want to call Mr. Erbacher --

17         MR. CARNESI:  He's dead.  Right?  That's the

18  position I'm in.  My client's not charged.  Mr. Erbacher is

19  dead.

20         Now, as I understand the rule, the witness is

21  allowed to refer to this statement to testify, as he has done.

22  But the way I understand the rule is, I can impeach him as if

23  the witness were there.

24         THE COURT:  No, I'm not going to allow that.

25         MR. CARNESI:  I can't ask him if he's aware that he

1    ever retracted his statement?

2              THE COURT:  No.

3              MR. CARNESI:  Okay.

4              THE COURT:  No.

5              (Side-bar end.)

6

7              (In open court.)

8    BY MR. CARNESI:

9    Q    Mr. Diaz, you told us, I think you referred to this

10   apartment on direct examination as being a small apartment; is

11   that accurate?

12   A    Which apartment, sir?

13   Q    The Franks' apartment.

14   A    That I recall?  I believe so, yes, I do remember it being

15   a small apartment.

16   Q    Okay.  You told us about -- well.

17             Can you describe the apartment as you first enter

18   it?

19   A    As best I remember, there was a little foyer area and I

20   think there was a kitchen to the right, then there was a

21   living room, and there was a bedroom to the right, and then

22   another little bedroom in the back, and then a bathroom in the

23   back, I believe, as far as I remember.

24   Q    Okay.  So, when you first enter the apartment, you enter

25   through a small foyer?

1   A    Little foyer, as I remember.

2   Q    And then directly into the living room?

3   A    I believe so, yes.

4   Q    And the bedrooms were kind of surrounding the living

5   room?

6   A    No, I believe one was on the right, I believe, as best I

7   remember and then one is in the rear to the right.

8   Q    Do you recall approximately how large the living room is?

9   A    Gee, I don't remember.

10  Q    Well, would it be as large as the distance between you

11  and I at this point?

12  A    No, no.

13  Q    Considerably smaller?

14  A    Yes.

15  Q    How about, let's say, from the second rail in the jury

16  box?

17  A    Maybe, maybe.  Best I remember, maybe.

18  Q    Okay.  And the bedroom door was connected to the living

19  room; right?

20  A    If I remember, I believe so, yeah.

21  Q    Okay.  And the distance again, from the living room to

22  the front door, there's a small foyer.  Do you know how large?

23  A    Little, a couple feet maybe, if I remember correctly.

24  Q    So, let's say, the box being about three feet or so,

25  would you say the distance is from you to me now?

1  A    What's that, the living room?

2  Q    Yeah, the end of the living room, the bedroom door, right

3  to the front door.

4  A    I have a vague recollection that could be correct.

5  Again, I don't remember specifically.

6  Q    Okay.  What would you estimate to be, where we're

7  standing now?

8  A    What from me to you?

9  Q    About 20 feet?

10 A    Yeah, something like that, 20, 22, something like that.

11 Q    Thank you.  Now, there was one written document, at

12 least, that you made up that was contemporaneous with the

13 events, do you recall that?  Do you recall making up a search

14 warrant for the apartment?

15 A    I have a vague recollection of that.

16 Q    Okay.  Do you recall after you had entered the apartment

17 and you placed these different individual people in custody or

18 restrained them there in the apartment, that you left the

19 apartment to go and get a search warrant in order to search

20 the apartment?

21 A    I have a vague recollection that I did so, yes.

22 Q    Okay.  And can we agree, sir, that that happened at a

23 time before you had gotten this telephone call that you told

24 us about, the call from Pepe?

25 A    That I went for the warrant before?

1    Q    Yes.

2    A    I don't remember that.  I mean, I don't remember the

3    sequence of events at this time.

4    Q    Do you remember writing out the affidavit for the search

5    warrant?

6    A    I don't recall.

7    Q    Well, let me show you what's been turned over to me as

8    LD-39.

9    A    It doesn't appear that that phone call is part of this

10   affidavit.

11   Q    No, it wasn't; was it?

12   A    No, it doesn't appear to be.  No, it's not.

13   Q    In fact, if you look at paragraph five, I believe it's

14   five or six, I marked it for you.

15   A    Yes.

16   Q    In that paragraph, and this is an affidavit you submitted

17   under oath; right?

18   A    Yes.

19   Q    Okay.  In that affidavit you refer to a statement by

20   Mr. Erbacher as to the identity of the individual or

21   individuals who were supplying the drugs; right?

22   A    Repeat the question?

23   Q    Sure.  Paragraph --

24        MR. CARNESI:  Let me come a little closer if I can,

25   Judge, because I don't remember if it was five or six.

1        THE COURT:  Yes.

2        MR. CARNESI:  Okay, paragraph five.

3   Q    See paragraph five of that affidavit?

4   A    Yes, sir.

5   Q    And in paragraph five, you're relating to this Judge what

6   you say Erbacher told you about the supplier of the drugs;

7   right?

8   A    Yes.

9   Q    And what did you say?  What did you say under oath at

10  that time, giving the affidavit to the Judge?

11  A    It says here that in order to play his supplier known as

12  Ron.

13  Q    Doesn't refer to Pepe at all; does it?

14  A    No, sir.

15  Q    In the in the course of your conversations that you claim

16  to have had with Erbacher, did he ever tell you physically

17  where the people who were supplying Franks with the drugs were

18  located?

19  A    No, not that I remember, no.

20  Q    You don't remember him ever referring to Frank's people

21  in Brooklyn?

22  A    That rings a bell.

23       MR. CARNESI:  5388.

24  Q    I'm going to show you what I have as LD-29, it's page

25  three, and that's testimony that you gave during that trial

1    back in 1981.

2          Do you remember testifying at that point that Frank

3    told you -- I'm sorry.

4          MR. CARNESI:  Withdrawn.

5    Q    -that Erbacher told you that the deal couldn't go through

6    because Franks was having problems with his people in

7    Brooklyn?

8    A    That refreshes my memory, yes, I do recall that, vaguely

9    recall that, yes, sir.

10   Q    All right, thank you.

11         MR. CARNESI:  I have no further questions.

12         THE COURT:  All right.

13         Any redirect?

14         MR. TOOSSI:  Yes, Your Honor.

15   REDIRECT EXAMINATION

16   BY MR. TOOSSI:

17   Q    Mr. Diaz, you were asked some questions on

18   cross-examination about the book that you wrote about your

19   life.  Do you recall the questions you were asked and the

20   answers that you gave?

21   A    I somewhat do, yes.

22   Q    Yes, okay.  So, you testified on cross-examination that

23   you put a gun to your brother's head and you almost pulled the

24   trigger.  Do you recall giving that answer?

25   A    I don't recall giving that answer.  I recall the

1    attorney, the Counselor saying that that was said in the book.

2    Q    Do you recall that event in your life when you put the

3    gun to your brother's head?

4    A    I don't actually remember doing that, but I do remember

5    having that intention.

6    Q    Okay.  Can you explain for the jury whether your brother

7    had any physical afflictions during his life?

8    A    Yes, he was a grand mal epileptic.

9    Q    Can you explain to the jury what a grand mal epileptic

10   is?

11   A    A grand mal epileptic is one who has terrible convulsions

12   where he loses consciousness.  My brother was a pretty big

13   guy, strong kid, and he would get 20 to 30 attacks a day.  It

14   was incredible the amount of attacks he would get.

15        He was wearing down my parents because my parents

16   wouldn't go anywhere else for help, you know they were born on

17   the other side, they were from Europe.  And they just didn't

18   know how things worked here and I did the best I could to help

19   them with my brother because my brother was overseas in the

20   service and I was the only one they could depend on.

21   Q    In the incident you discuss where you put the gun to your

22   brother's head, were you in a car with your brother?

23   A    Yes, I was.

24   Q    And did he have an epileptic seizure at the time?

25   A    Yes, he did.

1  Q    And so why did you put the gun to his I head?

2  A    Again, I don't remember putting the gun to his head, but

3  I had the intention of trying to stop him from doing what he

4  was doing, which is he was having a severe epileptic attack

5  and it was raining terribly on the freeway.  I was going get

6  my brother who just arrived from overseas, he was in the

7  Air Force at the time, and he was going for the steering

8  wheel.  I couldn't see that well ahead of me, or behind me for

9  that matter, it was very difficult to get into another lane

10 and...

11 Q    Were you afraid that you were going get into an accident?

12 A    Yes, I was, that is correct, yes, sir.

13 Q    So, you didn't hate your brother; correct?

14 A    Of course not.

15 Q    Okay.  You loved your brother.

16 A    Yes.

17 Q    You would have never thought about killing him or

18 shooting him unless he was about to have a seizure and cause

19 you to have an accident; is that correct?

20 A    Of course, sir.

21 Q    And is that the incident that's recounted in your book?

22 A    Yes, sir, it is.

23 Q    Okay.  You were asked some questions on cross-examination

24 about a time that you gave up your gun because you felt that

25 you were emotionally unstable.  Do you recall giving those

1  answers?

2  A    Yes, I do.

3  Q    Okay.  When was that?  When did you feel that you needed

4  to give up your gun because you were emotionally unstable?

5  Was it before this case that we're talking about today?

6  A    Oh, no, I was in California then.

7  Q    Okay, how many years after the case that we've talked

8  about here today did you feel that you needed to give up your

9  gun because you felt emotionally unstable?

10 A    About six years later.

11 Q    Okay.  And the suicide ideation that you were asked about

12 when you put the gun to your head and thought about pulling

13 the trigger, when did that happen in relation to the events of

14 the case that we've talked about in this case?

15 A    That was subsequent to my wife's death.

16 Q    Okay.  So, if I understand this correctly, the portion of

17 your life where you felt emotionally unstable was subsequent

18 to your wife's death; correct?

19 A    Yes.

20 Q    How long were you married to her?

21 A    Twenty-eight years.

22 Q    What day did she die?

23 A    April 7th, 1997.

24 Q    When your --

25           MR. TOOSSI:  Withdrawn.

1  Q    You were asked some questions about putting a doctor up

2  against the wall, slamming him up against the wall.  Do you

3  recall why you did that?

4  A    Because I was mad and I was angry.

5  Q    Why were you angry?  Why were you mad?

6  A    Because he challenged me on what my brother's condition

7  was because I brought him into the emergency room and he told

8  me what's wrong, I said my brother has grand mal epileptic and

9  he's having continual attacks.  He says what do you know about

10 epilepsy.

11 Q    Were you concerned that your brother wasn't being

12 properly attended to?

13 A    Absolutely.

14 Q    Is that why you slammed the doctor up against the wall?

15 A    Yes.  And because of his attitude, also.

16 Q    You were asked on cross-examination about the sequence of

17 events and you answered that you didn't recall in terms of

18 what happened inside the Franks' apartment.  Do you recall

19 being asked those questions and giving that answer?

20 A    I believe so, sir, yes.

21 Q    Is there anything that would refresh your recollection?

22 A    Perhaps if I saw my reports?

23        MR. TOOSSI:  Your Honor, may I approach the witness?

24        THE COURT:  Yes.

25        MR. TOOSSI:  3500-LD-18.

1   Q    If you could take a look at that document and then, if

2   your recollection is refreshed, please let me know.

3   A    You want me to read the whole report, sir?

4   Q    I would like to you read the report and to see if your

5   recollection is refreshed as to the sequence of when the

6   search warrant was obtained versus when the call from Pepe

7   came into the apartment.

8            MR. CARNESI:  Objection.  Just for the record, I

9   don't believe the gentleman has testified that Pepe ever came

10  into the apartment.

11           THE COURT:  Correct.

12           MR. TOOSSI:  The call from Pepe came into the

13  apartment.

14           THE COURT:  All right.

15           MR. TOOSSI:  The incoming call from Pepe came into

16  the apartment.

17           THE COURT:  All right.

18           THE WITNESS:  Yes, sir, that refreshes my memory.

19  Q    What was the sequence of events?

20  A    The sequence of events as reported by me was that we

21  obtained the search warrant first and the telephone call from

22  Pepe came secondly, after we -- while we were in the process

23  of executing the search warrant.

24  Q    Okay.  You were asked some questions about 3500-LD-39.

25  Do you recall being shown this document?

1    A    Yes, sir, I do.

2    Q    In that document, you testified that there was no

3    reference to a Pepe, there was only a reference to a Ron; is

4    that correct?

5    A    Yes.

6    Q    Okay.  At that point, at that point in your

7    investigation, who was in the apartment?

8    A    Ron, the gentleman we identified as Ron Barlin, Pauline

9    Frank and Tony Cuccio.

10   Q    Okay.  And did you take any significance from the fact

11   that a person named Ron was in the apartment at that time?

12   A    Yes, of course.

13   Q    Is that document handwritten or is it typed?

14   A    It's handwritten.

15   Q    Is it your handwriting?

16   A    Doesn't appear to be, sir, no.

17   Q    Is it fair to say that you didn't actually draft that

18   document?

19   A    It's fair to say.

20   Q    Okay.  And is it fair to say that when this search

21   warrant was obtained, you had brother agents in the Franks'

22   apartment waiting for you to come back?

23   A    That's correct.

24   Q    All right.  Are you familiar with what a criminal

25   complaint is?

1    A    Yes, sir.

2    Q    What is a criminal complaint?

3    A    Criminal complaint is where you set forth the facts and

4    circumstances of the case in order to render the appropriate

5    document, whether it be search warrant or an arrest warrant.

6    Q    Is it a charging document?

7    A    Yes, it is a charging document.

8    Q    Okay.  Do you recall filing a complaint in connection

9    with this case?

10   A    I vaguely do, yes.

11   Q    Okay.  Would anything improve your recollection?

12   A    Yes, the report would.

13        MR. TOOSSI:  I'm showing you what's marked as

14   35-LD-38.

15        THE COURT:  When you say 35, you mean 3500.

16        MR. TOOSSI:  3500, thank you, yes, Your Honor.

17   3500-LD-38.

18   Q    What is that document?

19   A    This is a complaint, sir.

20   Q    And was this the charging document that you filed, that

21   you signed against Ron Barlin, Anthony Cuccio, George

22   Gleckler, Milagro Fantauzzi?

23   A    Yes, sir.

24   Q    George Gleckler?

25   A    And John Doe a/k/a Pepe.

1   Q    And John Doe a/k/a Pepe.

2         What's the date of that document?

3   A    Appears to be May 14th, 1981.

4   Q    When was that in relation to the arrest in Herb Frank's

5   apartment?

6   A    I, I'd have to look further at the report, sir, I don't

7   know.

8

9         (Continued on following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION CONTINUED

2  BY MR. TOOSSI:

3  Q    Showing you again 3500-LB-18.

4  A    According to this, the arrest occurred on May 13th

5  pursuant to the issuance of the warrant.

6  Q    Check out your report.  Is that correct that the arrest

7  happened on May 13, 1981?

8  A    Yes, sir.

9  Q    You testified earlier that the complaint was filed on

10  May 14, 1981; is that correct?

11  A    Complaint was filed -- well, I don't know which date here

12  is correct. I'm looking at one that is on the top left and

13  sworn before me on the 14th day of May.

14  Q    Is it fair to say you swore out that complaint on May

15  14,1981?

16  A    It appears to be, sir.

17  Q    And does that complaint refer to the phone call with

18  Pepe?

19  A    Yes, it does.

20  Q    Does that complaint also refer to Bruce Erbacher's

21  statement about his suppliers being Ron and Pepe?

22  A    Yes, it does, sir.

23          MR. TOOSSI: No further questions.

24          THE COURT:  Recross.

25          MR. CARNESI:  Yes.

1   RECROSS EXAMINATION

2   BY MR. CARNESI:

3   Q    I will try to simplify this, if I can. Before the phone

4   call on the night of the arrest, were there any --

5   A    What phone call, sir.

6   Q    The Pepe phone call?

7   A    Okay.

8   Q    Okay. Were there any written documents referring to Pepe

9   that you created?

10  A    Other than my report.  My report (indicating), right over

11  here.  Based on the information.

12  Q    What is the date on the report?

13  A    Now which one are you referring to.

14  Q    Which one were you holding up?

15  A    This one is the affidavit, the complaint and this --

16  Q    Let's talk about the affidavit.

17  A    This one here is my report.

18  Q    The affidavit the complaint.  Can we agree that was

19  generated after the phone call, May 14th, you told the

20  prosecutor, right?

21  A    Yes, it appears so. Well, before the warrant -- after the

22  warrant was executed.

23  Q    After the warrant was executed and after the phone call,

24  right?

25  A    Before the phone call.  The phone call was before this

1  complaint was made (indicating).  This is a complaint.  This

2  is not the search warrant, sir.

3  Q    I understand.

4  A    Then why ask the question?

5        THE COURT:  Please.

6        THE WITNESS:  I'm sorry.

7  Q    It is dated May 14th, excuse me?

8  A    Yes.

9  Q    You have it in front of you, right?

10 A    Yes.

11 Q    It is dated the 14th, right?

12 A    Yes, sir, it is.

13 Q    And that is after the phone call, the Pepe phone call you

14 told us about?

15 A    After the phone call, yes, sir, it is.

16 Q    That is why I asked the question.

17       Now, the affidavit that you made up was before the

18 Pepe phone call, right?

19 A    That's correct, sir.

20 Q    And in the affidavit you're saying what you swore to is

21 what Bruce Erbacher told you after being arrested, right?

22 A    Let me see it again.  It may contain elements of what he

23 said.

24       (Mr. Carnesi handing to the witness)

25       And this is again, sir?

1  Q    Is that the affidavit that you swore to at as being
2  accurate when you got the search warrant?
3  A    Yes.
4  Q    And in that affidavit what it says here is what you say
5  you were told by Bruce Erbacher after he was arrested, right?
6  A    It states what it states.  After being advised of his
7  rights Erbacher stated that Frank would be expecting payment
8  that evening in order to pay his supplier.
9  Q    Okay. That is what you swore he told you when you went in
10 front of the magistrate, right?
11 A    Yes, sir.
12 Q    And finally, you were waving around this report, LD-18,
13 and can you tell me when that report was prepared?
14 A    You said I was waving a report, sir?
15 Q    Yes, you held it up to me and said it was in my report?
16 A    I see. Okay. What is your question regarding this?
17 Q    Sure.  When was that report written?
18 A    When was that report what?
19 Q    When was that report prepared?
20 A    This report was typed on May 29th, 1981.
21 Q    Can we agree once again that that is substantially after
22 you claim you had gotten this phone call from Pepe?
23 A    This was prepared, yes, after.  Umm-Humm.
24 Q    You believe that report was prepared from some earlier
25 notes; is that right?

1  A    From my earlier handwritten report.

2  Q    Which doesn't exist any more?

3  A    No.

4         MR. CARNESI: Thank you.

5         THE COURT:  Any re-redirect?  As to as to no, Your.

6         MR. TOOSSI: No, Honor.

7         THE COURT:  You may step down.

8         THE WITNESS:  Thank you, Your Honor.

9         MS. MACE:  Yes, Your Honor, the government now calls

10 Millie Gludau.

11        MR. CARNESI: Before we do that, can we take a break?

12        THE COURT:  Yes.

13        Members of the jury, we are going to take our

14 afternoon recess.  Fifteen minutes please.  Remember my

15 admonitions, do not discuss the case, keep an open mind.

16        (Whereupon, the jury exited)

17        While I have the attorneys -- well, I didn't see the

18 press people here. There was a second letter from Gangland

19 News, Jerry Capeci, who has requested any pictures and other

20 exhibits that I request which are introduced into evidence and

21 he's requesting any transcripts of conversations which they

22 may provide to the jurors as aids in deciphering the

23 tape-recorded conversations that they were listening to during

24 trial.

25        Do you have any objection, and I'm asking the

defense because I assume -- well, let me ask the government

first.  Do you have any objection to any pictures and other

exhibits which are introduced into evidence during the trial.

MR. NORRIS: Aside from some minor redactions that

might be necessary for personal information, we have no

objection.

THE COURT:  And transcripts of conversations that

the jurors use as aids in deciphering the tape-recorded

conversations?

MR. NORRIS: If they are admitted and shown to the

jurors as aids, we have no objection, as well as either of

those, it would be clear that those are not exhibits as such.

THE COURT:  Now, either Mr. Carnesi  or

Mr. DiBenedetto, with regard to Mr. Capeci's request, any

pictures and other issues exhibits which are introduced into

evidence.

MR. CARNESI: Judge, I have no objection.

THE COURT: No objection.

MR. CARNESI: I have talked to Mr. Vernace and he has

no objection.

THE COURT:  What about transcripts of conversations.

MR. CARNESI: Judge, transcripts are little bit

different.  I don't like to decide things in a vacuum.  I have

not seen what transcripts they have they intend to introduce.

THE COURT:  Correct, and I must say in many cases

the transcripts don't go into evidence because they're just used as aids.  They don't get to take them into the jury room with them.

MR. CARNESI:  That certainly would be my position, Judge.

THE COURT:  Okay.

Now, also, Mr. Marzulli, we talked about his requests on Friday -- Thursday, I'm sorry.  He wanted to make copies of exhibits in evidence, including documents subject to redaction, personal information, and also photographs.  Any objections?

MR. NORRIS: No, Your Honor.

MR. CARNESI: No objection.

THE COURT:  So we've granted that. He also asks for access to copy photographs in evidence which depicted the victim, the defendant, codefendants and coconspirators, cooperating witnesses.

MR. NORRIS: As long as they are in evidence, no objection.

MR. CARNESI: That is fine.  I don't believe there are any pictures in evidence.

THE COURT:  Well, only the head-shots that you have.

MR. CARNESI: Yes, I have no objection to those.

THE COURT: All right. So that's fine.  We can give that to him.

1          (Defendant now present);  (Jury now present)

2          THE COURT: The record will reflect that all of the

3    jurors are present, the defendant and all counsel. Ms. Mace.

4          MS. MACE:  The government now calls Millie Gludau.

5    M I L A G R O S     G L U D A U,

6          having been first duly sworn, was examined

7          and testified as follows:

8          THE CLERK:  Thank you.  Be seated.  Please state

9    your name and spell it for the record.

10          THE WITNESS: Millie Gludau G-L-U-D-A-U.

11          MS. MACE:  May I inquire, Your Honor?

12          THE COURT:  Yes.

13    DIRECT EXAMINATION

14    BY MS. MACE:

15    Q    How old are you?

16    A    Fifty-nine.

17    Q    Do you work?

18    A    Yes, I do.

19    Q    What do you do?

20    A    Housekeeping.

21    Q    How far did you go in school?

22    A    Eleventh grade.

23    Q    Are you married?

24    A    Yes, I am.

25    Q    Is this your first marriage?

1   A    Second marriage.

2   Q    Where were you born?

3   A    The Dominican Republic.

4   Q    When did you come to the United States for the first

5   time?

6   A    1970.

7   Q    How old were you at that time?

8   A    Seventeen.

9   Q    Please explain what the circumstances were under which

10  you first came to the United States?

11  A    It was summer vacation with my brothers.

12  Q    At the end of the summer did you leave?

13  A    No, I stayed.

14  Q    Why did you stay?

15  A    I didn't want to go back home and I escaped from my

16  uncle's house and went to live with some friends.

17  Q    When did you get married for the first time?

18  A    1974.

19  Q    And what was your husband's name?

20  A    Charles Fantauzzi.

21  Q    Did you take your husband's last name?

22  A    Yes, I did.

23  Q    You said or testified earlier your name is Millie; is

24  that short for anything?

25  A    Milagros.

1   Q    At some point did you go by the name Milagros Fantauzzi?

2   A    Yes, I did in the beginning when I stayed here.

3   Q    After marrying Charles Fantauzzi, were you able to become

4   a lawful permanent resident of the United States?

5   A    Yes.

6   Q    When did you get your green card?

7   A    In '80, '81. 1981.

8   Q    Did there come a time when you were separated from your

9   husband Charles Fantauzzi?

10  A    Yes.

11  Q    You recall when that was?

12  A    Late 70s.

13  Q    Is Mr. Fantauzzi still living today?

14  A    No, he passed away.

15  Q    Do you recall when he passed away?

16  A    It was late 70s.  Like almost like eighty. Eighty. Almost

17  like 1980.  I had left him.  It was, like, maybe two years

18  after I left him.  I don't recall.

19  Q    So when he passed away it was after you were already

20  separated?

21  A    Yes.

22  Q    Did you continue to use the name Fantauzzi after you were

23  separated from your husband?

24  A    Yes.

25  Q    When did you change your name to your current name

1  Gludau?

2  A     When I got married to my husband now.

3  Q     When was that?

4  A     December 1995.

5  Q     How long have you been married to your current husband?

6  A     Seventeen years.

7  Q     What does your husband do?

8  A     He is a New York City Firefighter.

9  Q     Do you have any children?

10  A     Not with my husband.  I have three children with my old

11  husband.

12  Q     Ma'am, have you ever been convicted of a crime?

13  A     Yes.

14  Q     What crime were you convicted of?

15  A     Conspiracy to sell drugs.

16  Q     When was that?

17  A     In 1981.

18  Q     Did you go to prison?

19  A     Yes, I did.

20  Q     For how long?

21  A     Six months.

22  Q     Both before and after you went to prison what, if

23  anything, did you do for work?

24  A     I did waitressing, I sold Electrolux Vacuum cleaners,

25  prostitution.

1   Q     Were you ever arrested in connection with prostitution?

2   A     Yes.

3   Q     Did you did go to prison for that?

4   A     No.

5   Q     What happened?

6   A     It was dismissed.

7   Q     Have you ever been deported from the United States?

8   A     Yes.

9   Q     When did that happen?

10  A     The year 2000.

11  Q     What was your understanding why you were deported?

12  A     Because I had a felony.

13  Q     And that was conspiracy to sell drugs that you mentioned

14  earlier?

15  A     Yes.

16  Q     What country with you deported to?

17  A     Dominican Republic.

18  Q     After you were deported did you stay in the Dominican

19  Republic?

20  A     Yes.

21  Q     For how long?

22  A     Almost a year.

23  Q     Then what happened?

24  A     I just tried to -- I came back into the country

25  illegally.

1  Q     In the United States?

2  A     Yes.

3  Q     Why did you come back to the United States at that time?

4  A     My son had cancer and I thought he was going to die.  I

5  just want to say good-bye.

6  Q     Was your son living in the United States?

7  A     Yes.

8  Q     You testified that when you came into the United States

9  you did so illegally; is that right?

10 A     Yes.

11 Q     What country did you enter the United States through?

12 A     Canada.

13 Q     Can you explain briefly how you came into the United

14 States illegally at that time?

15 A     I went to Panama.  Then from Panama I went to Nicaragua,

16 then from Nicaragua to Costa Rica, then from Costa Rica,

17 Mexico into Canada.

18 Q     In connection with your trip from the Dominican Republic,

19 ultimately to the United States, did you use any false

20 documents?

21 A     Yes, I did.

22 Q     What did you use?

23 A     American passport.

24 Q     Did that passport have your own photo on it?

25 A     Yes.

1   Q    Did it have your true name, though?

2   A    No.

3   Q    In the course of your trip from the Dominican Republic to

4   the United States when you entered illegally, did you bribe

5   anyone?

6   A    Yes, I did.

7   Q    Where did that occur?

8   A    That was in Nicaragua and in Costa Rico.

9   Q    Do you recall who you paid money to?

10  A    The people that work at the airport.

11  Q    I'd like to turn your attention to December 9, 2010. Did

12  FBI agents come to your house that day?

13  A    Yes.

14  Q    Did they tell you that you were suspected of having

15  committed a crime?

16  A    Yes.

17  Q    What crime did you commit?

18  A    Reentering the country illegally.

19  Q    When the agents came to your house, or after they came to

20  your house that day, were you advised of your Miranda Rights?

21  A    Yes.

22  Q    Did you agree to waive those rights and speak with

23  agents?

24  A    Yes, I did.

25  Q    After that meeting with the FBI, did you eventually get a

1  lawyer?

2  A    Yes, I did.

3  Q    And did you speak with agents and prosecutors again after

4  you had a lawyer?

5  A    Yes, I did.

6  Q    Have you pleaded guilty to the crime of illegal reentry?

7  A    Yes, I did.

8  Q    When did you plead guilty?

9  A    February 14, 20013.

10 Q    Did you enter into a cooperation agreement at that time?

11 A    Yes, I did.

12 Q    Have you been sentenced for the crime of illegal reentry

13 yet?

14 A    No.

15 Q    I'd like to turn your attention back to the winter of

16 1980, 1981. Where were you living at that time?

17 A    I was on Queens Boulevard in Rego Park with my two

18 children.

19 Q    Is that in Queens, New York?

20 A    Yes.

21 Q    And by that time had your husband Charles Fantauzzi

22 passed away already?

23 A    Yes.

24 Q    Were you seeing anyone?

25 A    I was going out with George Gleckler.

1   Q    How did you meet George Gleckler?

2   A    I met him at a club.

3   Q    Could you briefly describe what Mr. Gleckler was like?

4   A    His personality?

5   Q    Yes.

6   A    He was a nice easy going person.  Very mellow, very kind.

7          MS. MACE: I'd like to -- Your Honor, may I approach

8   the witness?

9          THE COURT: Yes.

10  Q    I'm showing you what's been marked for identification

11  purposes as Government Exhibit 741, do you recognize that?

12  A    Yes, me and George.

13  Q    Is that a photograph of you and George?

14  A    Yes.

15  Q    And when, approximately, was it taken?

16  A    It was after we got arrested when we moved to Queens,

17  Forest Hills, and Charlie my -- one of my sons was on Little

18  Legal League and he was playing baseball.

19  Q    Was that approximately 1981?

20  A    Yes.

21  Q    How did the government get that photograph?

22  A    I gave it to them.

23         MS. MACE:  Your Honor, we offer Government

24  Exhibit 741.

25         THE COURT: Any objection.

1            MR. CARNESI: No, Your Honor.

2            THE COURT:  Received.

3            (Government Exhibit 741  received and marked into

4    evidence)

5            MS. MACE:  May I publish, Your Honor?

6            THE COURT:  Yes.

7    Q    Do you see that on the screen next to you, ma'am?

8    A    Yes.

9    Q    Who, again, is in this photograph?

10   A    George Gleckler and myself.

11   Q    So, for the record, you are the person on the left here?

12   A    Yes.

13   Q    What is in the background?

14   A    It's a baseball field.

15   Q    Why were you there that day?

16   A    My son was playing baseball.

17   Q    Ma'am, did you ever see George Gleckler use drugs?

18   A    Yes.

19   Q    What kind of drugs did he use?

20   A    Cocaine.

21   Q    Anything else?

22   A    I didn't see him using anything else besides that.

23   Q    Did you ever see Mr. Gleckler use heroin?

24   A    One time, yes.  I am sorry, yes.

25   Q    Did you ever use cocaine with him yourself?

1  A    I did it one time, yes.

2  Q    What happened?

3  A    I got very sick, and he had to rush me to the hospital --

4  to St. John's Hospital in Queens.

5  Q    Have you ever used illegal drugs since that time that you

6  used cocaine with George Gleckler?

7  A    No.

8  Q    How about before that incident, have you ever used drugs?

9  A    No, never.

10  Q    Now, a part from drugs for his own use, did you ever see

11  George Gleckler with a larger quantity of drugs?

12  A    Yes.

13  Q    What kind of drugs?

14  A    Marijuana and cocaine.

15  Q    When did you see George Gleckler with a larger quantity

16  of cocaine?

17  A    Sometimes in the house.  We had it in -- around him.  I

18  don't remember when.

19  Q    Can you describe what you saw?

20  A    It is big packages like this (indicating).  This big.

21  Q    For the record, you are showing the with your hands,

22  approximately, a foot wide?

23  A    Yes.

24  Q    You also mentioned seeing him with large quantities of

25  marijuana, please describe what you saw.

1  A    Yes, it was a few bags, like garbage bags, of marijuana

2  in the basement of the house when I was living with him.

3  Q    What type of business was George Glecker in?

4  A    A drug dealer.

5  Q    Were you ever with George Gleckler when he delivered

6  drugs to someone?

7  A    One time.

8  Q    Please describe what happened.

9  A    We went to this apartment, and he gave this guy an

10  envelope, and the person gave him money back.

11  Q    Where was the apartment that?

12  A    On Fifth Avenue, around 60th Street.

13  Q    In Manhattan?

14  A    Manhattan, yes.

15  Q    During this period of winter 1980, '81, did you speak

16  with George Gleckler about the drug dealing business?

17  A    Yes, sometimes.

18  Q    Did you accompany George Gleckler on any trips for the

19  drug dealing business?

20  A    Yes.

21  Q    Where did you go?

22  A    We went to Mexico, California, Florida, Seattle.

23  Q    What was the purpose of those trips?

24  A    He was looking for people to get more drugs from,

25  dealers.

1    Q    Suppliers of drugs?

2    A    Suppliers, yes.

3    Q    You mentioned going to Florida, who, if anyone, did you

4    and George Gleckler meet with in Florida?

5    A    Was this old person called Uncle Moe that he was supposed

6    to bring some stuff to New York -- some drugs.

7    Q    And in California, where in California did you go with

8    George Gleckler?

9    A    San Diego.

10   Q    Who, if anyone, did you and George Glecker meet with in

11   Santiago?

12   A    A person named Corky. I can't remember.  The name was

13   like Corkey or, Corey. I don't remember?

14   Q    Something that sounded like Corkey?

15   A    Yes.

16   Q    And what was discussed when you and George Glecker met

17   with Corkey?

18   A    They were talking about marijuana.

19   Q    You also mentioned going to -- I believe you said Seattle

20   with George Glecker?

21   A    Yes.

22   Q    And what was the purpose of that trip or that meeting?

23   A    He was looking for somebody that -- with a claim to bring

24   drugs around, bring it from one place to another.

25   Q    I believe you testified you went to Mexico, where in

1  Mexico did you go with George Glecker?

2  A    Mazatlan.

3  Q    What was the purpose of that trip?

4  A    He was looking for marijuana.

5  Q    Now, you've already testified that you were ultimately

6  arrested for your role in the drug conspiracy, what was in

7  your purse at the time that you were arrested?

8  A    It was cocaine, and $5,000.

9  Q    You've testified about people in other cities who were --

10 you and George Glecker met with.  Who, if anyone else, was in

11 this drug dealing business with George Glecker in New York?

12 A    It was somebody named Herbie and Bruce.?

13 Q    Were you present for conversations between Bruce and

14 George Glecker concerning drug dealing?

15 A    Yes.

16 Q    What do you recall being discussed?

17 A    About money and how much and where to take it.

18 Q    Was the money in connection with the drug dealing?

19 A    Yes.

20 Q    In what way?

21 A    How to collect -- I don't recall that well but it was

22 money and drugs.

23 Q    Based on your conversations, what was your understanding

24 of Bruce's role in the drug dealing business?

25 A    He used to buy from George.  He used to get from George

1   and he will sell it to somebody else.

2   Q    In those conversations were the names of any other people

3   involved in the drug dealing business with George, Bruce and

4   Herbie discussed.

5   A    I heard the name Pepe and Ron, but I never remember

6   seeing the faces.

7   Q    During the time we have been discussing, 1980 to '81,

8   were you ever in Bruce's apartment?

9   A    Yes.

10  Q    Where did Bruce live?

11  A    Right off Fifth Avenue on the lower numbers, like 87th

12  Street.  I'm not sure.  Off Fifth Avenue.

13  Q    Were you ever in Herbie's apartment?

14  A    Yes.

15  Q    Where did Herbie live?

16  A    In Queens on Woodhaven Boulevard.

17  Q    Were you ever invited to Herbie's apartment?

18  A    Yes, one time for dinner.

19  Q    And did you, in fact, go to dinner?

20  A    Yes, I did.

21  Q    Who was there?

22  A    Was two children and his wife Herbie.

23  Q    Do you recall how old his children were?

24  A    They were between 12, ten, 12, 14.  Something like that.

25  Q    Were they sons or daughters?

1  A    I believe it was one girl and a boy.

2  Q    Now, in relation when you were ultimately arrested, when

3  did this dinner party happen?

4  A    It was not too far from after the dinner party that I got

5  arrested.

6  Q    Please describe what Herbie's apartment looked like when

7  you went in that evening for the dinner party.

8  A    You just walk in and there was, like, a dining room

9  first, then the living reason was like one whole row, then was

10 a room on the right and there was windows on the front of me.

11 Q    The room on the right, could you see what type of room

12 that was?

13 A    It was like a bedroom.

14 Q    When you walked in the front door you walked through a

15 first room, the dining area into a living room and to your

16 right was the bedroom?

17 A    Yes.

18 Q    And were you there with George Glecker that night?

19 A    Yes.

20 Q    Now, did anyone else come to the apartment during the

21 course of that evening?

22 A    Yes, two guys came in.

23 Q    Please describe what happened when the two men came.

24 A    Herbie took them into the room and they spent maybe 15,

25 ,20 minutes and then they left.

1  Q    After Herbie took the two men into the room, what room

2  did they go into?

3  A    To the one right in front of the couch.

4  Q    That was the one you said was a bedroom?

5  A    Yes.

6  Q    And how long, approximately, are they in the bedroom?

7  A    About 20 minutes.

8  Q    When they opened the door what, if anything, did you see?

9  A    There was a bed and on top of the bed was some kind of

10 rifles, gunshots.

11 Q    There were some guns on the bed?

12 A    Yes.

13 Q    How many guns?

14 A    Could be two or three, or three or four.  It was more

15 than two, though.

16 Q    When they opened the door to come out of bedroom did you

17 see the men who came out of the bedroom?

18 A    Yes, I did.

19 Q    And what, if anything, did you notice about the men?

20 A    There was one was -- what do you mean, the height?  How

21 they look like?

22 Q    Well, were they the same height or was one --

23 A    No, one was very short, the other one was taller because

24 I was sitting on couch and one on my eye level and he had

25 glasses.

1  Q    And after the -- when the men came out, did either of

2  them speak to you?

3  A    The shorter one with the glasses said good night and they

4  left.

5  Q    After these men left the apartment, what happened next?

6  A    George was sitting next to me and Herbie told George to

7  go into the room and they closed the door.

8  Q    And George did go in the room?

9  A    Yes, he did.

10 Q    How long were Herbie and George in the bedroom?

11 A    About the same time, about 15, 20 minutes.

12 Q    And what happened after that amount of time?

13 A    George came out, and I can see his face, he was very

14 upset. And after that we were, there like, maybe few minutes,

15 maybe 15 minutes, ten minutes and we left.

16 Q    You say when George came out of the bedroom he appeared

17 upset, can you describe what you mean by that?

18 A    His face looks very upset.  I can see when he was upset.

19 Q    He did he appear to you different than he normally did?

20 A    Yes, like red and kind of cranky.

21 Q    Did you stay for dinner that evening?

22 A    Umm, I think I made the chocolate pudding but I don't

23 remember eating anything.  I don't think we ate because I

24 don't remember what I ate so I think we left before dinner.

25 Q    What, if anything, did George say to you while you were

1  still in the apartment?

2  A    He just said let's go.

3  Q    Did you leave earlier than you'd planned to leave?

4  A    Yes.

5  Q    Now, what happened next after you left Herbie's

6  apartment?

7  A    After we left we went to the elevator and I asked him

8  what happened. So he said that they wanted him to sell heroin.

9  He was not going to do that.

10 Q    What, if anything, did you and George Glecker do after

11 you left Herbie's apartment building?

12 A    Before he dropped me off in my apartment he stopped and

13 he called Bruce and he told Bruce he wanted to speak to him.

14 Q    Did you and George Gleckler see Bruce?

15 A    Not that night. Couple of days later.  I don't know if it

16 was the next day or the day after but it was not too long.

17 Like maybe a day or two.

18 Q    So a day or two later you and George Gleckler saw Bruce?

19 A    Yes.

20 Q    And what happened on this occasion?

21 A    He was talking to Bruce about this situation that he

22 didn't want to sell any heroin and Bruce told him that it is

23 okay because he will be making more money, but he said he also

24 didn't want to get involved in heroin.

25 Q    Just to be clear, George Gleckler was saying he didn't

1  want to get involved with heroin?

2  A    Yes.

3  Q    Is that right?

4  A    To Bruce.

5  Q    And what did Bruce say in response?

6  A    He said he will make more money.

7  Q    And were any other names mentioned during that

8  conversation?

9  A    Well, there -- we were walking to the restaurant and they

10 were right in front of me and they would mention the name

11 Pepe.

12 Q    Do you recall specifically what was said about Pepe in

13 that conversation?

14 A    No.

15 Q    Were you ever in Herbie's apartment after that?

16 A    No, that was the day I got arrested.

17 Q    Do you recall when that was?

18 A    It was in the spring of '81.

19 Q    Why did you go to Herbie's house that day -- or

20 apartment, excuse me?

21 A    George was going to -- it was around my birthday and

22 George was going to take me to dinner or lunch, and said he

23 would have to do a -- make a stop, and we stopped on Herbie's

24 apartment and we -- outside I was sitting in the car, and he

25 called, he went outside and called upstairs to his house and

1  they said he was not there yet.

2  Q    Just to be clear, when you arrived at Herbie's apartment,

3  did you immediately go up to the apartment?

4  A    No. We waited there.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **DIRECT EXAMINATION**

2  BY MS. MACE: (Continuing)

3  Q    And what were you waiting for?

4  A    We were waiting for Herbie to come in.

5  Q    And did Herbie eventually arrive?

6  A    Yes.

7  Q    Can you describe what happened when you arrived?

8  A    He came in on a taxi and he had a briefcase and a

9  raincoat, and he opened up his briefcase and gave George a bag

10 of drugs, and...

11 Q    Please, describe what that bag looked like.

12 A    It was like a brown paper bag like lunch, lunch paper

13 bag.  And I don't know what they were saying but they say

14 let's go upstairs.  And then George came to the window and

15 told me stay in the car, I'm going upstairs with Herbie, I be

16 right back.

17           And I say, I been waiting here for a very long time,

18 can I use the bathroom.  So, he asked Herbie and Herbie said

19 yes you can go to the bathroom.  So, when I got out of the

20 car, George say can you please put this in your pursue.

21 Q    And he was referring to what?

22 A    To the drug.

23 Q    It was a bag of drugs and he asked you to put it in your

24 pursue?

25 A    Yes.

1  Q    Did you agree to put it in your pursue?

2  A    Yes.  Then I put it in my purse and we went upstairs.

3  Q    And what happened when you got upstairs to Herbie's

4  apartment?

5  A    There was, it was police there and we got arrested.

6  Q    And what, if anything, did you see in the apartment when

7  you went there that day?

8  A    Excuse me?

9  Q    Did you see anything in the apartment that day or could

10 you describe what you saw?

11 A    Well, when we walk in, was the dining room table was full

12 evidence like guns and stuff.  And his wife was there and the

13 police, and George and I, and Herbie.

14 Q    Now, at some point, did agents find the package that was

15 in your purse?

16 A    Yes.  First, when I walk in, they were talking to Herbie

17 and they asked George what was his name.  They told me to sit

18 down on a chair and after that, they were looking around and

19 they found my purse and they say who is this, and I say that's

20 my purse.

21       And George was sitting next to me and I say George,

22 there's something in there that is not mine, so he say don't

23 say anything.  I say, what do you mean, that's not my stuff.

24 He say don't say anything because these people will kill you.

25 Q    Now, were you, in fact, arrested on that evening when you

1   were at Herbie's apartment?

2   A    Yes.

3   Q    After you were arrested, was there a trial?

4   A    Yes.

5   Q    Were you found guilty of conspiracy to sell drugs?

6   A    Yes.

7   Q    And you went to jail?

8   A    Yes.

9         MS. MACE:  I'd like to now show you a series of

10  photographs.

11        Your Honor, these have all been admitted now into

12  evidence already.

13        THE COURT:  All right.

14  Q    Mrs. Gladau, I'm now showing you what's been admitted as

15  Government's Exhibit 18.

16        (The above-referred to Exhibit was published to the

17  jury.)

18  A    That's Herbie.

19  Q    I'm showing you Government's Exhibit -- and with regard

20  to Herbie, do you know Herbie's last name?

21  A    No.

22  Q    I'm showing you Government's Exhibit 814.

23        (The above-referred to Exhibit was published to the

24  jury.)

25  Q    Do you recognize this person?

1  A    That's Herbie's wife.

2  Q    Do you recall her name?

3  A    No.

4  Q    Showing you Government's Exhibit 23.

5         (The above-referred to Exhibit was published to the

6  jury.)

7  Q    Do you recognize that person?

8  A    No.

9  Q    Government's Exhibit 96.

10        (The above-referred to Exhibit was published to the

11 jury.)

12 Q    Do you recognize this person?

13 A    That's the gentleman that was there that night of the

14 dinner.

15 Q    And which gentleman are you referring to?

16 A    The one with the glasses.

17 Q    But on the night of the dinner, I believe you testified

18 that you and George Gleckler went and Herbie was at the

19 apartment with his wife; is that correct?

20 A    Yes, mm-hmm.

21 Q    And then two gentlemen came?

22 A    Yes.

23 Q    And was the person shown in Government's Exhibit 96 one

24 of those two gentlemen?

25 A    Yes.

1  Q   Which one?

2  A   The one with the glasses.

3  Q   Was he the shorter one or the taller one?

4  A   The shorter guy.

5  Q   So, the person shown in Government's Exhibit 96 is the

6  shorter of the two men that came out of the bedroom in

7  Herbie's apartment?

8  A   Yes.

9  Q   Do you know his name?

10 A   No.

11 Q   Showing you Government's Exhibit 812.

12          (The above-referred to Exhibit was published to the

13 jury.)

14 Q   Who is that?

15 A   That's me.

16 Q   Showing you Government's Exhibit 5.

17          (The above-referred to Exhibit was published to the

18 jury.)

19 Q   Do you recognize this person?  Let it focus for a moment.

20 A   No.

21 Q   Showing you Government's Exhibit 815.

22          (The above-referred to Exhibit was published to the

23 jury.)

24 Q   Do you recognize that person?

25 A   That's George Gleckler.

1   Q    Showing you Government's Exhibit 811.

2             (The above-referred to Exhibit was published to the

3   jury.)

4   Q    Do you recognize that person?

5   A    No.

6   Q    You testified, Mrs. Gladau, that you signed a cooperation

7   agreement in February of 2013; is that right?

8   A    Yes.

9   Q    When did you first decide to cooperate with the

10  Government?

11  A    In December.

12  Q    Of 2010?

13  A    Yes.

14  Q    Is that when the agents first came to your home?

15  A    Yes.

16  Q    And why did you decide to cooperate?

17  A    Well, I think it will help with my immigration case.

18  Q    What happened after you made the decision to cooperate?

19  A    I got a lawyer and I started seeing the District

20  Attorneys, the lawyers, and I used to go see them once in a

21  while.

22  Q    And in those meetings, did you meet with both prosecutors

23  and agents?

24  A    Yes.  Immigration agents and FBI and...

25  Q    And were you asked questions during those meetings?

1  A      Yes.

2  Q      Did you tell the agents and the prosecutors about crimes

3  that you had committed?

4  A      Yes.

5  Q      Including the drug conspiracy crime that you were

6  convicted of in the early '80s?

7  A      Yes.

8  Q      Did you also tell the prosecutors and agents about crimes

9  that you'd never been prosecuted for?

10 A      Yes.

11 Q      Like what?

12 A      Like prostitution.

13 Q      Did you tell the Government about crimes that other

14 people had committed?

15 A      Yes.

16 Q      And when you were being asked these questions and you

17 provided the information that you had, did the agents and

18 prosecutors ask you questions about what you had told them?

19 A      Yes.

20 Q      How many times would you say you met with the Government?

21 A      Six, seven times.

22 Q      And over what period of time was that?

23 A      Almost two years.

24 Q      Did you speak with agents and prosecutors before you came

25 here to testify today?

1  A    Yes.

2  Q    Did you go through some possible questions that you might

3  be asked?

4  A    Yes.

5  Q    Did you discuss what might be asked of you on

6  cross-examination?

7  A    No.  Yes.

8  Q    Well, what do you recall?  Do you recall if you discussed

9  with the Government possible questions that might come up on

10 cross-examination?

11 A    Yes, I'm sorry.

12 Q    Now, Mrs. Gladau, were you ever provided any information

13 about this case that you're now testifying in?

14 A    No.

15 Q    Were you ever told who the defendant in the case would

16 be?

17 A    No.

18 Q    Were you ever shown any documents?

19 A    No.

20 Q    Other than the photograph that you provided to the

21 Government, were you shown photographs?

22 A    Yes.  Head shots.

23 Q    And by head shots you mean photographs of people just

24 they're heads?

25 A    Yes.

1   Q    And those are like the ones I just showed you a few

2   moments ago?

3   A    Yes.

4           MS. MACE:  Your Honor, may I approach again?

5           THE COURT:  Yes.

6           MS. MACE:  I'm showing you what's been marked for

7   identification purposes as MG-12.

8   Q    Do you recognize that document?

9   A    Yes.

10  Q    What is it?

11  A    It's my cooperation agreement.

12  Q    If you could turn to the back page of your cooperation

13  agreement, is there a date on the agreement?

14  A    February 14, 2013.

15  Q    And did you sign that agreement?

16  A    Yes, I did.

17  Q    You can close it now, thank you.

18          Under the agreement, what is the maximum penalty

19  that you face for illegal re-entry?

20  A    Twenty years.

21  Q    Do you know now what sentence will be?

22  A    No.

23  Q    Who decides or who will ultimately decide what your

24  sentence will be?

25  A    The Judge.

1  Q    What's your understanding of your obligations under the
2  cooperation agreement?
3  A    Tell the truth.
4  Q    Is there anything else you're expected to do?
5  A    Just tell the truth.
6  Q    Okay.  And if you're asked to testify, as you have been
7  here, are you required to come and testify as well?
8  A    Yes.
9  Q    Now, if you do those things, if you testify when asked to
10  and if you tell the truth, what do you get in return?
11  A    Can you repeat the question, please?
12  Q    If you do what you're required to do under the agreement
13  and you tell the truth, what do you expect to get in return?
14  A    The Government will write a letter to the Judge and to
15  Immigration.
16  Q    And what is your understanding of what the letter would
17  say?
18  A    That I was testifying in the Court.
19  Q    And in that letter, would the Government recommend a
20  specific sentence to the Judge?
21  A    No.
22  Q    As you sit here today, do you have any idea of how much
23  time you might serve as a result of your conviction for
24  illegal re-entry?
25  A    No.

1  Q    While your case is pending, are you allowed to live and

2  work in the United States?

3  A    Yes.

4  Q    What's your understanding of what will happen to your

5  immigration status after you are sentenced?

6  A    I don't know.  I can be deported.

7  Q    What do you hope will happen?

8  A    I hope I can stay here.

9  Q    As you sit here today, do you know whether or not you

10 will be deported?

11 A    I'm not sure.

12 Q    What is your understanding, Mrs. Gladau, of what would

13 happen if you lied in your testimony?

14 A    If you lie, you go to jail and everything, the agreement,

15 everything, will be destroyed.

16 Q    And what would the possible penalty you'd face for

17 illegal re-entry?

18 A    Twenty years.

19 Q    And if you lied here today, would you have any chance of

20 staying in the United States?

21 A    No.

22         MS. MACE:  No further questions.

23         THE COURT:  Cross-examination.

24         MR. CARNESI:  Thank you.

25

1    CROSS-EXAMINATION

2    BY MR. CARNESI:

3    Q    Good afternoon, Mrs. Gladau, my name is Charles Carnesi.

4    A    Good afternoon, sir.

5    Q    Now, what's your understanding of what would have

6    happened if you hadn't signed that cooperation agreement?

7    A    You mean the paper that I just got?

8    Q    Yeah?

9    A    What will happen?

10   Q    What would have happened if you had not signed that

11   paper?

12   A    I don't know.  I guess I will go to jail.

13   Q    And you would have been deported; right?

14   A    Right away.

15   Q    Okay.  Now, when you were first arrested, you were

16   arrested by individuals working for Homeland Security; is that

17   right?

18   A    When was that?

19   Q    When you were first arrested, when you first got here.

20   A    At the airport?

21   Q    Where was it that you were arrested?

22   A    Well, for what crime?

23            THE COURT:  Yes.

24   Q    For illegal re-entry, I'm sorry.

25   A    Oh, I was at the airport, Kennedy Airport, I'm sorry.

1  Q    That's okay, I wasn't clear.

2        MS. MACE:  I'm sorry, Your Honor, just to be clear,

3  there were, I think, two arrests, deportation-related arrests,

4  one back in 2000.

5        MR. CARNESI:  Right.  That's what we're going to get

6  to.

7  Q    That's the second time you were arrested for illegal

8  re-entry; right?

9  A    No.

10 Q    Let me go back.

11       In 1984, you were deported; correct?

12 A    19 -- I wasn't sure if I was deported.  They asked me to

13 go and George needed some money that was there and I just went

14 there.  I didn't get deported.  I didn't know that I got

15 deported.

16 Q    Didn't they tell you that you had to leave?

17 A    No.

18 Q    Okay.  When did you leave?

19 A    I went in the '80s to sign a paper because George needed

20 some money to be released.

21 Q    And what happened?

22 A    I came back.  I had my green card.  I didn't know I was

23 deported.

24 Q    Didn't you seek to re-enter the United States in the year

25 2000?  April 27th of 2000?

1  A    But I was living here and I went on vacation with my

2  husband.

3  Q    All right.  And then what happened, you were unable to

4  re-enter?

5  A    I came back, I was on -- the year 2000, I went to the

6  airport and they told me there was something wrong in my

7  immigration papers, there was a felony.  They gave me a piece

8  of paper and I went to Federal Plaza to Immigration office.

9  In the year 2000.

10 Q    Okay.  Were you ultimately directed to leave the country

11 in 2000?

12 A    Not when I entered through the airport.  When I went to

13 the Federal Plaza, to Immigration office.  I got detained

14 there and I got deported.  That was the first time.

15 Q    That was in the year 2000?

16 A    Yes, sir.

17 Q    Okay.  Now, you then at some point in time set about

18 trying to come back into the country; is that right?

19 A    Yes.

20 Q    Okay.  And when did you begin to attempt to get back into

21 the country?

22 A    The year 2001.

23 Q    All right.  And how long did it take to you get back into

24 the country?

25 A    From the time that I left the Dominican Republic?

1   Q    Yes.

2   A    About maybe three weeks.

3   Q    Okay.  And in the course of trying to re-enter the

4   country, did you obtain a false passport?

5   A    Yes, I did.

6   Q    How did you get the passport?

7   A    Somebody at the Dominican Republic.  I pay for it.

8   Q    And did you provide them with a picture to be attached to

9   the passport?

10  A    Yes, I did.

11  Q    Now, were you able to use that passport to come back into

12  the United States?

13  A    Not to the United States.  I went to Canada.

14  Q    All right.  And how did you get to Canada?  From where;

15  from the Dominican Republic directly?

16  A    No.  I went from Costa Rica to Mexico, Mexico Canada.

17  Q    All right.  And were you at any point questioned or

18  detained during that trip?

19  A    No.

20  Q    When you got to Canada, what did you do to re-enter the

21  United States?

22  A    I had, I still had my American driver's license, but I

23  drove through and they didn't ask me for anything.

24  Q    You drove through the Canadian border back into the

25  United States?

1   A    Yes.

2   Q    Did anybody come and meet you with a car?

3   A    They came to the car, they say you had a good time,

4   everything was okay?  And that was it.  They didn't ask me for

5   any ID.

6   Q    Where did you get the car?

7   A    My husband's car.

8   Q    Did he drive up to meet you?

9   A    Yes, he did.

10  Q    Now, do you remember when that was?

11  A    Was the 4th of July weekend, 2001.

12  Q    And did you remain in the country from 2001 until you

13  were arrested once again in 2010?

14  A    Yes, sir.

15  Q    Okay.  Now, you told us at different points that you were

16  involved in certain illegal activity, besides the drug

17  dealing?

18  A    Yes.

19  Q    What did you do?

20  A    Was prostitution.

21  Q    Okay.  And when was that?

22  A    That was before 1992.

23  Q    What else did you do?

24  A    Waitress.

25  Q    Okay.  When you say waitress, what was illegal about

1  you --

2  A    Oh, no, illegal was just prostitution.  I never did

3  anything illegal besides that.

4  Q    Well, did you apply for Welfare at some point?

5  A    That was for couple of months one time that I was, I

6  didn't have anything to, no work, nothing to do.

7  Q    Okay.  And did you apply for Welfare while you were here

8  illegally?

9  A    At that time, I didn't think I was illegal.

10 Q    At that time, while you were applying for Welfare or

11 collecting Welfare, were you also working off the books?

12 A    No, I wasn't working at all.  I had a baby girl.

13 Q    Did you ever collect Welfare while you were working off

14 the books?

15 A    No, when I stopped Welfare, I went back to work.

16 Q    All right.  Now, you told us on direct examination that

17 you recall Mr. Gleckler having a conversation with

18 Mr. Erbacher; right?

19 A    Who is Erbacher?

20 Q    That's Bruce, I'm sorry.

21 A    Oh, okay.

22 Q    You don't know Bruce's name?

23 A    I know Bruce, but I don't know his last name.

24 Q    Did you never learned his last name?

25 A    No, nobody ever gave me last names.

1  Q    Okay.  In any event, you said that you overheard a

2  conversation at some point between Gleckler and Bruce; right?

3  A    Yes.

4  Q    All right.  And was this conversation in the apartment or

5  was it outside?

6  A    It was many conversation, I don't know which one you're

7  talking about.

8  Q    You said you heard him mention the name Pepe?

9  A    We were walking on the street going to a restaurant we

10 were going to eat and they were right in front of me.

11 Q    Okay.  They were walking in front of you at the time.

12 A    Yes.

13 Q    Do you remember when that was?

14 A    That was after the dinner that George was upset and he

15 wanted to talk to Bruce.

16 Q    Do you recall when that dinner was?

17 A    I don't remember the days.

18 Q    Do you remember the time of year?

19 A    No.

20 Q    Do you remember whether it was cold?

21 A    Oh, it was not cold.  It was like springtime.

22 Q    Do you remember the restaurant that you were going to?

23 A    Yes, was, it was country-style music.  It was on

24 5th Avenue near Bruce's house.

25 Q    Okay.  Do you remember the name of it?

1   A    I think it was the Lone Star Cafe, something like that, I

2   don't remember really good the name.

3   Q    Now, you told us that or you identified for the

4   prosecutor a little while ago a picture of Herbie; right?

5   A    Yes.

6   Q    You also identified a picture of Herbie's wife?

7   A    Yes.

8   Q    Okay.  As you sit here now, do you know Herbie's last

9   name?

10  A    No.

11  Q    Herbie was in the apartment the night that you were

12  arrested; right?

13  A    He came up with me, yes.

14  Q    Okay.  His wife was also in the apartment that night;

15  right?

16  A    Yes.

17  Q    Okay.

18  A    Yes.

19  Q    Okay.  Do you remember who else was in the apartment at

20  that time?

21  A    Was the police and the children.

22  Q    Those are the only people that you remember that night?

23  A    Well, I was really frightened and I was crying, I was

24  sitting on a chair and I didn't look anywhere.  I was just

25  very...

1    Q    My question to you, if you understand it, is do you
2    remember anyone else in the apartment that night?
3    A    Besides the police and Herbie's wife and the children and
4    George, myself and Herbie, I don't remember anybody else.
5              MR. CARNESI:  Let me show you, this is Government's
6    Exhibit 5.
7              THE WITNESS:  Okay.
8    Q    Do you see the person in that picture?
9    A    Yes.
10   Q    Do you recognize that person?
11   A    No.
12   Q    Do you recall him being in the apartment the night you
13   were arrested?  Do you remember him?
14   A    No.  Herbie's apartment is very dark.
15   Q    Do you remember this person?
16   A    No.
17   Q    Okay.
18             MR. CARNESI:  This is Government's Exhibit
19   Number 23, this is the person with the bandage around his
20   head.
21             THE WITNESS:  Mm-hmm.
22   Q    Do you ever remember seeing this person before?
23   A    No.
24   Q    As you sit here now, you have no recollection of this
25   person being with you in the apartment the night you were

1   arrested?

2   A    No.

3   Q    Okay.  Do you remember him from anywhere else?

4   A    No, I don't remember him.

5   Q    And the first picture I showed you, do you remember that

6   individual from anywhere else?

7   A    No.

8   Q    Now, after you were arrested in the apartment that night,

9   you were subsequently indicted with other people; right?

10  A    Yes.

11  Q    And do you remember -- well.

12       Going back, even before you were indicted, do you

13  remember going before the Judge when you were initially

14  arrested?

15  A    Going before the, in front of the Judge?

16  Q    Yes, when you were first arrested.

17  A    Yes.

18  Q    Okay.  To discuss bail, things like that?

19  A    Yes.

20  Q    Okay.  Did you go alone or did you all go in a group?

21  A    I don't remember.

22  Q    Do you remember either of these individuals being present

23  in court?

24  A    No.

25  Q    Five or 23?

1   A     No.

2   Q     Okay.  Now, after you were indicted, you had to go to

3   court a number of times before the actual trial, do you

4   remember that?

5   A     Yes.

6   Q     How many times do you think you went to court prior to

7   the trial?

8   A     I don't remember.

9   Q     A lot?  More than two?

10  A     Yes, more than two times, yes.

11  Q     More than five?

12  A     I'm not sure.

13  Q     Did you also meet with the lawyers in a group?

14  A     No.

15  Q     Did you and the other people who were arrested?

16  A     No, just George and I with my lawyer and George's lawyer.

17  Q     Did you never met in a group?

18  A     No.

19  Q     Okay.  Now, you remember being on trial; right?

20  A     Yes.

21  Q     That was certainly an important event, that was the first

22  time you had ever been on trial; right?

23  A     Yes.

24  Q     Do you remember where the trial took place?

25  A     It was in a courthouse in Manhattan.

1  Q    Do you remember the Judge at all?

2  A    I remember, yes, I remember seeing the Judge.

3  Q    Do you remember what the Judge looked like?

4  A    Yes, I think, yes.

5  Q    Could you describe the Judge to me?

6  A    He was a very slender person.  And his last name was with

7  a G like Greta or something like that.

8  Q    Okay.  And how about the prosecutor?  Do you remember the

9  prosecutor's name?

10 A    No.

11 Q    Do you remember what he looked like?

12 A    No.

13 Q    Do you recall how long the trial took?  Did it take more

14 than a week?

15 A    It was a long time.

16 Q    About four weeks?

17 A    Yes.

18 Q    And you have no recollection of sitting next to these two

19 individuals during the course of that trial?

20 A    No.

21 Q    Okay.  You were there for every day of the four weeks?

22 Every day?

23 A    I was there all the time, yes.

24 Q    And in the four weeks, did you ever hear anybody refer to

25 Mr. Frank's?  His wife?  To Herbie's wife?

1  A    Can you repeat the question?

2  Q    Sure.  Do you remember Herbie's wife?

3  A    Yes.

4  Q    Sitting there at the table?

5  A    Yes.

6  Q    Did you ever hear anybody refer to her by name?

7  A    In her house.  I don't pay attention, I didn't pay

8  attention to the name.

9  Q    During the course of the entire trial, the entire

10 month-long trial, do you remember anybody ever mentioning

11 Herbie's wife's name?

12 A    No.

13 Q    Do you remember in the course of that trial Herbie's wife

14 ever testifying?

15 A    No.

16 Q    Do you ever remember seeing a gentleman with a bandage

17 wrapped around his head?

18 A    No.  No, sir, I'm sorry.

19 Q    Okay.  Now, you're looking at the cooperation agreement.

20 In the cooperation agreement it provides that, if you request

21 it, that you you're going to be provided with an S-visa;

22 right?

23 A    I read this, yes.

24 Q    Okay.  It also provides that if you request, other people

25 will be provided with visas on your behalf; isn't that a fact?

1    A    I'm not -- can you repeat the question, please?

2    Q    Sure.  Doesn't it also say that if you request it, the

3    Government is going to assist you with providing visas for

4    other individuals?

5    A    I don't know who's -- what's the other person?

6    Q    Do you remember anything in the agreement to that effect?

7    A    I went with my lawyer through that, yes, but I don't

8    remember every, every line.

9    Q    Okay.  When you got arrested, did you have a conversation

10   with the FBI agents or any of the law enforcement people who

11   were arresting you agreeing not to be brought before a judge

12   and not getting a lawyer immediately?

13   A    Can you repeat that, please?  I'm sorry.

14   Q    When you got arrested on the drug case, they brought you

15   very shortly in front of a Judge; right?  Do you remember

16   that?

17   A    That was in 1981?

18   Q    Yes?

19   A    Yes.

20   Q    On this occasion, when you were arrested for illegal

21   re-entry, do you remember signing a paper agreeing that the

22   agents do not have to bring you in front of a judge and that

23   you don't have to get a lawyer right away?

24   A    Yes.

25   Q    Okay.  At that time, did you have a cooperation agreement

1  signed, do you remember?

2  A    No.  The first time in December 2000.

3  Q    Yeah, when you first got arrested and they didn't bring

4  you in front of the Judge.

5  A    Right.  I don't recall.  I sign a paper, but I don't

6  recall, it was just to -- I don't remember.  What was...

7  Q    The paper would have said that you're agreeing that they

8  can delay bringing you in front of a judge and that you are

9  not asking for a lawyer at that point.

10  A    Oh, yeah, but I got a lawyer.

11  Q    Later on.

12  A    Pardon me?

13  Q    Later on.

14  A    Yes, like a week later.

15  Q    Okay.  And you were released without ever going before

16  the Judge.

17  A    That day, yes.

18  Q    Okay.  Now, you told us also that your recollection today

19  is that when you were in Herbert Frank's apartment on the

20  second occasion, the time with the chocolate pudding, that you

21  observed two people come in to the apartment; is that right?

22  A    The night of the dinner.

23  Q    Yes.

24  A    Yes.

25  Q    You saw them coming into the apartment?

1   A    Yes.

2   Q    Okay.  Now, that was the second time you had been to

3   Herbie's apartment; right?  The night of the dinner?

4   A    No, that was the first time.

5   Q    Let me show you, do you remember as you told us on direct

6   examination that you spoke to the prosecutor and agents a

7   number of times prior to coming to court today?

8   A    Yes.

9   Q    Okay.

10           MR. CARNESI:  Let me show you, this is MG 25.  And

11  this has been provided to me as a report of those

12  conversations with you.

13           THE WITNESS:  Okay.

14           MR. CARNESI:  Let me show you page one of that

15  report.

16           If you can just read it to yourself, to that mark

17  there, and tell me if that refreshes your recollection.

18           THE WITNESS:  What you marked here on the first.

19  Q    Yes, if that refreshes your recollection, first of all,

20  that what you're referring to, you told the agents was your

21  second visit to the apartment.

22  A    Yes, I met him at the park, but I was not in his house.

23  Q    Okay.  But that's how you referred to it in the report;

24  right, as the second visit?

25  A    Oh, the second visit was, yeah.  At the apartment, I only

1    been there once for the dinnertime.  First time that I met

2    Herbie was at the park.  His son was playing baseball.  I

3    didn't go to his house.

4

5              (Continued on following page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS EXAMINATION CONTINUED

BY MR. CARNESI:

Q     You never got to his apartment?

A     No, not that day.

Q     Okay. But in the report it is referring to the second visit.  We are talking about the same instance, that is the night of what you describing is the night of the dinner, right?

A     I guess I don't remember. Yeah, the second.  Yeah, the second day was the dinner night.  I was not there before.  It was only the first time.

Q     Okay.

A     Yes.

Q     Now, I'm asking you if you look at what's in the report at the second time, does that refresh your recollection as to what you told the agent?

A     On the second time (perusing), yes.

Q     Okay. And is it fair to say that what you told them is that you didn't see the people entering, you saw people coming out of the bedroom, right?

A     Yes, but maybe I forgot to tell them they got in, but I was there when they came in.

Q     Okay.

A     Umm-Humm.

Q     So you think you forgot to tell them that?

1    A    I guess.

2    Q    Does it say in here or in the report anything about one

3    of the individuals speaking to you?

4    A    Only one person said good night when he left.

5    Q    Does it say that in the report anywhere that one of the

6    people turned to you and spoke to you?

7    A    No.

8    Q    What it says here in the report, from what you remember

9    at the time, was that they exited the bedroom and walked right

10   outside the apartment, right?

11   A    To the door, yes.

12   Q    Now, the apartment, Frank's apartment, was a relatively

13   small apartment; is that right?

14   A    Yes.   Umm-Humm.

15   Q    And from the bedroom door, let's say you're at the

16   bedroom door now, how far away would this individual would

17   have had to walk?

18   A    Right at the beginning of this.  Right here.

19   Q    Okay. So he would have walked from you at the bedroom

20   door to about the beginning of the jury box?

21   A    Yes.

22   Q    As the front door, he exited the apartment?

23   A    Yes, exit was to the left.

24   Q    But it was about that far away?

25   A    Yes.

1  Q    And how long do you think it took the individual to walk

2  from the bedroom door those ten, 15 feet, whatever it may be?

3  A    How long it would take to walk?

4  Q    Yes, how long did it take him to walk?

5  A    A second.

6  Q    Okay. And then that's when you claim you saw this

7  individual?

8  A    Yes, I saw him right there.

9  Q    That was the on only time?

10 A    That I saw him?

11 Q    Yes.

12 A    Yes.

13 Q    Is it your testimony that you recognized that person,

14 first time you were asked about that person was some 31 years

15 later?

16 A    Well, if I saw the picture and I would say I remember it

17 because I remember; otherwise, I don't remember anybody else.

18 Q    Well, you don't remember people I showed you, right?

19 A    I was not close to them, no.

20 Q    But that's what I am asking you. You remember that

21 individual you saw walk from the bedroom to the front door?

22 A    Yes, he was right in front of my face.

23 Q    You remember him 30 years, 31 years later?

24 A    Yes, I do. Yes, I do.

25 Q    Okay. Now, you told us that Mr. Gleckler was -- you knew

1  that he was selling drugs, right?

2  A    Yes.

3  Q    Did you assist him in selling the drugs?

4  A    Assist him, no.

5  Q    Did you ever count marijuana or money for him?

6  A    No.

7  Q    You know how he transported the drugs?

8  A    No.

9  Q    Did you ever know him to cut out sections of books and

10 hide money and drugs in the books?

11 A    I saw him one time cutting a big book, yes, and he opened

12 the -- and I said why are you are destroying the book.  He

13 said that's how he travels with the money or drugs. I don't

14 know.

15 Q    You took quite a few trips with him?

16 A    Yes.

17 Q    As he was involved in trying to obtain drugs, right?

18 A    Yes.

19 Q    Is it your testimony that the only time you carried a

20 package of drugs for him was that one occasion when you were

21 arrested in the apartment?

22 A    That was the only time, yes.

23 Q    Did he freely involve you in discussions he had with

24 other people about drugs?

25 A    No, he just talk about it right in front of me.

1   Q      That is what I meant to say.

2   A      Yes.

3   Q      When you met Uncle Moe he sat down with you and with

4   George and you openly -- he openly discussed --

5   A      Uncle Moe never sat with me.  I was in the car and George

6   went to talk to him on his trailer in Florida, and when he

7   came back to the car he told me Uncle Moe is going to be

8   bringing some drugs to New York.

9   Q      Was there anybody that you sat with directly with George

10  where you talked about -- where it was spoken about drugs?

11  A      Only Bruce.

12  Q      Did you overhear any of the conversations that took place

13  in Frank's apartment when individuals were in the bedroom --

14  when the two individuals were in bedroom?

15  A      No.

16  Q      Did you ever hear the name Ron?

17  A      Yes, I did.

18  Q      Where did you hear that name?

19  A      Bruce and George, they were talking about Ron but I don't

20  know who he is.

21  Q      How about the night that you were arrested, did you ever

22  hear of anybody, agents, anybody else refer to an individual

23  by the name of Ron?

24  A      No.

25  Q      How about during all the period of time that you went to

1   court, did you ever hear anybody refer to Ron?

2   A    No.

3   Q    Do you remember anybody at the trial testifying about

4   Ron?

5   A    I didn't pay attention too much.  I was very, very

6   nervous, and that time 30 years ago I didn't speak English

7   that well.

8   Q    Do you recall anybody speaking about Ron at the trial?

9   A    Not at the trial, no, sir.

10  Q    Do you recall anybody at the trial speaking about an

11  individual by the name of Cuccio or Anthony Cuccio?

12  A    No.

13  Q    Do you remember any testimony by any agents or any

14  individuals who testified -- any other individual who

15  testified at the trial about an individual wearing a bandage

16  on his head that night?

17  A    No.

18           MR. CARNESI:  Thank you Judge, I have no further

19  questions.

20           MS. MACE:  May I have one moment?

21           THE COURT:  Yes.

22           (Government counsel conferred)

23           MS. MACE:  Your Honor, if I may, I have a few

24  questions.

25           THE COURT:  Yes.

1    REDIRECT EXAMINATION

2    BY MS. MACE:

3    Q    Ms. Gludau, you were asked questions on cross-examination

4    about your cooperation agreement, do you remember?

5    A    Yes.

6    Q    You were asked some questions about what was referred to

7    in the agreement as an S Visa, do you remember those

8    questions?

9    A    Yes, I do.

10   Q    Your husband, is he a U.S. citizen?

11   A    Yes, he is.

12   Q    Your children, are they U.S. citizens?

13   A    Yes.

14          MS. MACE:  Your Honor, we'd like to offer into

15   evidence 3500-MG-12.  That's the cooperation agreement.

16          MR. CARNESI:  No objection.

17          THE COURT:  I will receive Exhibit 3500-MG-12.

18   Received.

19          (Government Exhibit 3500-MG-12 received and marked

20   into evidence)

21          MS. MACE:  I have no further questions.

22          MR. CARNESI: No recross.

23          THE COURT:  You may step down.

24          THE WITNESS:  Thank you.

25          MR. NORRIS: One moment.  Your Honor.

1          (Pause in the proceeding)

2          MR. NORRIS: Your Honor, the government calls Annette

3   Frank.

4      A N N E T T E   F R A N K          , having been

5   first duly sworn/affirmed, testified as follows:

6          THE WITNESS:  I affirm, yes.

7          THE COURT:  Please be seated. Tell your us your full

8   name and spell it.

9          THE WITNESS:  Annette Frank A-N-N-E-T-T-E  Frank

10  F-R-A-N-K.

11  DIRECT EXAMINATION

12  BY MR. NORRIS:

13         MR. NORRIS:  May I inquire?

14         THE COURT: Yes.

15  Q    Good afternoon, ma'am.  How old are you?

16  A    Forty-five.

17  Q    Where did you live growing up?

18  A    Woodhaven, Queens.

19  Q    How far did you go in school?

20  A    Two years of college.

21  Q    Do you still live here in New York city?

22  A    Yes.

23  Q    Where do you live?

24  A    Woodhaven, Queens.

25  Q    Are you employed?

1   A    No.

2   Q    Are your parents alive?

3   A    No.

4   Q    What were your parents names?

5   A    Herbert and Pauline Frank.

6   Q    Do you need some water?

7   A    No.

8   Q    Were your parents ever arrested?

9   A    Yes.

10  Q    Were you ever present when one or both of your parents

11  were arrested?

12  A    Yes.

13  Q    When was that?

14  A    March or April of 1982.

15  Q    What were they arrested for?

16  A    I guess it would fall into drug trafficking.

17  Q    What happened to your parents after that?

18  A    My father and mother were convicted, my father of drug

19  trafficking, served his time, and my mother -- I am not sure

20  what her -- what she was charged with but she served six

21  months.

22  Q    Are you here today voluntarily?

23  A    Yes.

24  Q    Were you given a subpoena to testify?

25  A    Yes.

1   Q    Did you agree to meet with the government?

2   A    Yes.

3   Q    Did you agree to meet with the government to prepare for

4   your testimony?

5   A    Prepare, no.

6            THE COURT:  Are you sure you don't want water?

7            THE WITNESS:  No.

8   Q    Now, you testified a moment ago that your memory is that

9   your parents were arrested in March or April of 1982; is that

10  right?

11  A    Yes.

12  Q    And were they arrested on multiple occasions or just that

13  one occasion?

14  A    Just that once.

15  Q    How old were you at the time?

16  A    Twelve and a half I believe, or 13.

17  Q    And where did you live at the time they were arrested?

18  A    In Woodhaven, Queens.

19  Q    What type of residence?

20  A    Co-op apartment.

21  Q    And who did you live in that co-op apartment with, aside

22  from your parents?

23  A    My brother.

24  Q    How old was your brother at the time?

25  A    Two years older than I am.

1   Q    About 14?

2   A    Yeah, 14 or 15.

3   Q    Now, prior to your parents' arrest, were you aware at

4   that time whether your parents were involved in illegal

5   activity?

6   A    I knew my father was.

7   Q    And what type of illegal activity did you understand that

8   he was involved with?

9   A    Drugs.

10            MR. NORRIS: I am putting up on the screen what is in

11  evidence, Your Honor, Government Exhibit 813.

12  Q    Who is that?

13  A    My father.

14  Q    And I don't believe I asked you, what was his name?

15  A    Herbert Frank.

16  Q    Putting up on the screen Government Exhibit 814, who is

17  that?

18  A    My mother, Pauline.

19  Q    You said your father was involved in the drug business,

20  at the time he was arrested did you, yourself, have any

21  involvement in the drug business with them?

22  A    I hope not.  I was 12 years old.  What do you do think I

23  was doing?

24  Q    Did your father ever ask you to do things related to his

25  drug business?

1   A     In the house, yes.

2   Q     What did he ask you to do?

3   A     To move packages into boxes, luggage.

4   Q     At that time, at that age, did you ever see guns in your

5   apartment?

6   A     Yes.

7   Q     I'm showing you what's in evidence as Government

8   Exhibit Five. Do you recognize that person?

9   A     I believe that to be Ronnie, a friend of my father's.

10  Q     And do you know Ronnie's last name?

11  A     I'm not quite sure.  It might Barlin or Barlett,

12  something to that effect.

13  Q     And when did you first meet Ronnie?

14  A     That would be the late 70s, from my father.  He was a

15  friend of his.

16  Q     Do you recall how your father and Ronnie knew each other?

17  A     I never asked. They were just friends. They just -- I

18  just -- I took it that it was a friend of his.

19  Q     Did you have an understanding of how they had met?

20  A     No, I never asked.

21  Q     Do you recall when you first met Ronnie?

22  A     Not the first time, no.

23  Q     Can you recall any occasion which you saw him?

24  A     Sure. He was around a lot.

25  Q     You say, "around" what do you mean?

1  A     Numerous times throughout year.  Maybe once or twice a

2  month with my father for a couple of years.

3  Q     Where specifically would you see him?

4  A     Usually at our apartment.

5  Q     And when Ronnie would come to your apartment, did you

6  have occasion to observe what type of things he and your

7  father did?

8  A     No.

9  Q     Did you have an understanding at that time what the

10  nature of their relationship was, aside from being friends?

11  A     No.

12  Q     You stated a moment ago that your father and mother were

13  arrested for drug charges at a point in time that you were in

14  the apartment; is that right?

15  A     Right.

16  Q     Do you know if Ronnie was ever arrested?

17  A     I know he was arrested at the same time but not at the

18  apartment.

19  Q     And do you know where he was arrested?

20  A     No, I don't.

21  Q     Do you know what happened to Ronnie's case?

22  A     No, I don't.

23  Q     When is the last time you saw him?

24  A     Oh, probably right before he was arrested.  Spoke to him

25  in the early 90s on the phone, but did not visually see him.

1  Q    When you spoke to him in the early 90s on the phone, what
2  was the reason for your speaking to him then?
3  A    He was looking for my father.
4  Q    You recall how tall Ronnie was?
5  A    Hard to say since I might have been not even four feet at
6  that time.  I will say 5' 10'.  He was taller than my father
7  who was approximately 5'9".
8  Q    Showing you what's in evidence as Government Exhibit 23.
9  Do you know who this is?
10  A    Yes.
11  Q    Who is that?
12  A    Anthony Cuccio.
13  Q    How do you recognize him?
14  A    He was a friend of my father's.
15  Q    Do you recall when you first met Mr. Cuccio?
16  A    About the first meeting.  Again, he was just like Ronnie,
17  in and out of the house with my father. I just took it as
18  friends, the way people have friends.
19  Q    Was, he like Ronnie, in and out of your apartment for a
20  period of time before the arrest?
21  A    Oh, sure.  Yes, social visits, etcetera, you know.
22  Q    Did you ever see him anywhere aside from in your
23  apartment?
24  A    Outside in Brooklyn occasionally.
25  Q    Did you have an understanding at that time the nature of

1   your father's relationship with Mr. Cuccio?

2   A    No.

3   Q    Did you have an understanding as to whether Mr. Barlin

4   and Mr. Cuccio knew each other?

5   A    I just assumed they did through my father.

6   Q    What do you remember about Mr. Cuccio?

7   A    Nice warm man. Had a son a little bit younger than I was.

8   Q    Did you ever recall if he was ever involved in any

9   illegal activities in your presence?

10  A    No, not in my presence.

11  Q    Did you have an understanding as to whether he was

12  involved in illegal activity?

13  A    Only once I heard afterwards when every one was arrested

14  they were -- what they were alleged to have done.

15  Q    Do you know whether he was arrested?

16  A    I know he was arrested at the time.  I don't believe he

17  was tried with my father.

18  Q    Do you know the details, well, of what happened after

19  these arrests?

20  A    No.

21  Q    You see on this photograph Mr. Cuccio has a damage around

22  his head, do you see that?

23  A    Yes.

24  Q    Do you recall anything about that bandage?

25  A    I came over that morning to our apartment he.  Had a head

1    wound towards the back of his head and my mother patched it

2    up, put gauze on it and wanted to take him to the hospital,

3    and he didn't want to go.  So she just kept him there waiting

4    for my father to come home, so he could drag him off to the

5    hospital.

6    Q    Do you recall what the nature of the head wound was?

7    A    Told by the police afterwards that it was a gunshot

8    wound.

9    Q    When was the last time you saw Mr. Cuccio?

10   A    It was right before the bust; that day of the bust.

11   Q    Showing you what's in evidence as Government Exhibit 811,

12   do you recognize that?

13   A    Is that I believe Bruce, I think?

14   Q    Do you know Bruce's last name?

15   A    No.

16   Q    Who do you know this individual to be?

17   A    I don't want to use the word friend but I had met him

18   once or twice in association with my father.  He came to the

19   house.

20   Q    To the apartment on Woodhaven Boulevard?

21   A    Yes.

22   Q    And what can you recall about Bruce?

23   A    I just figured maybe he was like a strung out alcoholic

24   or something.  He didn't look like everyone else.  He looked

25   sickly.

1   Q    Did you have an understanding of the nature of his

2   relationship with your father?

3   A    No.

4   Q    When is the last time you saw Bruce?

5   A    Just that time in the apartment -- oh, no. Correction.

6   Outside Manhattan Correctional Center when I went to visit my

7   mother when she was being detained.  He was outside as a

8   trustee already.

9   Q    What's the Manhattan Correctional Center?

10  A    Yes.

11  Q    What is that?

12  A    The jail.

13  Q    Did you have an understanding as to whether he was

14  incarcerated?

15  A    I knew he was a trustee, that he would -- when he was

16  arrested that he cut some deal.  He was already outside

17  sweeping up without any handcuffs while my mother sat inside.

18  Q    What you do mean by the word "trustee"?

19  A    I believe that is what they call inmates who you don't

20  have to watch, that they're elevated above regular inmates.

21  Q    Showing you what's in evidence as Government Exhibit 815,

22  do you recognize that individual?

23  A    No.

24  Q    Showing you what's in evidence as Government Exhibit 812,

25  do you recognize that individual?

1   A    I believe that might be Millie.

2   Q    Who is Millie?

3   A    The girlfriend of Ronnie, I believe.

4   Q    How did you know her?

5   A    I believe I met her maybe once or twice.

6   Q    Where?

7   A    In the apartment in Woodhaven with Ronnie.

8   Q    Do you remember anything about this meeting?

9   A    Yeah, that she also like Bruce, didn't seem all right

10  like everyone else.

11  Q    When's the last time you saw her?

12  A    In MDC.  When I went to visit my mother she was in the

13  waiting room.

14  Q    Millie was in the waiting room at the jail?

15  A    Yes.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    **DIRECT EXAMINATION**

2    BY MR. NORRIS:  (Continued)

3    Q    Showing you what's in evidence as Government's

4    Exhibit 96.

5            (The above-referred to Exhibit was published to the

6    jury.)

7    Q    Do you recognize that individual?

8    A    I know now from the newspapers who he is.

9    Q    When did you look in the newspapers and see his

10   photograph?

11   A    Well, it was a different photograph, but as of last week,

12   there was write-up, last Thursday in The Daily News.

13   Q    Let me stop you right there.

14   A    Okay.

15   Q    Prior to seeing the photograph in the newspaper, had the

16   Government ever shown you this photograph before?

17   A    Yes, yes.

18   Q    And did you recognize it?

19   A    Yes.

20   Q    And who do you recognize him to be?

21   A    I didn't know who he was, what his name was.  He just

22   looked familiar.

23           MR. NORRIS:  No further questions, thank you.

24           THE WITNESS:  Okay.

25           THE COURT:  All right.

1       Cross-examination?

2              MR. CARNESI:  Thank you.

3    CROSS-EXAMINATION

4    BY MR. CARNESI:

5              MR. CARNESI:  Cross.

6    Q    Good afternoon, Ms. Frank, my name is Charles Carnesi.

7              With regard to the last individual?

8              (The above-referred to Exhibit was published to the

9    jury.)

10   Q    The FBI had shown you a picture of that individual;

11   right?

12   A    Correct.

13   Q    Did they show the picture to you the first time you spoke

14   to them?

15   A    No.

16   Q    Between the first time you spoke to them and the second

17   time when they did show you the picture, did you do anything

18   to determine who the individual you were discussing was?

19   A    No.

20   Q    Did you go on the Internet at all?

21   A    Not until after I was served with a summons and the name

22   was there.

23   Q    The name was on the summons?

24   A    On the summons, yes.  Mr. Vernace.  Before that, I didn't

25   know his name or that was him.

1  Q    Okay.  And did you do that after or before you saw the

2  picture?

3  A    After.  After the day after I was served a summons.

4  Q    Okay.  Now, you said that that person looked familiar

5  from somewhere?

6  A    Correct.

7  Q    Do you know where?

8  A    No.

9  Q    Do you know whether or not you had previously seen a

10  picture of him?

11  A    I could have seen it in The News.

12  Q    Do you recall that individual being in your apartment or

13  somebody who was a friend of your father's?

14  A    No.

15          MR. CARNESI:  Thank you.  I have no further

16  questions.

17          MR. NORRIS:  Nothing further.

18          THE COURT:  You may be excused.

19          THE WITNESS:  Okay.

20          (Witness excused.)

21          THE COURT:  Members of the Jury, we're going to stop

22  for our evening recess.

23          Please, remember my admonitions.  Do not discuss the

24  case, keep an open mind.

25          We will begin again tomorrow at 9:30.

1          THE COURTROOM DEPUTY:  All rise.

2          (Jury exits at 5:09 p.m.)

3

4          (In open court.)

5          (The following occurs outside the presence of the

6   jury.)

7          THE COURT:  Okay, if there is nothing else, we are

8   adjourned until tomorrow morning.

9          MR. NORRIS:  Thank you, Your Honor.

10          (Defendant remanded.)

11

12          (WHEREUPON, the proceedings were adjourned to

13   March 19th, 2013, at 9:30 a.m.)

14

15                              * * *

16

17

18

19

20

21

22

23

24

25

1

<u>I N D E X</u>

2

3  <u>WITNESS</u>                                        <u>PAGE</u>

4

5    **N I C K   L U C A D A M O**

6        DIRECT EXAMINATION

7        BY MR. TOOSSI                              856

8        VOIR DIRE

9        BY MR. CARNESI                            864

10        DIRECT EXAMINATION

11        BY MR. TOOSSI                             876

12        CROSS-EXAMINATION

13        BY MR. CARNESI                            879

14

15    **D A V I D   C O T T O N**

16        DIRECT EXAMINATION B

17        Y MR. TOOSSI                              885

18

19    **L O U I S   D I A Z**

20        DIRECT EXAMINATION

21        BY MR. TOOSSI                             898

22        CROSS-EXAMINATION

23        BY MR. CARNESI                            923

24        CROSS-EXAMINATION

25        BY MR. CARNESI                            923

1

2   **L O U I S   D I A Z**

3      CROSS-EXAMINATION

4      BY MR. CARNESI                    952

5      REDIRECT EXAMINATION

6      BY MR. TOOSSI                     976

7      RECROSS EXAMINATION

8      BY MR. CARNESI:                   986

9

10  **M I L A G R O S   G L U D A U**            992

11     DIRECT EXAMINATION

12     BY MS. MACE:                      992

13     CROSS-EXAMINATION

14     BY MR. CARNESI                   1024

15     REDIRECT EXAMINATION

16     BY MS. MACE:                     1047

17

18  **A N N E T T E   F R A N K**              1048

19     DIRECT EXAMINATION

20     BY MR. NORRIS:                   1048

21     CROSS-EXAMINATION

22     BY MR. CARNESI                   1060

23

24

25

**E X H I B I T S**

Plaintiff's Exhibit 904                          888

Government's Exhibits 841 and 842               889

Government's Exhibit 843                         891

Government's Exhibit 811                         900

Government's Exhibit 1-B                         901

Government's Exhibit 813                         901

Government's Exhibit 814                         902

Government's Exhibit 815                         903

Government's Exhibit 812                         904

Government Exhibit 741                          1001

Government Exhibit 3500-MG-12                   1047

VB     OCR     CRR